Timothy J. Preso
Earthjustice
313 East Main Street
Bozeman, MT 59715
tpreso@earthjustice.org
(406) 586-9699 | Phone
(406) 586-9695 | Fax

*Counsel for Plaintiffs*

Bradford M. Purdy (Idaho Bar # 3472)
2019 N. 17th Street
Boise, ID 83702
bmpurdy@hotmail.com
(208) 384-1299 | Phone
(208) 384-8511 | Fax

*Local Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| GERALD JAYNE, <u>et al.</u>, | ) |
| Plaintiffs, | ) |
| v. | ) Case No. 09-cv-015 (BLW) |
| HARRIS SHERMAN, <u>et al.</u>, | ) |
| Defendants, | ) **PLAINTIFFS' CONSOLIDATED BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF SUMMARY JUDGMENT** |
| and | ) |
| IDAHO ASSOCIATION OF COUNTIES, <u>et al.</u>, | ) |
| Defendant-Intervenors. | ) |

# TABLE OF CONTENTS

I.  PLAINTIFFS SATISFY ARTICLE III STANDING REQUIREMENTS .........................4

II.  FWS'S "NO-JEOPARDY" DETERMINATIONS FOR THE CARIBOU AND
     GRIZZLY WERE ARBITRARY AND UNLAWFUL UNDER THE ESA....................11

     A.  FWS's "No-Jeopardy" Determinations Relied Upon Nonbinding
         Assurances Omitted From The Idaho Roadless Rule .............................11

     B.  In Relying On Nonbinding Assurances To Protect Northern Idaho's
         Imperiled Grizzly And Caribou Populations, FWS Violated The ESA................13

         1.  The ESA's Demand For Binding Conservation Measures Applies
             To Actions Within Agency Control...........................................14

         2.  The ESA's Demand For Binding Conservation Measures Applies
             To "Programmatic" Agency Actions .........................................16

     C.  FWS Failed To Consider The Impacts Of The "Entire Agency Action" ..............17

     D.  FWS Arbitrarily Analyzed The Idaho Rule's Impact On Grizzly Bears In
         The Pack River Area And Kootenai National Forest...............................20

         1.  FWS Disregarded The Inapplicability Of The IPNF Supervisor's
             Assurances To Grizzly Habitat In The Pack River Area ..........................20

         2.  FWS Disregarded The Inapplicability Of The IPNF Supervisor's
             Assurances To Grizzly Habitat In The Kootenai National Forest ............21

III.  IN RELYING ON FWS'S ARBITRARY AND UNLAWFUL "NO-JEOPARDY"
      DETERMINATIONS, THE FOREST SERVICE VIOLATED THE ESA ....................22

IV.  THE FOREST SERVICE FAILED TO TAKE A "HARD LOOK" AT THE
     IDAHO ROADLESS RULE'S LOGGING AND ROAD-BUILDING IMPACTS..........23

     A.  Backcountry/Restoration......................................................23

     B.  General Forest ...............................................................26

V.  THE FOREST SERVICE'S ALLOCATION OF UNLEASED ACRES FOR
    PHOSPHATE MINING ALSO VIOLATED NEPA .......................................28

VI.  THE FOREST SERVICE ARBITRARILY RELIED ON THE WYOMING
     WILDERNESS ACT TO CLASSIFY THE WINEGAR HOLE ROADLESS
     AREA.............................................................................31

VII.    DEFENDANTS FAIL TO JUSTIFY DENIAL OF PLAINTIFFS' REQUESTED
        REMEDY.........................................................................................................................33

VIII.   CONCLUSION..............................................................................................................40

## TABLE OF AUTHORITIES

### FEDERAL CASES

Alsea Valley Alliance v. Dep't of Commerce,
    358 F.3d 1181 (9th Cir. 2004) ........................................................................33

Amoco Prod. Co. v. Village of Gambell,
    480 U.S. 531 (1987)........................................................................................35

Ashley Creek Properties, LLC v. Timchak,
    649 F. Supp. 2d 1171 (D. Idaho 2009), appeal docketed,
    No. 09-35724 (9th Cir. Aug. 5, 2009) ..............................................................6

Babbitt v. United Farm Workers Nat'l Union,
    442 U.S. 289 (1979)........................................................................................9

Bennett v. Spear,
    520 U.S. 154 (1997)................................................................................ 15-16

Cal. ex rel Lockyer v. U.S. Dep't of Agric.,
    459 F. Supp. 2d 874 (N.D. Cal. 2006), aff'd, 575 F.3d 999 (9th Cir. 2009) ............... passim

Cal. ex rel. Lockyer v. U.S. Dep't of Agric.,
    575 F.3d 999 (9th Cir. 2009) ...................................................... passim

Cal. ex rel. Lockyer v. U.S. Dep't of Agric.,
    Nos. C05-03508 EDL, C05-04038 EDL,
    2008 WL 5102864 (N.D. Cal. Dec. 2, 2008)........................................................39

California v. Block,
    690 F.2d 753 (9th Cir. 1982) .........................................................28, 29, 30

Citizens for Better Forestry v. U.S. Dep't of Agric.,
    341 F.3d 961 (9th Cir. 2003) ................................................................ 10-11

Citizens for Better Forestry v. U.S. Dep't of Agric.,
    481 F. Supp. 2d 1059 (N.D. Cal. 2007) ...........................................................37

Citizens for Better Forestry v. U.S. Dep't of Agric.,
    632 F. Supp. 2d 968 (N.D. Cal. 2009).............................................................6

Conner v. Burford,
    848 F.2d 1441 (9th Cir. 1988) ........................................................17, 18, 19, 20

Ctr. for Biological Diversity v. Kempthorne,
     588 F.3d 701 (9th Cir. 2009) ..............................................................5, 9

Ctr. for Biological Diversity v. Rumsfeld,
     198 F. Supp. 2d 1139 (D. Ariz. 2002) ....................................16, 20, 22

Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,
     623 F. Supp. 2d 1044 (N.D. Cal. 2009) ............................................ 6-7

Ctr. for Food Safety v. Vilsack,
     No. C 08-00484 JSW, 2010 WL 3222482 (N.D. Cal. Aug. 13, 2010) ................................34

Defenders of Wildlife v. Salazar,
     No. CV 9-77-M-DWM, 2010 WL 3084194 (D. Mont. Aug. 5, 2010) ..........................33, 37

Didrickson v. U.S. Dep't of Interior,
     982 F.2d 1332 (9th Cir. 1992) ..........................................................10

Ecological Rights Found. v. Pac. Lumber Co.,
     230 F.3d 1141 (9th Cir. 2000) ..........................................................10

Friends of Endangered Species, Inc. v. Jantzen,
     760 F.2d 976 (9th Cir. 1985) ............................................................21

Friends of Yosemite Valley v. Norton,
     348 F.3d 789 (9th Cir. 2003) ............................................................30

Gifford Pinchot Task Force v. FWS,
     378 F.3d 1059 (9th Cir. 2004) ..........................................................20

High Sierra Hikers Ass'n v. Blackwell,
     390 F.3d 630 (9th Cir. 2004) ............................................................34

Hogback Basin Pres. Ass'n v. U.S. Forest Serv.,
     577 F. Supp. 2d 1139 (W.D. Wash. 2008)..........................................39

Idaho Farm Bureau Fed'n v. Babbitt,
     58 F.3d 1392 (9th Cir. 1995) ............................................................34

Idaho Sporting Congress, Inc. v. Alexander,
     222 F.3d 562 (9th Cir. 2000) ............................................................34

Idaho Watersheds Project v. Hahn,
     307 F.3d 815 (9th Cir. 2002) ............................................................34

Japan Whaling Ass'n v. Am. Cetacean Soc'y,
    478 U.S. 221 (1986) .......................................................................................9

Kazarian v. U.S. Citizenship & Immig. Servs.,
    596 F.3d 1115 (9th Cir. 2010) ......................................................................27

Kootenai Tribe v. Veneman,
    313 F.3d 1094 (9th Cir. 2002) ............................................................ *passim*

Lands Council v. Cottrell,
    No. CV 09-164-N-EJL-REB, 2010 WL 3168375 (D. Idaho Aug. 9, 2010) ..........................2

Lands Council v. Powell,
    395 F.3d 1019 (9th Cir. 2005) ......................................................................27

Los Angeles v. Lyons,
    461 U.S. 95 (1983) .......................................................................................7

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992) ...................................................................................7, 9

Miller v. Gammie,
    335 F.3d 889 (9th Cir. 2003) .........................................................................7

Monsanto Co. v. Geertson Seed Farms,
    130 S. Ct. 2743 (2010) ...........................................................................34, 36

Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,
    463 U.S. 29 (1983) ......................................................................................21

N. Alaska Envtl. Ctr. v. Kempthorne,
    457 F.3d 969 (9th Cir. 2006) ...........................................................18-19, 30-31

N. Alaska Envtl. Ctr. v. Lujan,
    961 F.2d 886 (9th Cir. 1992) ........................................................................30

North Carolina v. EPA,
    550 F.3d 1176 (D.C. Cir. 2008) ....................................................................34

N. Cheyenne Tribe v. Norton,
    503 F.3d 836 (9th Cir. 2007) ........................................................................34

Nat'l Wildlife Fed'n v. NMFS,
    422 F.3d 782 (9th Cir. 2005) ........................................................................37

Nat'l Wildlife Fed'n v. NMFS,
    524 F.3d 917 (9th Cir. 2008) ..............................................................13, 14, 15

Native Ecosystems Council v. Dombeck,
    304 F.3d 886 (9th Cir. 2002) ...........................................................................36

Native Ecosystems Council v. U.S. Forest Serv.,
    418 F.3d 953 (9th Cir. 2005) ................................................................ 26, 27-28

Natural Res. Def. Council v. Kempthorne,
    506 F. Supp. 2d 322 (E.D. Cal. 2007) ...........................................................14

Natural Res. Def. Council v. U.S. Dep't of Interior,
    275 F. Supp. 2d 1136 (C.D. Cal. 2002) ..........................................................34

Neighbors of Cuddy Mountain v. U.S. Forest Serv.,
    137 F.3d 1372 (9th Cir. 1998) .........................................................................31

Nw. Envt'l Advocates v. U.S. EPA,
    268 F. Supp. 2d 1255 (D. Or. 2003) ...................................................15, 16, 17

Ohio Forestry Ass'n v. Sierra Club,
    523 U.S. 726 (1998)..................................................................................4, 11

Oregon Natural Desert Association v. Tidwell,
    Civ. No. 07-1871-HA, 2010 WL 2246419 (D. Or. June 4, 2010).......................15

Pac. Coast Fed'n of Fishermen's Ass'ns v. NMFS,
    482 F. Supp. 2d 1248 (W.D. Wash. 2007)..........................................................19

Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation,
    426 F.3d 1082 (9th Cir. 2005) .........................................................................22

Pacific Rivers Council v. Thomas,
    30 F.3d 1050 (9th Cir. 1994) .....................................................................17, 37

Paulsen v. Daniels,
    413 F.3d 999 (9th Cir. 2005) ......................................................................33, 39

Resources Ltd., Inc. v. Robertson,
    35 F.3d 1300 (9th Cir. 1994) ......................................................................17, 22

Salmon River Concerned Citizens v. Robertson,
    32 F.3d 1346 (9th Cir. 1994) .........................................................................30

Seattle Audubon Soc'y v. Espy,
  998 F.2d 699 (9th Cir. 1993) ......................................................................6

Selkirk Conservation Alliance v.  Forsgren,
  336 F.3d 944 (9th Cir. 2003) ............................................................ 13-14

Sierra Club v. U.S. Dep't of Energy,
  287 F.3d 1256 (10th Cir. 2002) ...............................................................11

Summers v. Earth Island Inst.,
  129 S. Ct. 1142 (2009)..................................................................... 5, 6, 7

Tenn. Valley Auth. v. Hill,
  437 U.S. 153 (1978).................................................................................15

W. Oil and Gas Ass'n v. EPA,
  633 F.2d 803 (9th Cir. 1980) ...................................................................34

W. Radio Serv. Co., Inc. v. Espy,
  79 F.3d 896 (9th Cir. 1996) .....................................................................14

Wash. Toxics Coal. v. EPA,
  413 F.3d 1024 (9th Cir. 2005) .................................................................38

White Tanks Concerned Citizens, Inc. v. Strock,
  563 F.3d 1033 (9th Cir. 2009) .................................................................10

Winter v. Natural Res. Def. Council,
  129 S. Ct. 365 (2008)...............................................................................36

## STATUTES AND LEGISLATIVE MATERIALS

16 U.S.C. § 528.................................................................................................28
       § 1536(a)(2).......................................................................... 15, 16, 23

Wyoming Wilderness Act of 1984,
  Pub. L. No. 98-550, § 401, 98 Stat. 2807..............................................32

130 Cong. Rec. 28,680 (1984) ......................................................................33

## REGULATIONS AND ADMINISTRATIVE MATERIALS

73 Fed. Reg. 61,456 (Oct. 16, 2008).................................................................... *passim*

36 C.F.R. § 219.12(e) (1981) ...................................................................................28
36 C.F.R §§ 294.10-14.......................................................................8, 25, 27
    §§ 294.23................................................................................................. *passim*
    § 294.24.............................................................................. 1, 23-24, 26
    § 294.25(e)(1) ...................................................................................9, 29
    § 294.28.............................................................................................24, 29

The U.S. Forest Service and U.S. Fish and Wildlife Service ("FWS") approved promulgation of the Idaho Roadless Rule only by repeatedly assuming that the rule's new authorizations for logging and other development projects across millions of roadless acres either did not exist or would never be implemented.  The agencies turned a blind eye to the Idaho Rule's new development authorizations even though an alleged "compelling interest" in enacting them was the key reason the Forest Service cited for repealing and replacing the 2001 Roadless Area Conservation Rule.  See 73 Fed. Reg. 61,456, 61,458, 61,473 (Oct. 16, 2008).  In so doing, the defendant agencies violated the Endangered Species Act ("ESA"), the National Environmental Policy Act ("NEPA"), and the Wyoming Wilderness Act.

In attempting to defend the Idaho Rule, defendants, intervenors, and amici direct much of their argument to matters that are irrelevant to the legal issues before this Court.

First, concerning the 5.3 million acres of National Forest roadless-area lands in Idaho assigned to the Idaho Rule's Backcountry/Restoration theme, defendants and their supporters frequently disregard the actual provisions of the Idaho Rule, which authorize logging and road building prohibited under the 2001 Roadless Rule.  See 36 C.F.R. §§ 294.23(b)(2)-(3), 294.24(c)(1)(i)-(ii).  Instead, they repeatedly assert "the intent" of the Backcountry prescription to "mirror the provisions of the 2001 Roadless Rule."  Fed. Resp. at 8; Trout Unlimited Amici Mem. at 12; see also Otter Resp. at 11.

As set forth at Point IV.A, infra, this position inaccurately portrays the intent underlying the Backcountry theme.  More fundamentally, it overlooks the fact that implementation of the Idaho Roadless Rule will be governed by the provisions of the rule, not the intentions of its drafters.  The architects of the rule will move on in their careers; some already have.  Future agency officials—and judges—will be left with the language of the rule, which allows temporary

1

road construction in a 442,000-acre Backcountry "community protection zone" ("CPZ"), and offers little additional protection with its vague suggestion that newly authorized road-building projects outside this zone are "expected to be infrequent."  36 C.F.R. § 294.23(b)(2), (3).  Plaintiffs accordingly focus their arguments on the rule itself.

*Second*, defendants and their supporters rely heavily on the "collaborative development" of the Idaho Roadless Rule.  Fed. Resp. at 1; see Otter Resp. at 1-2; Kootenai Resp. at 17; Idaho Ass'n of Counties/Idaho Mining Ass'n ("IAC/IMA") Resp. at 5-7.  They accuse plaintiffs of "purposefully ignor[ing] this collaborative foundation," Otter Resp. at 1, and even claim that plaintiffs "attempt to hide the reality from this Court," Vaughan Decl. ¶ 24 (Doc. 91-3).  Yet no amount of collaboration can exempt a federal agency decision from governing environmental laws or justify a lesser standard of review.  See, e.g., Lands Council v. Cottrell, No. CV 09-164-N-EJL-REB, 2010 WL 3168375, at *2 (D. Idaho Aug. 9, 2010) (invalidating Forest Service approval of logging project developed through "several years of … collaboration").[1]

Moreover, as amici Trout Unlimited, et al., acknowledge, "an inclusive process is no guarantee of good public policy."  Trout Unlimited Amici Mem. at 12.  Here, the chief conservation benefit of the Idaho Roadless Rule cited by its supporters is its allocation of approximately 3.2 million acres to Wild Land Recreation and Primitive management that is more protective than the 2001 Roadless Rule.  See id. at 5; Otter Resp. at 5-6; IAC/IMA Resp. at 8. However, nearly half of this acreage already received heightened protection as recommended

---

[1] Although Gov. Otter submits materials claiming that plaintiffs "refused to engage in the process" of developing the Idaho Roadless Rule, Vaughan Decl. ¶ 23, the governor admits that The Wilderness Society "provided the useful 'Community Fire Planning Zones' concept" used in the final rule, Otter Resp. at 9-10.  While plaintiffs declined to petition for a rule they did not support, they actively participated in the Idaho Roadless Rule promulgation process.  See Second Gehrke Decl. (attached); Hoyt Decl. ¶¶ 9-13 (Doc. 67-4); see also, e.g., AR FS 520; AR FS 787 at IDD1456, IDD1649, IDD1799, IDD1824.

wilderness under forest plans.  See 73 Fed. Reg. at 61,464; AR FS 842-99 (Final Environmental

Impact Statement) ("FEIS"), at 70.  Further, as to all of the Wild Land Recreation and Primitive

acreage, the Forest Service itself projected that "no adverse effects to roadless characteristics are

expected from timber activities or associated road building" under the 2001 Roadless Rule.

FEIS at C4-9 (emphasis added).[2]  By contrast, the Idaho Rule reduces regulatory protections for

5.3 million Backcountry acres and strips virtually all protections from 405,900 General Forest

acres—many of which face a real threat from harmful development activities absent the 2001

Roadless Rule.  See Second Hoyt Decl. ¶¶ 3-11 (attached); Hoyt Decl. ¶¶ 19-20, 22-25 & Exs.

10, 11, 13, 14; see also 73 Fed. Reg. at 61,460 (acknowledging 2001 Roadless Rule is

"environmentally preferred alternative").  In sum, the Idaho Roadless Rule reflects a bargain that

sacrificed 2001 Roadless Rule protections for a majority of irreplaceable roadless areas, many of

which are coveted for development, in exchange for improved regulatory protections for a

minority of roadless lands that faced no threat of development under the 2001 Rule.

Ultimately, however, this case does not require this Court to determine whether the Idaho

Roadless Rule established good public policy, but rather whether the defendants violated NEPA,

the ESA, and the Wyoming Wilderness Act.  The agencies violated these statutes, and at every

turn their legal violations operated to inaccurately minimize the environmental consequences of

repealing the 2001 Roadless Rule in favor of the less protective Idaho Rule.  For these reasons,

the Idaho Roadless Rule should be set aside and the 2001 Roadless Rule should be reinstated.

---

[2] Plaintiffs attach as Exhibit 1 a table summarizing the Forest Service's projections of impacts
under the 2001 Roadless Rule for roadless-area acres assigned to the Idaho Roadless Rule's Wild
Land Recreation and Primitive themes.

# I.      PLAINTIFFS SATISFY ARTICLE III STANDING REQUIREMENTS

Defendants argue that plaintiffs "cannot demonstrate Article III standing," Fed. Resp. at 6, despite the fact that plaintiffs' standing evidence here is identical to that deemed sufficient by the Ninth Circuit in a prior controversy over the 2001 Roadless Rule.

In Kootenai Tribe v. Veneman, 313 F.3d 1094, 1104 (9th Cir. 2002), the Ninth Circuit addressed an appeal from a preliminary injunction issued by this District that prohibited implementation of the 2001 Roadless Rule and left management of roadless areas to less protective forest plans.  Because the Forest Service declined to appeal the injunction, the Ninth Circuit assessed whether the appellant defendant-intervenor conservation groups (many of whom are plaintiffs here) demonstrated Article III standing.  See id. at 1109.  As in this case, the management scheme that replaced the 2001 Roadless Rule in Kootenai Tribe did "not mandate or direct the Forest Service to propose or implement any action."  73 Fed. Reg. at 61,463 (quoted in Fed. Resp. at 2); see Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 733 (1998) (observing that forest plan "does not give anyone a legal right to cut trees").  Nevertheless, the Ninth Circuit held that the appellants had standing, stating:

> [The appellants'] staff and members hunt, hike, fish and camp in roadless areas. These areas were to be protected by the Roadless Rule but will have less protection from development if the district court's injunction is sustained.  This is sufficient to establish an injury in fact.

Kootenai Tribe, 313 F.3d at 1109 (emphasis added); accord Cal. ex rel Lockyer v. U.S. Dep't of Agric., 459 F. Supp. 2d 874, 885 (N.D. Cal. 2006) (plaintiffs had standing to challenge repeal of 2001 Roadless Rule where they demonstrated "geographical proximity to areas that will be affected by changed roadless area policies"), aff'd, 575 F.3d 999 (9th Cir. 2009).

Here, as in Kootenai Tribe, plaintiffs have documented their concrete interest in specific roadless areas that have lost regulatory protection as a result of the challenged action.  Plaintiffs'

affidavits establish their members' use and enjoyment of numerous National Forest roadless areas in Idaho that were protected under the 2001 Roadless Rule but receive less protection—or no protection at all—under the Idaho Roadless Rule.  See Gehrke Decl. ¶¶ 3-6 (Doc. 67-3);[3] Hoyt Decl. ¶¶ 15-27; Jayne Decl. ¶¶ 3-10 (Doc. 67-19); Scott Larson Decl. ¶¶ 3-6 (Doc. 67-20); Pavia Decl. ¶¶ 3-8 (Doc. 67-21); Toner Decl. ¶¶ 4-8 (Doc. 67-23).  The resulting injury to plaintiffs—"an increased risk of road development affecting conservation and environmental interests"—satisfies Article III.  Kootenai Tribe, 313 F.3d at 1109-10.[4]

Notwithstanding the controlling decision in Kootenai Tribe, defendants attack plaintiffs' standing based on the U.S. Supreme Court's decision in Summers v. Earth Island Institute, 129 S. Ct. 1142 (2009).  See Fed. Resp. at 2-3.  However, Summers is inapposite.  Summers held that plaintiffs lacked standing to raise an ultra vires challenge to a regulation exempting small logging projects from the Forest Service's internal appeal procedures.  129 S. Ct. at 1150.  The plaintiffs' sole timely standing affidavit in Summers failed to establish any specific geographic nexus between the affiant's environmental interest and the challenged regulation, instead stating merely non-specific "plans to visit several unnamed National Forests in the future."  Id. at 1150; see Ctr. for Biological Diversity v. Kempthorne, 588 F.3d 701, 707 (9th Cir. 2009) (distinguishing Summers because plaintiffs' affidavit in that case "cited an injury that was

---

[3] Although plaintiffs' Craig Gehrke declaration documents Mr. Gehrke's use of 10 roadless areas over three decades and threats to these areas under the Idaho Roadless Rule, Gehrke Decl. ¶¶ 3-6, Gov. Otter claims "the provisions of the rule simply do not support Gehrke's allegations" because one such roadless area does not harbor a CPZ or municipal water supply system.  Otter Resp. at 21.  However, the roadless areas discussed by Mr. Gehrke encompass 5,300 General Forest acres and 28,300 CPZ acres where road construction or logging may proceed under the Idaho Roadless Rule, and seven of these 10 roadless areas also face a threat from non-CPZ logging.  See FEIS at C3-330, C3-333, C3-336, C4-13, C4-39, C5-349, C5-358.

[4] Plaintiffs equally satisfy Article III causation and redressability requirements because their injury is caused by the Idaho Roadless Rule and would be redressed by a ruling invalidating that rule "and allowing the [2001] Roadless Rule to have force."  Kootenai Tribe, 313 F.3d at 1110.

unattached to any particular site in the National Forests").  By contrast, plaintiffs here have

documented their interests in numerous specific roadless areas that have been opened to

development by the Idaho Roadless Rule, and therefore have established that "application of the

regulations by the Government will affect them in the manner" required by Article III.

Summers, 129 S. Ct. at 1149; see Citizens for Better Forestry v. U.S. Dep't of Agric., 632 F.

Supp. 2d 968, 979 (N.D. Cal. 2009) (distinguishing Summers in challenge to programmatic

forest planning regulation because the "declarations here are not lacking in specificity, as was the

declaration in Summers").[5]

In addition, "Summers involved a substantive challenge to regulations that exempted

certain projects from procedural requirements that would ordinarily apply."  Citizens for Better

Forestry, 632 F. Supp. 2d at 978.  Accordingly, "[t]he plaintiffs in Summers could not possibly

suffer the procedural injury that was the basis of their standing until the regulations were actually

applied to specific projects."  Id. at 978-79.  Here, however, plaintiffs have already suffered the

defendant agencies' unlawful failure to comply with required NEPA and ESA procedures in

promulgating the Idaho Roadless Rule.  For this reason, plaintiffs' procedural injury "will not

become more concrete when the Rule is applied to … a site-specific plan."  Id. at 979; see also

Seattle Audubon Soc'y v. Espy, 998 F.2d 699, 703 (9th Cir. 1993) (holding that plaintiffs had

standing to challenge forest management plan under NEPA regardless of site-specific

implementation by Forest Service); Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,

---

[5] This Court in Ashley Creek Properties, LLC v. Timchak, 649 F. Supp. 2d 1171, 1178 (D. Idaho 2009), appeal docketed, No. 09-35724 (9th Cir. Aug. 5, 2009), read Summers to overrule language in a footnote in Kootenai Tribe such that a plaintiff's "vague, 'some day' intentions to use an area that will suffer environmental harm" were insufficient to establish recreational or aesthetic injury.  Here, plaintiffs' affidavits establish concrete plans to use affected roadless areas, and, as discussed above, Summers did not overrule the Kootenai Tribe holding upon which plaintiffs rely.

623 F. Supp. 2d 1044, 1050 n.2 (N.D. Cal. 2009) (distinguishing <u>Summers</u> in ESA challenge to biological opinions where "plaintiffs challenge the government's procedures as they have been concretely applied to the four southern California forests and the forest plans governing them").

Nor did <u>Summers</u> reject standing based on a "'heightened risk'" of harm to plaintiffs' interest in a specific site.  Fed. Resp. at 3 (purportedly quoting <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992)).[6]  The <u>Summers</u> majority noted the dissent's advocacy for recognizing standing based on "a realistic threat that reoccurrence of the challenged activity would cause the plaintiff harm in the reasonably near future," and responded that, even if that standard were applied, the plaintiffs' affidavits in <u>Summers</u> did not "meet that requirement" because "[t]hey fail to establish that the affiants' members will <u>ever</u> visit one of the small parcels at issue."  129 S. Ct. at 1152-53 (quotations, alteration, and emphasis omitted).  <u>Summers</u> therefore did not hold that a "heightened risk" of harm to a specific site was insufficient for standing, but rather that the evidence in that case failed to establish even a "realistic threat" of such harm.  <u>See id.</u> at 1150 (<u>Summers</u> plaintiffs' evidence of harm was "weaker" than that deemed insufficient to establish "realistic threat" of injury in <u>Los Angeles v. Lyons</u>, 461 U.S. 95 (1983)).  Indeed, <u>Summers</u> did not even confront a potential "heightened risk" injury; the challenged regulation in <u>Summers</u> was not geographically specific and thus did not present a "heightened risk" to any particular tract in the National Forests—unlike the Idaho Rule.  Accordingly, <u>Kootenai Tribe</u>—not <u>Summers</u>—is controlling.  <u>See</u> <u>Miller v. Gammie</u>, 335 F.3d 889, 900 (9th Cir. 2003) (en banc) (district courts must follow Circuit precedent unless "clearly irreconcilable" with "intervening higher authority").

_____

[6] Contrary to defendants' citation, <u>see</u> Fed. Resp. at 3, <u>Lujan</u> did not address the "heightened risk" issue, but instead assumed that the affidavits in that case sufficiently demonstrated injury to wildlife species.  <u>See</u> 504 U.S. at 564.  The words "heightened risk" do not appear in <u>Lujan</u>.

In any event, even if proof of threatened injury from a site-specific project were required to establish standing—which it is not—plaintiffs have provided such proof.  The Forest Service and U.S. Bureau of Land Management ("BLM") on June 6, 2008 authorized an expansion of the J.R. Simplot Co.'s Smoky Canyon phosphate mine into a 400-acre lease modification in the environmentally sensitive North Fork Deer Creek watershed of the Sage Creek roadless area. See Hoyt Decl. ¶ 19 & Ex. 10 at 20-24, App. I, p. 1 & Fig. 2; Second Hoyt Decl. ¶¶ 3, 5; see also AR FS 1448 at 3-182 ("Deer Creek watershed" is "unique aquatic reference").  Because this area was not leased prior to January 2001, the 2001 Roadless Rule would have prevented road construction to facilitate phosphate mining in this key watershed.  See 36 C.F.R. § 294.12(b)(7). The agencies therefore conditioned their North Fork Deer Creek lease modification with a stipulation that no mining may occur "until a determination is made regarding whether the Roadless Area Conservation Rule applies to the proposed activities" and, accordingly, "whether the activities are allowed or must be modified."  Hoyt Decl. Ex. 10 at App. I, p. 3.  Promulgation of the Idaho Roadless Rule means that the 2001 Roadless Rule does not apply to this lease modification and mining activities may proceed as early as next year, injuring plaintiffs' interest. See Hoyt Decl. ¶ 19; Second Hoyt Decl. ¶ 3; Toner Decl. ¶¶ 4-8; see also Brent Larson Decl. ¶ 7 (Doc. 80-2) (stating that mining of lease modification may begin in 2011).[7]  Although defendants seek to downplay the imminence of this injury because the determination required by the quoted stipulation "has not been performed," Fed. Resp. at 3-4, the outcome is a foregone conclusion— the 2001 Roadless Rule obviously does not apply to the North Fork Deer Creek lease modification because it was repealed by the Idaho Roadless Rule, which permits road

---

[7] Intervenors IAC/IMA suggest the threat of mining North Fork Deer Creek is alleviated by a stipulation between plaintiff Greater Yellowstone Coalition and Simplot.  See IAC/IMA Resp. at 17.  The stipulation expires at the end of December 2010, and thus does not prevent mining North Fork Deer Creek in 2011.  See Second Hoyt Decl. ¶ 6 & Ex. 16.

construction in this area, see 36 C.F.R. § 294.25(e)(1).  The pending agency determination is a

formality that cannot defeat plaintiffs' standing.  See Babbitt v. United Farm Workers Nat'l

Union, 442 U.S. 289, 298-300 (1979) (plaintiff must demonstrate "realistic danger" of

impending direct injury).  Other similar projects are in the agency pipeline.  See Second Hoyt

Decl. ¶¶ 3-11; Hoyt Decl. ¶¶ 19-20, 22-25 & Exs. 10, 11, 13, 14.  Accordingly, plaintiffs have

amply demonstrated injury in fact even under the heightened standard that defendants wrongly

advocate.  See Ctr. for Biological Diversity, 588 F.3d at 707-08 (distinguishing Summers;

plaintiffs had standing to challenge regulations establishing programmatic framework for issuing

authorizations to take polar bears where the regulations "have been and continue to be

implemented").

       The defendant agencies' remaining standing arguments are equally meritless.  They claim

plaintiffs have failed to establish standing for their ESA claims concerning the woodland caribou

and grizzly bear because plaintiffs' declarations purportedly do not identify "an interest in the

Pack River Area or the Kootenai National Forest."  Fed. Resp. at 5.  However, plaintiffs' Pavia

declaration documents an interest in the Selkirk woodland caribou and Selkirk and Cabinet-Yaak

grizzly bear populations, which range throughout broad areas of the Idaho Panhandle and

Kootenai national forests, including the Pack River Area.  See Pavia Decl. ¶¶ 3-9.  This

establishes plaintiffs' standing, because "a person who observes or works with animals of a

particular species in the very area of the world where that species is threatened by a federal

decision is facing [sufficient] harm, since some animals that might have been the subject of his

interest will no longer exist."  Lujan, 504 U.S. at 566-67; see Japan Whaling Ass'n v. Am.

Cetacean Soc'y, 478 U.S. 221, 231 n.4 (1986) (plaintiffs "alleged a sufficient 'injury in fact' in

that the whale watching and studying of their members will be adversely affected by continued

whale harvesting" throughout northern Pacific); <u>Didrickson v. U.S. Dep't of Interior</u>, 982 F.2d 1332, 1340-41 (9th Cir. 1992) (same where organization seeking to defend limit on take of sea otters averred that its members "study, observe and enjoy the sea otters in Alaska").

Defendants also claim that Mr. Pavia describes "only vague and indefinite plans to return to the Selkirk IRA," Fed. Resp. at 5, but Mr. Pavia stated that he has visited the Selkirk roadless area in the past and intends to return "during the next few years," Pavia Decl. ¶¶ 3, 6. This is sufficient, especially given that Mr. Pavia lives near the Selkirk area. <u>See id.</u> ¶¶ 2-3; <u>Ecological Rights Found. v. Pac. Lumber Co.</u>, 230 F.3d 1141, 1149 (9th Cir. 2000) ("Repeated recreational use itself, accompanied by a credible allegation of desired future use, can be sufficient, even if relatively infrequent, to demonstrate that environmental degradation of the area is injurious to that person."); <u>accord</u> <u>White Tanks Concerned Citizens, Inc. v. Strock</u>, 563 F.3d 1033, 1039 (9th Cir. 2009) (noting that plaintiff's "members live near" affected area).

As for the agencies' assertion that impacts to caribou or grizzly bears from the Idaho Roadless Rule are unduly "speculative" because of alleged protections afforded by the Idaho Rule and forest plans, Fed. Resp. at 5, defendants cannot escape their own relegation of 4,545 acres of caribou recovery habitat and 8,972 acres of core grizzly habitat to the Idaho Rule's General Forest theme, and 58,507 acres of caribou habitat and 155,045 acres of grizzly habitat (including 12,190 CPZ acres) to the Backcountry theme, both of which authorize road construction and logging. AR FWS 1 (Biological Opinion) ("BiOp"), at 100-01, 146; <u>see also</u> <u>Citizens for Better Forestry v. U.S. Dep't of Agric.</u>, 341 F.3d 961, 975 (9th Cir. 2003) (plaintiffs had standing because "lower environmental safeguards at the national programmatic level will result in lower environmental standards at the site-specific level"). FWS concluded that adverse impacts to caribou from the General Forest allocations alone "cannot be discounted," BiOp at

106, and that the rule's allowance for road construction threatened "serious ramifications on the stability and recovery" of grizzly bears, id. at 145.  Even if such projects must be "'consistent with applicable forest plan components,'" Fed. Resp. at 5 (citation omitted), FWS determined that existing forest plans inadequately protect these species, see Point II.A, infra.  Further, even crediting the Idaho Panhandle National Forests' letter agreement "to defer projects in grizzly habitat," Fed. Resp. at 5-6, this unenforceable agreement is inapplicable to the Pack River Area and the Kootenai forest, see Point II.D, infra.[8]

## II.   FWS'S "NO-JEOPARDY" DETERMINATIONS FOR THE CARIBOU AND GRIZZLY WERE ARBITRARY AND UNLAWFUL UNDER THE ESA

The U.S. Fish and Wildlife Service's "no-jeopardy" determinations for the grizzly bear and woodland caribou deliberately failed to evaluate development activities authorized by the Idaho Rule, instead assuming that such activities would never occur based on non-binding forest supervisor assurances.  Defendants fail to salvage this arbitrary analysis.

### A.   FWS's "No-Jeopardy" Determinations Relied Upon Nonbinding Assurances Omitted From The Idaho Roadless Rule

Rather than defending FWS's actual analysis, defendants seek to marginalize the Forest Service letter assurances on which the challenged "no-jeopardy" determinations relied.  Defendants claim FWS's biological opinion rested largely on the existing protections of the Idaho Panhandle National Forests' ("IPNF") management plan—not the extra-regulatory

---

[8] Defendants' footnote argument that plaintiffs' claims are unripe, see Fed. Resp. at 6 n.6, defies California ex rel. Lockyer, 575 F.3d at 1011, which held ripe a challenge to the Forest Service's replacement of the 2001 Roadless Rule with a state petitions rule.  If a challenge to a rule that simply invited states to petition for roadless area management was ripe, then a fortiori plaintiffs' challenge here to the fruit of a specific petition is also ripe.  See Ohio Forestry Ass'n, 523 U.S. at 737 (plaintiff claiming NEPA procedural injury "may complain of that failure at the time the failure takes place, for the claim can never get riper"); Sierra Club v. U.S. Dep't of Energy, 287 F.3d 1256, 1264 (10th Cir. 2002) (same regarding ESA procedural challenge).

assurances of the Forests' supervisor.  See Otter Resp. at 17-19; Kootenai Resp. at 8-12; Fed.

Resp. at 18-20.  Defendants' argument defies the administrative record.

FWS repeatedly stated that the IPNF forest plan's "habitat management guidelines" for

caribou "are outdated."  BiOp at 79, 99; see also id. at 99 (IPNF plan's caribou cumulative

effects model is "outdated," "incomplete," and "has not been validated as recommended by the

Caribou Recovery Plan").  Moreover, while "currently the IPNF does not conduct timber harvest

that removes allocated old growth stands" essential to caribou, this practice is "not explicitly

stated as a standard" in the IPNF forest plan.  Id. at 99.  As the Forest Service itself asserted,

even the IPNF forest plan's direction for "Management Area 7" lands—those "designated for

caribou management within identified caribou habitat," AR FS 26 (IPNF Plan) at III-33—

"allow[s] for timber harvest and road building" like the Idaho Rule's unprotective General Forest

theme, AR FWS 423 at 6508; see also AR FWS 421 at 6501 (same).  Accordingly, FWS sought

to justify its conclusion that projects proposed under the Idaho Rule would "consider[] the needs

of the caribou" only by invoking (1) the IPNFs' recent record of avoiding "vegetation

management projects … 'likely to adversely affect' the caribou" and (2) the IPNF supervisor's

"stated intent of continuing to use the best available science to maintain and manage old growth

stands that are suitable caribou habitat within the caribou recovery area."  BiOp at 100 (emphasis

added); see also id. at 103-10; id. at 307-08 (App. B) (IPNF caribou letter).[9]

---

[9] Other FWS statements referenced by defendants, see Fed. Resp. at 17-26, are equally
unavailing.  While declaring that "[o]nly 1.1 percent (4,545 acres) of all [General Forest land]
(405,900 acres) overlaps the caribou recovery area," BiOp at 100, FWS ultimately concluded
that "the possibility of adverse effects to caribou cannot be discounted" as the "exact locations of
future projects are not known nor are there restrictions on the distribution of effects spatially or
temporally," id. 106; see also id. at 100-01 (same).  While citing telemetry data to assert that
General Forest acres "may not be used as heavily by caribou," id. at 106, the agency recognized
that "a number of anecdotal caribou sighting reports in various seasons have occurred throughout
the U.S. portion of the recovery area since 2000, further demonstrating the likelihood for caribou

With respect to grizzlies, FWS repeatedly noted that the Forest Service had yet to promulgate a forest plan amendment that would establish motorized-access standards "and contribute to the conservation and recovery of the species" within the Selkirk and Cabinet-Yaak recovery zones.  BiOp at 37; see also id. at 145-51.  As a result, FWS explicitly founded its "no-jeopardy" determination for the grizzly bear on the nonbinding protections promised by the IPNF supervisor.  See id. at 145-51; id. at 309-10 (App. C) (IPNF grizzly letter).  FWS assumed no "adverse effects to grizzly bears" within the Cabinet-Yaak and Selkirk zones "[b]ased on the August 7, 2008, letter from the IPNF Forest Supervisor"—an "assumption" that was "central to [FWS's] effects analysis and biological conclusions."  Id. at 146 (emphasis added).

**B.     In Relying On Nonbinding Assurances To Protect Northern Idaho's Imperiled Grizzly And Caribou Populations, FWS Violated The ESA**

FWS arbitrarily relied on unenforceable assurances to protect caribou and grizzly bears from the "potentially … serious ramifications" of the Idaho Roadless Rule.  See BiOp at 145 (grizzly bear); see also id. at 106 (recognizing potential for "significant adverse effects to the caribou"); Pls.' Mem. at 8-11.  An agency's "sincere general commitment" to undertake essential conservation measures is insufficient to support a "no-jeopardy" finding; conservation measures "may not be included as part of [a] proposed action without more solid guarantees that they will actually occur"—that is, "specific and binding plans."  Nat'l Wildlife Fed'n v. NMFS, 524 F.3d 917, 935-36 (9th Cir. 2008) ("NWF") (emphasis added).  Accordingly, in resting its jeopardy analysis on a forest supervisor's nonbinding promise to avoid harmful activities allowed under the Idaho Rule, FWS violated the ESA.  See id.; see also Selkirk Conservation Alliance v.

---

to occur throughout this area," id. at 107.  While stating that decommissioning of temporary roads under the Idaho Rule "will help to minimize the adverse effects of increased habitat fragmentation and human disturbance," id. at 110, FWS conceded that "[e]ven temporary roads create a long-term impact, given the caribou's need for large expanses of mature and old-growth forest," id. at 95; see also id. at 104 (same).

13

Forsgren, 336 F.3d 944, 956 (9th Cir. 2003) (cited in Kootenai Resp. at 11) (upholding FWS's

reliance on conservation agreement that "impose[d] enforceable obligations on the parties");

Pls.' Mem. at 8-9 (collecting cases invalidating biological opinions that relied on unenforceable

measures).  The defendant agencies' contrary arguments cannot be sustained.[10]

        1.      The ESA's Demand For Binding Conservation Measures Applies To
               Actions Within Agency Control

      While federal defendants suggest that the ESA's demand for binding conservation

measures is waived whenever an agency's "stated commitments" are "within its control," Fed.

Resp. at 22 (citing NWF, 524 F.3d at 936 n.17), this is not the law.  In the National Wildlife

Federation footnote cited by defendants, the Ninth Circuit recognized that future habitat

improvements should not be considered in a biological opinion if "the [action] agencies lack the

power to guarantee the improvements in question."  NWF, 524 F.3d at 936 n.17 (emphasis

added).  While the fact that such improvements are outside "agency control" may render such a

"guarantee" impossible in a given case, see id., the mere presence of agency control over

conservation measures does not displace the ESA's demand for "specific and binding plans"

before a biological opinion may include the measures "as part of the proposed action," id. at 935-

36; see also Natural Res. Def. Council v. Kempthorne, 506 F. Supp. 2d 322, 353, 356 n.20 (E.D.

Cal. 2007) (invalidating "no-jeopardy" determination where conservation measures were

"largely under the control of the action agency" but not "certain and enforceable").

---

[10] Federal defendants wrongly assert that the IPNF supervisor's assurances "became mandatory"
as a result of "FWS's incorporation of and reliance on the[] commitments into the Biological
Opinion."  Fed. Resp. at 22 n.17; see, e.g., NWF, 524 F.3d at 935-36 (holding that action
agencies failed to provide requisite "specific and binding plans" despite incorporation of their
"sincere general commitment" as "part of the proposed action" in biological opinion).  Nor did
those assurances become enforceable due to their restatement in an interim Forest Service
directive.  See Fed. Resp. at 20, 21, 24 (citing Forest Service Manual 1925.06-07); W. Radio
Serv. Co., Inc. v. Espy, 79 F.3d 896, 901 (9th Cir. 1996) (Forest Service "Manual and Handbook
do not have the independent force and effect of law").

Nor may the absence of enforceable conservation measures be overcome by an agency's claimed practice of considering a species' needs.  Fed. Resp. at 21.  The Ninth Circuit rejected such an argument in National Wildlife Federation, where the action agencies' inadequate but "sincere general commitment" to improve salmon habitat through the installation of "'surface bypass collectors'" was "'exemplified by the recent installation of such structures at three dams.'"  524 F.3d at 935-36.  Federal defendants' attempt to rest ESA compliance on the Forest Service's past "practice" and future "control" accordingly fails.  See Fed. Resp. at 21-22.[11]

This result reflects the purpose and structure of the ESA, which demands mandatory protections for listed species consistent with its policy of "affording endangered species the highest of priorities."  Tenn. Valley Auth. v. Hill, 437 U.S. 153, 194 (1978).  Section 7 of the Act requires each federal agency—"in consultation with … the Secretary"—to "insure that any action" of the agency "is not likely to jeopardize the continued existence of any endangered species or threatened species."  16 U.S.C. § 1536(a)(2) (emphases added).  "If the consulting agency concludes that an … action may jeopardize the survival of species protected by the ESA, … the action must be modified" and the consulting agency is required to recommend any lawful alternatives.  NWF, 524 F.3d at 925; 16 U.S.C. § 1536(b)(3)(A).  If the consulting agency instead determines that an action will not jeopardize a listed species—or "offers reasonable and prudent alternatives to avoid that consequence"—it must provide the action agency with an incidental take statement "setting forth 'the terms and conditions ... that must be complied with by the Federal agency" to cushion the action's impact on listed species.  Bennett v. Spear, 520

---

[11] Oregon Natural Desert Association v. Tidwell, Civ. No. 07-1871-HA, 2010 WL 2246419 (D. Or. June 4, 2010) (Haggerty, J.) (cited in Fed. Resp. at 21, 22), is not to the contrary.  There, the relevant habitat protections were binding.  Id. at *17 ("[T]he grazing strategy passes muster as it sets up an enforcement process that is triggered by certain criteria.").  Indeed, the same court had previously invalidated a "no-jeopardy" determination reliant on "[u]nenforceable promises." Nw. Envt'l Advocates v. U.S. EPA, 268 F. Supp. 2d 1255, 1273 (D. Or. 2003) (Haggerty, J.).

U.S. 154, 158 (1997) (quoting 16 U.S.C. § 1536(b)(4)).  Under either scenario—a jeopardy

opinion or a non-jeopardy opinion setting forth terms and conditions of incidental take—

mandatory species protections apply.  See id. at 169 (describing biological opinions' "powerful

coercive effect on the action agency").

Defendants' argument would enable federal agencies to circumvent the ESA's demand

for mandatory protections by declaring a nonbinding intention to conserve imperiled species.

This is not the law.  Where, as here, a federal agency uses unenforceable conservation measures

"as a way to amend the agency action to avoid a jeopardy finding and to avoid imposition of

mandatory [alternatives]," the resulting "no-jeopardy" determination is unlawful.  Ctr. for

Biological Diversity v. Rumsfeld, 198 F. Supp. 2d 1139, 1144 (D. Ariz. 2002).

2.      The ESA's Demand For Binding Conservation Measures Applies To
"Programmatic" Agency Actions

Federal defendants get no further in seeking to exempt "programmatic" agency actions

from the ESA's requirement for specific, binding plans.  See Fed. Resp. at 17-20.

First, federal defendants ignore contrary precedent.  In Northwest Environmental

Advocates v. U.S. EPA, the court evaluated a biological opinion regarding the potential effects

of Oregon's revised water-quality standards on imperiled salmon—standards that required EPA

approval before taking effect.  268 F. Supp. 2d at 1259, 1272-73.  While Oregon's water-quality

standards had no direct impacts on fish, the court invalidated the opinion due to its reliance on

the state's "largely speculative and unenforceable" commitment to "undertake certain

conservation measures."  Id. at 1273 (quotations omitted).  According to the court, the consulting

agency's "clear findings" indicated "that a no-jeopardy finding was unwarranted"—and

"[u]nenforceable promises by the regulated state d[id] not alter that finding."  Id.

Northwest Environmental Advocates is consistent with the Ninth Circuit's admonition

that ESA Section 7 mandates apply despite agency characterizations of their actions as "'merely'

programmatic." Pacific Rivers Council v. Thomas, 30 F.3d 1050, 1055 (9th Cir. 1994).

Defendants' argument would render such programmatic consultations an empty exercise.

Indeed, under defendants' argument, it appears impossible for such consultations ever to yield a

jeopardy finding, for programmatic actions inherently do not "authorize road-building or other

on-the-ground activity." Fed. Resp. at 17. Yet the Ninth Circuit did not insist on programmatic

consultations so that courts could merely rubber stamp no-jeopardy findings. See Resources

Ltd., Inc. v. Robertson, 35 F.3d 1300, 1305 (9th Cir. 1994) (invalidating no-jeopardy

determination regarding programmatic forest management plan).

Second, despite defendants' dismissal of the idea that the Forest Service could or should

"preemptively craft mitigation measures for every conceivable future action under the Idaho

Rule," Fed. Resp. at 18, FWS relied on agency letters that sought to do precisely that—albeit

through unenforceable assurances that violated the ESA, see BiOp at 307-310 (Apps. B and C)

(IPNF letters); see also Conner v. Burford, 848 F.2d 1441, 1454 (9th Cir. 1988) ("FWS could

have determined [at the leasing stage] whether post-leasing activities in particular areas were

fundamentally incompatible with the continued existence of the species.").

### C.    FWS Failed To Consider The Impacts Of The "Entire Agency Action"

According to defendants, FWS "properly analyzed the 'entire agency action' under

review" as the ESA requires. Fed. Resp. at 18, 20. Yet defendants also contend that the adverse

impacts of the activities allowed under the Idaho Rule will properly be addressed in future, site-

specific consultations. Id. at 17-20; Kootenai Resp. at 10-11. Neither argument has merit.

First, rather than basing its biological opinion on "the circumstances in which …

activities could be authorized" in caribou and grizzly habitat under the Idaho Rule, Fed. Resp. at

18 (emphasis added), FWS relied on the IPNF supervisor's nonbinding assurances to exclude

permitted habitat-disturbing activities from consideration.  In the agency's words:

> as potential effects to grizzly bears related to road construction or reconstruction
> within grizzly bear core habitat under the [Idaho Roadless Rule] are not
> anticipated to occur until the Access Amendment [decision] is signed [due to the
> IPNF supervisor's letter assurance], <u>such potential effects to grizzly bears are not
> analyzed within the context of [FWS's] analy[sis]</u>.

BiOp at 146 (emphasis added); <u>see also</u> <u>id.</u> at 100 (stating FWS's "expect[ation] that projects

proposed under the [Idaho Rule]" will address caribou needs due to IPNFs' nonbinding

assurances and practice of avoiding projects "that were 'likely to adversely affect' the caribou").

 This violates the ESA.  Under the statute, "the scope of the agency action is crucial

because the ESA requires the biological opinion to analyze the effect of the <u>entire</u> agency

action."  <u>Conner</u>, 848 F.2d at 1453 (emphasis in original) (cited in Fed. Resp. at 18-19).  Absent

a "comprehensive biological opinion[] considering all stages of the agency action" at issue,

"'there can be no assurance that a violation of the ESA's substantive provisions will not result.'"

<u>Id.</u> at 1454, 1458 n.40 (citation omitted).  By utilizing nonbinding assurances as a means of

ignoring the full scope of activities authorized by the Idaho Rule, FWS failed to prepare a

"comprehensive" biological opinion "analyz[ing] the effect of the <u>entire</u> agency action."  <u>See</u> <u>id.</u>

at 1453-54 (emphasis in original).

 Federal defendants' contrary contention that FWS properly relied on "'reasonable and

foreseeable' assumptions regarding future activities that may occur" under the Idaho Rule

misapplies their cited cases.  <u>See</u> Fed. Resp. at 18-20.  In <u>Conner</u> and <u>Northern Alaska</u>

<u>Environmental Center</u>, the Ninth Circuit held that the ESA's mandate for consultation on the

"<u>entire</u> agency action" required agencies analyzing programmatic oil and gas leasing

authorizations to address uncertainty concerning post-leasing development by "mak[ing]

projections, based on <u>potential</u> locations and levels of oil and gas activity, of the impact of

production on protected species."  <u>Conner</u>, 848 F.2d at 1453, 1454; <u>N. Alaska Envtl. Ctr. v.</u>

<u>Kempthorne</u>, 457 F.3d 969, 981 (9th Cir. 2006) (upholding FWS's "reli[ance] on a reasonable

and foreseeable oil development scenario," as "envisioned by this Court in <u>Conner</u>").  Here,

however, FWS did not utilize "'reasonable and foreseeable'" projections to predict where

resources might be found for development under the full scope of the Forest Service's

programmatic authorization.  <u>See</u> Fed. Resp. at 18 (quoting <u>N. Alaska Envtl. Ctr.</u>, 457 F.3d at

981).  Instead, FWS <u>narrowed</u> the scope of the Forest Service's programmatic authorization by

assuming that certain development authorized by the Idaho Rule would never be implemented,

and discounted the rule's impacts on that basis.  <u>See</u> <u>supra</u>.  FWS did not assess the "entire"

Idaho Roadless Rule, but instead assumed away the rule's impacts based on the IPNFs' non-

binding letters.  Because FWS's assumption evaded an analysis of the "<u>entire</u> agency action,"

<u>Conner</u>, 848 F.2d at 1453, FWS violated the ESA.[12]

    *Second*, contrary to defendants' argument, <u>see</u> Fed. Resp. at 17-18, 19; Kootenai Resp. at

10-11, the prospect of future consultations cannot supplant the ESA's demand for a

"comprehensive biological opinion," <u>Conner</u>, 848 F.2d at 1454.  A provision for future

consultation does not satisfy the demands of the ESA even when "written into" an agency's

action, as "biological opinions must be coextensive with the agency action and … stipulations

[providing for future, site-specific consultations] cannot be substituted for comprehensive

biological opinions."  <u>Id.</u> at 1455, 1458; <u>see also, e.g.</u>, <u>Pac. Coast Fed'n of Fishermen's Ass'ns v.</u>

<u>NMFS</u>, 482 F. Supp. 2d 1248, 1265-70 (W.D. Wash. 2007) (biological opinions may not

---

[12] Contrary to federal defendants' argument, <u>see</u> Fed. Resp. at 18, <u>California ex rel. Lockyer</u>, 459
F. Supp. 2d at 912, did not suggest—much less hold—that the potential effects of an agency rule
may be disregarded on the basis of nonbinding, extra-regulatory assurances.

"essentially defer[] analysis to future site-specific consultations"); <u>Rumsfeld</u>, 198 F. Supp. 2d at 1156 (invalidating biological opinion that "s[ought] to postpone, for three years, … [an] assessment which must be made as part of the process of issuing the Final BO").[13]

> **D.     FWS Arbitrarily Analyzed The Idaho Rule's Impact On Grizzly Bears In The Pack River Area And Kootenai National Forest**

Defendants also fail to justify FWS's reliance on facially inapplicable forest supervisor assurances to protect grizzly bears in the Pack River Area and the Kootenai National Forest from impacts threatened by the Idaho Rule.  <u>See</u> Fed. Resp. at 20 n.16, 23-24.

> 1.     <u>FWS Disregarded The Inapplicability Of The IPNF Supervisor's Assurances To Grizzly Habitat In The Pack River Area</u>

The government's defense of FWS's assessment regarding the Idaho Rule's impacts on grizzlies in the Pack River Area ("PRA")—outside the Selkirk recovery zone—defies the challenged biological opinion.  <u>See id.</u> at 23-24.  By its own terms, the IPNFs' short-term promise to "defer" any decision likely to harm grizzlies does not extend to bears occupying Backcountry PRA lands.  <u>See</u> Pls.' Mem. at 9-10; <u>see also</u> Fed. Resp. at 23 (conceding same). Seeking to evade this problem, federal defendants wrongly declare that "FWS recognized that the Forest Service's assurances did not apply to the PRA and independently analyzed the area," concluding that "[d]ue to low grizzly bear presence, as well as their acclimation to existing conditions, … <u>any</u> potential activity under the Idaho Rule in that area can occur without adversely affecting the bears."  Fed. Resp. at 23 (emphasis added).

---

[13] Despite federal defendants' contrary suggestion, the "agencies' duty of continued consultation," <u>Conner</u>, 848 F.2d at 1458 n.42 (cited in Fed. Resp. at 19), and FWS's ability to rely on previously reviewed programmatic actions while conducting "later project-specific environmental analysis," <u>Gifford Pinchot Task Force v. FWS</u>, 378 F.3d 1059, 1068 (9th Cir. 2004) (cited in Fed. Resp. at 19), also do not supplant the ESA's requirement that impacts of programmatic agency actions be thoroughly assessed, <u>see Conner</u>, 848 F.2d at 1458 n.42.

Rather than determining that grizzlies within the Pack River Area are impervious to the additional logging and road construction allowed under the Idaho Roadless Rule, see id., FWS concluded that "[m]aintaining the existing roaded conditions within the PRA would most likely prevent displacing the grizzly bears that are utilizing the area," BiOp at 147 (emphases added). According to FWS, the PRA's existing conditions would be maintained under the Idaho Rule because of the IPNF supervisor's irrelevant promise to defer logging and road-building projects elsewhere. Id. ("[FWS] expects that the [Forest Service's] (specifically, the IPNF) commitment to avoid adverse effects to grizzly bears would extend to actions proposed under the [Idaho Rule] within the PRA, and would, therefore, maintain the existing roaded conditions within the PRA … ."). This arbitrary analysis violates the ESA. See Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 43 (1983) (agency action arbitrary and capricious if agency "offered an explanation for its decision that runs counter to the evidence before the agency"); cf. Friends of Endangered Species, Inc. v. Jantzen, 760 F.2d 976, 984-85 (9th Cir. 1985) (cited in Kootenai Resp. at 11-12) (upholding "no-jeopardy" determination where "the Service was aware of all relevant limitations" in assessing impacts to species).

2.   FWS Disregarded The Inapplicability Of The IPNF Supervisor's Assurances To Grizzly Habitat In The Kootenai National Forest

Equally meritless is federal defendants' footnote defense of FWS's failure to consider the need for grizzly protections within the Kootenai National Forest, where the Idaho Rule relegated roadless portions of the Cabinet-Yaak grizzly recovery zone to the Backcountry theme. See Pls.' Mem. at 10-11; Fed. Resp. at 20 n.16. First, contrary to federal defendants' assertion that "the Forest Service's [grizzly bear] commitment expressly applies to both the Kootenai and Idaho Panhandle National Forests," Fed. Resp. at 20 n.16, the IPNF supervisor's letter did not—and could not—bind the Kootenai supervisor, BiOp at 309 (App. C) (IPNF Supervisor: "I will defer

decisions" likely to adversely affect the grizzly bear (emphasis added)); see also id. at 147 (discussing "the USFS's (specifically, the IPNF) commitment to avoid adverse effects to grizzly bears" (emphasis added)).  Second, while federal defendants cite a 2007 letter in which the Kootenai supervisor sought to reinitiate formal consultation on a Montana mine, Fed. Resp. at 20 n.16 (citing AR FWS 507 at 7218-19), the challenged biological opinion did not even reference this correspondence.  See Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation, 426 F.3d 1082, 1091 (9th Cir. 2005) ("[W]e rely only 'on what the agency actually said' in the BiOp to determine whether the agency considered the appropriate factors." (emphasis in original, citation omitted)).[14]

## III.   IN RELYING ON FWS'S ARBITRARY AND UNLAWFUL "NO-JEOPARDY" DETERMINATIONS, THE FOREST SERVICE VIOLATED THE ESA

In defending the Forest Service's reliance on FWS's arbitrary and unlawful "no-jeopardy" determinations, federal defendants declare that "[p]laintiffs' arguments … that the Forest Service cannot rely on a biological opinion that incorporates its own commitments are nonsensical."  Fed. Resp. at 22.  However, the ESA does not permit an action agency to rely on a biological opinion that arbitrarily disregards the absence of binding conservation measures.  See Rumsfeld, 198 F. Supp. 2d at 1157; see also Resources Ltd., 35 F.3d at 1305 (Forest Service arbitrarily relied on biological opinion that omitted relevant information in Service's possession,

---

[14] Defendants' contention that plaintiffs "misconstru[ed]" record documents in discussing FWS's "'failed'" administrative process is also meritless.  See Fed. Resp. at 24-25; see also Otter Resp. at 17-18.  First, the concerns of the Interior Department's attorney were not "addressed by amending the [Idaho] Rule to make clear that forest plan direction relating to [listed] species continues to apply," Fed. Resp. at 24 (emphasis added), as FWS's "no-jeopardy" determinations ultimately relied on the IPNF supervisor's letter assurances—"informal, non-binding statements made in ancillary documents," AR FWS 502 at 7159 (July 21, 2008 Nagle email); BiOp at 93-110, 143-51, 307-10.  Second, FWS's staff did not abandon their concerns regarding the opening of caribou habitat to logging and road construction under the Idaho Roadless Rule.  Compare Fed. Resp. at 24-25 (asserting that FWS staff's concern was "resolved") with BiOp at 106 ("The potential modification of 4,545 acres of [General Forest] caribou habitat … could result in significant adverse effects to the caribou.").

notwithstanding prospect of future consultations and Service's "emphasi[s] … that when site-specific decisions are made certain planned [timber] sales may have to be cancelled because of danger to grizzlies").  Having failed to incorporate essential habitat protections into the Idaho Roadless Rule's new logging and road-building authorizations, the Forest Service did not reasonably "insure" that the rule "is not likely to jeopardize the continued existence of any endangered species or threatened species."  16 U.S.C. § 1536(a)(2).

## IV.   THE FOREST SERVICE FAILED TO TAKE A "HARD LOOK" AT THE IDAHO ROADLESS RULE'S LOGGING AND ROAD-BUILDING IMPACTS

The Forest Service offers no legitimate justification for its NEPA analysis of the Idaho Roadless Rule's logging and road-building impacts—an analysis that arbitrarily trivialized the consequences of replacing the 2001 Roadless Rule with the less-protective Idaho Rule by projecting impacts based on road construction and logging levels experienced while the 2001 Roadless Rule was in place.

### A.   Backcountry/Restoration

The Forest Service admits it assumed that logging and road-building impacts across the 5.3 million acres of roadless areas assigned to the Idaho Roadless Rule's Backcountry theme "will be 'essentially the same as the 2001 Roadless Rule,'" despite acknowledging that the Backcountry theme "allows targeted fuel reduction that the 2001 Rule would not."  Fed. Resp. at 7-8 (quoting AR FS 1151 at 2).  In fact, the Backcountry prescription allows temporary road construction and logging "for community protection zone activities" throughout a 442,000-acre CPZ area.  36 C.F.R. § 294.23(b)(2); see also id. § 294.24(c)(1)(i); FEIS at 142 (Table 3-14).  It allows temporary road construction and logging across the remaining 4.9 million Backcountry roadless acres upon a finding of "significant risk" to at-risk communities or water-supply systems, the latter of which encompass 57 percent of Backcountry lands.  36 C.F.R. §§

23

294.23(b)(3)(i), 294.24(c)(1)(ii); see FEIS at 211.  The 2001 Roadless Rule did not include such

permissions.  See generally 36 C.F.R. §§ 294.10-14.  Nevertheless, the Forest Service projected

the Idaho Rule's Backcountry road building and logging impacts by merely incorporating "the

total level of timber harvest projected for the 2001 Roadless Rule."  AR FS 1151 at 2.

      The Forest Service fails to justify its decision to attribute no additional impacts to the

Idaho Rule's additional road building and logging authorizations for Backcountry lands.  The

agency points out that it "collected extensive data" to support its projections.  Fed. Resp. at 7.

However, the Forest Service's principal data collection effort was to ask each National Forest in

Idaho to complete a spread sheet of roadless-area logging and road construction undertaken or

anticipated from 2001 to 2011.  See AR FS 1136-44.  As the Forest Service itself stated, "[t]his

information should reflect the 2001 Roadless Rule as it was/is the current direction."  AR FS

1151 at 1 (emphasis added).

      The Forest Service also discounts the Idaho Roadless Rule's logging authorizations for

Backcountry non-CPZ lands by pointing out that projects approved under the "significant risk"

standard are subject to additional constraints under 36 C.F.R. §§ 294.23(b)(3)(iii) and

294.24(c)(2).  See Fed. Resp. at 9; see also Otter Resp. at 13-14.[15]  These constraints include

vague direction to maintain "roadless area characteristics over the long term" and to

"[m]aximize[] the retention of large trees as appropriate for the forest type to the extent the trees

promote fire-resilient stands," 36 C.F.R. § 294.24(b)(3)(iii), (c)(2)(i), (ii) (emphases added), and

a mandate to comply with consistent forest plan standards, id. §§ 294.24(c)(2)(iii), 294.28(d).

However, the 2001 Roadless Rule imposed equivalent (and arguably tighter) constraints,

---

[15] The Forest Service does not attempt to defend its decision to attribute no additional impacts to
the Idaho Rule's broad permission for road building and logging in the CPZ portion of
Backcountry lands, except to state that "only" 442,000 acres are affected.  Fed. Resp. at 8.

requiring that authorized logging "will maintain or improve one or more of the roadless area characteristics" and will remove only "generally small diameter timber," id. § 294.13(b)(1), and likewise preserving consistent forest plan direction, see id. § 294.14(b).  Yet, while imposing equivalent constraints on logging, the 2001 Roadless Rule also prohibited logging altogether in circumstances where the Idaho Roadless Rule allows it.  NEPA required the Forest Service to rationally assess the impact of the Idaho Rule's allowance for additional logging.

As for the Forest Service's reliance on the Idaho Roadless Rule's authorization for only temporary roads in Backcountry lands, see Fed. Resp. at 9, the agency itself admitted in promulgating the 2001 Roadless Rule that "[t]he use of temporary roads may have the same long lasting and significant ecological effects as permanent roads, such as the introduction of non-native vegetation and degradation of stream channels," AR FS 6 (2001 Roadless Rule FEIS) ("2001 FEIS"), at 2-18; accord AR FS 2013 at 68-69.  Accordingly, the requirement that roads authorized under the Idaho Roadless Rule be temporary does not obviate the need for a "hard look" at resulting impacts.

Ultimately, the Forest Service relies on "the intent" of the Backcountry theme "that lands would be managed in a manner similar to the 2001 Roadless Rule."  Fed. Resp. at 8.  However, the stated intent of the Idaho Roadless Rule's Backcountry theme is not simply to mimic the 2001 Roadless Rule; it is to authorize additional road building and logging that would have been prohibited under the 2001 Roadless Rule.  The preamble states that the Backcountry theme "provides similar management direction as the 2001 Rule alternative for 5.26 million acres, although an estimated 442,000 acres would be subject" to CPZ logging and road-building provisions and, "[o]utside the CPZ, temporary roads could be constructed … to meet the objectives of reducing the significant risk of wildland fire effects."  73 Fed. Reg. at 61,460

(emphasis added); see also id. at 61,464 ("Governor Risch expressed a desire to have the areas designated under [the Backcountry] theme managed similar to the 2001 roadless rule while also providing for certain stewardship activities" (emphasis added)).  The Forest Service ignored these features of the rule's intent.  In so doing, the agency arbitrarily minimized the consequences of the Idaho Rule and skewed the comparison of alternatives in violation of NEPA.  See Native Ecosystems Council v. U.S. Forest Serv., 418 F.3d 953, 964-65 (9th Cir. 2005) (finding NEPA violation where agency applied incorrect data that skewed wildlife impact assessment for logging project).

### B.    General Forest

The Forest Service admits that it used "2001 Rule projections" to estimate logging and road-construction levels for the Boise, Payette, and Sawtooth national forest roadless areas assigned to permissive management under both the Idaho Roadless Rule and governing forest plans.  Fed. Resp. at 10.  Under the Boise, Payette, and Sawtooth forest plans, 122,500 roadless acres are allocated to management prescriptions equivalent to the Idaho Rule's unrestrictive General Forest theme.  See AR FS 41; AR FS 42 at B-5–B-6.  The Idaho Roadless Rule classifies 70,100 of these acres as General Forest, permitting logging and road construction in all circumstances except for road building associated with certain mineral leasing.  See AR FS 42 at B-5–B-6; 36 C.F.R. §§ 294.23(c), 294.24(d).  Nevertheless, the Forest Service attributed no additional impacts to this overlap of permissive logging and road-building authorizations, instead arbitrarily concluding that the resulting impacts would be "similar to the projections for the 2001 Roadless Rule."  AR FS 1151 at 1.

Beyond describing its irrational methodology, the Forest Service offers little to defend its conduct.  See Fed. Resp. at 10.  In the end, the agency essentially asserts that it committed only harmless error because the Boise, Payette, and Sawtooth forests "contain only a small percentage

of land in the GFRG theme state-wide."  Id.  However, the Forest Service arrives at this assertion

only by wrongly discounting its inaccurate treatment of 44,000 of the 70,100 acres assigned to

General Forest on the basis that they "are shrubland and grassland landscapes where timber

harvest is extremely unlikely."  Id. at 11.  Regardless whether logging is likely on these lands,

the overlap of General Forest management under the Idaho Roadless Rule and governing forest

plans permits road building on these 44,000 acres for other reasons, including "to achieve

restoration and maintenance objectives," "to support [management] actions taken to reduce

wildfire risks," and even generally "to meet access and travel [management] objectives," FEIS at

B-6—none of which was permitted under the 2001 Roadless Rule, see 36 C.F.R. § 294.12.

Accordingly, even apart from their logging potential, these 44,000 acres face a threat of road

building under General Forest management that the Forest Service failed to address.

      Moreover, "[i]n the context of agency review," harmless error "may be employed only

when a mistake of the administrative body is one that clearly had no bearing on the procedure

used or the substance of decision reached."  Kazarian v. U.S. Citizenship & Immig. Servs., 596

F.3d 1115, 1119 (9th Cir. 2010) (emphasis in original, quotations omitted).  Here, the Forest

Service's 70,100-acre mistake in analyzing the impacts of General Forest management defied the

procedural commands of NEPA, "which requires up-front disclosures of relevant shortcomings

in the data or models," Lands Council v. Powell, 395 F.3d 1019, 1032 (9th Cir. 2005), and

prohibits an agency from "rely[ing] on incorrect assumptions or data in an EIS," Native

Ecosystems Council, 418 F.3d at 964.  The Forest Service's assumption that 70,100 General

Forest acres would experience protective management similar to the 2001 Roadless Rule, despite

the elimination of such protections by the Idaho Roadless Rule, also made the agency's

allocation of 405,900 acres to General Forest appear more palatable to decision-makers and the

public.  This error was not harmless.  See id. at 964-65 (holding that Forest Service violated

NEPA where agency made 5,000-acre error in calculating 24,000 acres of elk summer range in

logging project area).

## V.   THE FOREST SERVICE'S ALLOCATION OF UNLEASED ACRES FOR PHOSPHATE MINING ALSO VIOLATED NEPA

The Forest Service seeks to defend its admitted failure to perform a detailed, site-specific

NEPA analysis of the Idaho Roadless Rule's General Forest allocation of at least 5,770 unleased

roadless acres for road construction to facilitate phosphate mining, arguing that the rule's

allocation "does not commit the Forest Service to authorize mining or road building on those

lands."  Fed. Resp. at 13.  However, this argument fails to distinguish California v. Block, 690

F.2d 753, 761-63 (9th Cir. 1982), which demanded a site-specific NEPA analysis of a similar

allocative decision regarding National Forest roadless areas.

Block concluded that site-specific analysis was required for roadless lands allocated to a

non-wilderness category because of a Forest Service regulation directing that such lands "'will

be managed for uses other than wilderness.'"  Id. at 762 (quoting 36 C.F.R. § 219.12(e) (1981)).

This regulation did not grant "automatic access," Otter Resp. at 15 n.10, to affected lands any

more than the Idaho Roadless Rule does to the 5,770 unleased phosphate acres.  The critical

regulation in Block meant that non-wilderness lands would "become available … for multiple

resource use activities other than wilderness," 690 F.2d at 762 (quotations omitted), but it did not

negate the role of subsequent decision-making regarding affected lands, see id. (acknowledging

role of "[f]uture decisions concerning" planning for non-wilderness areas).  Nor did it dictate

development of every non-wilderness acre.  See id. at 763 n.4 (noting Forest Service requirement

that subsequent planning decisions must protect "soil, watershed, fish, wildlife and aesthetic

values"); 16 U.S.C. § 528 (multiple uses include "outdoor recreation, … watershed, and wildlife

and fish purposes").  Thus, the Forest Service's suggestion that NEPA requires site-specific

analysis only where an action absolutely "commit[s] the Forest Service to authorize mining or

road building," Fed. Resp. at 13, defies Block.

     Block deemed site-specific NEPA analysis necessary because the cited Forest Service

regulation constrained the agency's subsequent discretion to "consider wilderness preservation as

an alternative to development" of non-wilderness lands.  Block, 690 F.2d at 763.  Similarly, with

respect to the 5,770 unleased phosphate acres, the Idaho Roadless Rule constrains the Forest

Service's discretion to consider preserving a roadless area as an alternative to authorizing road

construction to facilitate phosphate mining.  The rule provides that a road "may be authorized"

on the affected lands "in association with phosphate deposits," 36 C.F.R. § 294.25(e)(1), and

specifies that this permission "take[s] precedence" over existing forest plans, id. § 294.28(d), and

is "not subject to reconsideration, revision, or rescission in subsequent project decisions or land

and resource management plan amendments," id. § 294.28(e) (emphases added).  The Forest

Service describes this regulatory language as trumping only "inconsistent Forest Plans," Fed.

Resp. at 14 n.12 (emphasis added), but the plain language of 36 C.F.R. § 294.28 states that the

Idaho Rule's permission for roads in connection with phosphate mining not only trumps

inconsistent forest plans, see 36 C.F.R. § 294.28(d), but also controls subsequent planning and

project decisions, see id. § 294.28(e).

     The Forest Service also contends that the Idaho Roadless Rule does not "preclude the

agency from considering a specific site's roadless values during decision-making," Fed. Resp. at

14 n.12, but the agency fails to explain how the rule's direction that roads may be constructed to

facilitate phosphate mining on 5,770 unleased acres, and that this permission may not be

reconsidered at the project stage, nevertheless allows the Forest Service to prohibit road

construction at the project stage for the purpose of preserving a roadless area.[16]  While the Forest Service may retain discretion to prohibit road construction on the 5,770 unleased acres for other reasons, the decision whether to protect these lands from road construction for the purpose of preserving their status as inventoried roadless areas was made in the Idaho Roadless Rule.  "The site-specific impact of this decisive allocative decision must … be carefully scrutinized now and not when specific development proposals are made."  Block, 690 F.2d at 763.[17]

Contrary to the Forest Service's argument, the site-specific scrutiny required by NEPA would not involve undue "speculation."  Fed. Resp. at 15.  The Forest Service selected 5,770 unleased acres for General Forest treatment because they are the "specific areas … where there is very high potential for development in the future."  73 Fed. Reg. at 61,468 (emphasis added).  The agency consulted with the State of Idaho, the BLM, and the phosphate industry to identify "the locations of phosphate mining activities most likely to occur in the future."  Id. (emphasis added); see also id. at 61,470 (describing coordination with "representatives of the affected industry"); AR FS 230 (Forest Service email affirming that "phosphate industry was comfortable" with adjustment to Idaho Rule's phosphate provisions).  This is not a case, like Northern Alaska Environmental Center, 457 F.3d at 979 (cited in Fed. Resp. at 15-16), where "it

---

[16] Gov. Otter claims the threat of development on these acres is lessened by forest plan requirements, and a mandate to evaluate other access options.  Otter Resp. at 16-17.  However, the Caribou forest plan permits road construction for phosphate mining, see FEIS at 175, and the Forest Service said anything less than road access to the unleased acres would mean that "phosphate deposits on this acreage would not be mined," id. at 172.

[17] This "decisive allocative decision" distinguishes this case from those cited by the Forest Service, which did not involve regulatory predetermination of subsequent project decisions.  See Friends of Yosemite Valley v. Norton, 348 F.3d 789, 801 (9th Cir. 2003) (involving plan "provid[ing] broad guidelines for future approved actions that affect" river) (quotations omitted); Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1351 (9th Cir. 1994) (herbicide plan "delegat[ed] to district foresters, for the most part, the discretion to apply herbicides at the project level"); N. Alaska Envtl. Ctr. v. Lujan, 961 F.2d 886, 890 (9th Cir. 1992) (addressing mine permitting plan that did not constrain denial of permits) (all cited in Fed. Resp. at 12).

is impossible to know which, if any, areas … are most likely to be developed" across a multi-million-acre planning area; the 5,770 unleased phosphate acres were subjected to General Forest management because they are "most likely to be developed," id.

The Forest Service also errs in arguing that detailed analysis of measures to mitigate phosphate mining impacts on these 5,770 acres "would serve no purpose" because "the exact contours of any needed mitigation are not yet known." Fed. Resp. at 15, 16. The agency's FEIS relied on mitigations to diminish the Idaho Roadless Rule's phosphate mining impacts from a "high risk" to a "low risk" for Bonneville and Yellowstone cutthroat trout, FEIS at 261, 275—despite the fact that mitigation has never prevented unlawful water pollution in connection with any large-scale, open-pit phosphate mine in southeast Idaho, see id. at 186. The Forest Service cannot have it both ways, claiming that detailed mitigation analysis is impossible before a site-specific project proposal, but relying on mitigation to assure the public that the Idaho Rule's phosphate provision will not harm sensitive species despite the phosphate industry's unbroken record of unlawful water pollution in the region. NEPA required a detailed examination of available mitigations to inform the decision whether to open 5,770 roadless acres to industrial phosphate mining. See Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372, 1380-81 (9th Cir. 1998) (holding that NEPA demanded assessment of mitigation efficacy).[18]

## VI.   THE FOREST SERVICE ARBITRARILY RELIED ON THE WYOMING WILDERNESS ACT TO CLASSIFY THE WINEGAR HOLE ROADLESS AREA

Defendants attempt to rewrite the Forest Service's reason for opening Idaho's Winegar Hole roadless area—2,600 acres of recommended wilderness hosting sensitive wildlife habitat—to logging. See Fed. Br. at 26-28. The FEIS states that the Idaho Roadless Rule "would place

---

[18] The Forest Service's assertion that the Smoky Canyon Mine expansion demonstrates the agency's "commitment to robustly apply mitigation at the site-specific level," Fed. Resp. at 16 n.14, ignores the agency's own FEIS admission that "[t]he level of effectiveness of the measures adopted has been questioned," FEIS at 205.

these acres into a Primitive theme because the Congress has already enacted wilderness legislation for the surrounding area and declined to incorporate these 2,600 acres into wilderness." FEIS at 71. Although the Forest Service now claims that it did not "read the [Wyoming Wilderness Act ("WWA")] to formally release" the area for non-wilderness uses, Fed. Rep. at 26, it offers no other plausible reading of the FEIS. The Forest Service's reliance on the WWA to open the Winegar Hole area to logging impermissibly contradicts the Act's language, which released non-wilderness lands for "multiple use" management only within Wyoming. WWA of 1984, Pub. L. No. 98-550, § 401, 98 Stat. 2807, 2811-12.

The Forest Service nevertheless claims that its Winegar Hole classification was not exclusively based on the WWA, pointing to tables summarizing the recommendations of Fremont County and the State of Idaho. See Fed. Resp. at 27 (citing AR FS 77 at 39; AR FS 73 at 33). However, while Fremont County and Idaho sought to diminish protection of the Winegar Hole area, the record establishes that the Forest Service acceded to their preferences because it interpreted the WWA to justify that result. See FEIS at 71.

The Forest Service's claim that its Winegar Hole allocation finds support in congressional intent is similarly unfounded. See Fed. Resp. at 26-27. While the Forest Service cites a handful of statements in the WWA legislative history that refer to Idaho lands, none reference the Winegar Hole area. See Fed. Resp. Ex. 3 at 54, 325 & Ex. 4 at 194-95, 382 (all discussing Palisades area). Further, all but one statement cited by the Forest Service were made by parties invited to testify at Committee hearings, not members of Congress.[19] The Forest

---

[19] The Forest Service also points to then–Idaho Senator Craig's comment regarding "'cooperation of the [Wyoming] delegation on lands that overlap our adjoining boundaries.'" Fed. Resp. at 26-27 (quoting Fed. Resp. Ex. 3 at 142). This generic statement—made as Senator Craig objected to certain release language—does not suggest that Congress considered the wilderness suitability of the Winegar Hole area in Idaho when passing the WWA.

Service could not reasonably classify the Winegar Hole area based on testimony by <u>non-members of Congress</u> about <u>other</u> Idaho lands.

The Forest Service also argues that its decision finds support in the WWA's designation of wilderness lands in Colorado. Fed. Resp. at 27. However, the Act included the Colorado portion of the Platte River Wilderness only because the absence of a wilderness bill in Wyoming, where the "vast majority" of that wilderness area lies, had delayed earlier wilderness designation of those lands. 130 Cong. Rec. 28,680 (1984) (attached as Ex. 2). This unique circumstance does not indicate a congressional judgment about the Winegar Hole area.

## VII.   DEFENDANTS FAIL TO JUSTIFY DENIAL OF PLAINTIFFS' REQUESTED REMEDY

Despite the Ninth Circuit's recent affirmance of a judgment invalidating a repeal of the 2001 Roadless Rule and reinstating the 2001 Rule in closely analogous circumstances, <u>see</u> <u>Cal. ex rel. Lockyer</u>, 575 F.3d at 1019-20, defendants and intervenors claim this Court should deny plaintiffs an identical remedy. Their arguments are meritless.[20]

*First*, defendants offer no legitimate reason for this Court to depart from the principle that "vacatur of an unlawful agency rule normally accompanies a remand." <u>Alsea Valley Alliance v. Dep't of Commerce</u>, 358 F.3d 1181, 1185 (9th Cir. 2004); <u>accord</u> <u>Paulsen v. Daniels</u>, 413 F.3d 999, 1008 (9th Cir. 2005). Federal defendants claim that "[c]ourts commonly leave regulations or program-level decisions in place pending the agency's correction of legal errors." Fed. Resp. at 29. However, while the Ninth Circuit has on rare occasions permitted agency rules to stand

---

[20] Federal defendants, Gov. Otter, and IAC/IMA ask this Court to "hold separate proceedings on remedy." Fed. Resp. at 28; <u>see</u> Otter Resp. at 19-20; IAC/IMA Resp. at 12. However, they offer no reason why they could not have raised all relevant remedial considerations in the argument and numerous supporting declarations they already filed. <u>See</u> <u>Defenders of Wildlife v. Salazar</u>, No. CV 9-77-M-DWM, 2010 WL 3084194, at *18 n.15 (D. Mont. Aug. 5, 2010) (rejecting federal defendants' request for further remedial proceedings where "[t]hey did not offer a reason why they could not have briefed the issue in the first place, or otherwise why further briefing is necessary").

during remand, such circumstances most often have arisen in cases challenging environmentally

protective regulations, where vacatur threatened "irreversible consequences of environmental

damage."  Natural Res. Def. Council v. U.S. Dep't of Interior, 275 F. Supp. 2d 1136, 1143-44

(C.D. Cal. 2002) (discussing Idaho Farm Bureau Fed'n v. Babbitt, 58 F.3d 1392 (9th Cir. 1995)

(cited in Fed. Resp. at 29-30), and W. Oil and Gas Ass'n v. EPA, 633 F.2d 803 (9th Cir. 1980));

accord Ctr. for Food Safety v. Vilsack, No. C 08-00484 JSW, 2010 WL 3222482, at *2-3 (N.D.

Cal. Aug. 13, 2010); see also North Carolina v. EPA, 550 F.3d 1176, 1178 (D.C. Cir. 2008)

(remanding without vacatur to retain "enhanced protection of the environmental values covered

by" challenged rule (quotations omitted)).  It would flip these precedents on their head to deny

vacatur here, where defendants' Idaho Roadless Rule opened formerly protected lands to the

imminent threat of irreparable environmental harm.[21]

     *Second*, defendants wrongly claim that plaintiffs "have failed to show any 'irreparable

injury' from the Idaho Rule."  Fed. Resp. at 29; see Otter Resp. at 21; IAC/IMA Resp. at 15-19;

Kootenai Resp. at 16-17.  As an initial matter, the Supreme Court's recent ruling in Monsanto

Co. v. Geertson Seed Farms, 130 S. Ct. 2743 (2010), indicates that this Court may not need to

address such injunction factors if it deems vacatur appropriate.  See id. at 2761 ("no recourse" to

---

[21] Federal defendants note that, in addressing remands outside the context of administrative regulations or ESA violations, the Ninth Circuit allowed ongoing livestock grazing and horse packing operations to continue, see Idaho Watersheds Project v. Hahn, 307 F.3d 815, 833-34 (9th Cir. 2002); High Sierra Hikers Ass'n v. Blackwell, 390 F.3d 630, 642-43 (9th Cir. 2004), and permitted gas drilling that was consistent with a plaintiff's preferred alternative, see N. Cheyenne Tribe v. Norton, 503 F.3d 836, 843-44 (9th Cir. 2007).  See Fed. Resp. at 29.  Here, however, threatened harms do not involve grazing or passage of transient livestock, but rather long-lasting injuries caused by road building, logging, and mining that would not be permitted under the 2001 Roadless Rule.  See Idaho Sporting Congress, Inc. v. Alexander, 222 F.3d 562, 569 (9th Cir. 2000) (logging constituted "evidence of environmental harm … sufficient to tip the balance in favor of injunctive relief").  Further, while federal defendants argue that "discrete legal errors" fail to justify "an injunction against the [Idaho Roadless] Rule as a whole," Fed. Resp. at 30, the defendant agencies' multiple failures to legitimately assess key impacts infected the Forest Service's ultimate choice of the Idaho Rule over more protective options.

injunction "was warranted" if "less drastic remedy," such as vacatur, "was sufficient to redress respondents' injury").  In any event,  plaintiffs have fully justified an injunction.  The Idaho Roadless Rule authorizes harmful development activities in previously protected roadless areas. See Gehrke Decl. ¶¶ 5-6; Hoyt Decl. ¶¶ 14-27; Scott Larson Decl. ¶¶ 6-7; Pavia Decl. ¶¶ 7-9. The rule allows imminent expansion of the Smoky Canyon phosphate mine into the 400-acre North Fork Deer Creek lease modification in the Sage Creek roadless area, see Hoyt Decl. ¶ 19; Second Hoyt Decl. ¶¶ 3, 5; subsequent intrusion of Simplot's Dairy Syncline phosphate mine into 450 unleased acres of the Huckleberry Basin roadless area, see Hoyt Decl. ¶ 20 & Ex. 11; and planned implementation of logging projects in roadless areas, see Hoyt Decl. ¶¶ 22-25 & Exs. 13-14; Jayne Decl. ¶¶ 6-9.

Plaintiffs' demonstration of irreparable harm is equivalent to that underlying the injunction order in California ex rel. Lockyer:  proof of irreparable harm from "phosphate mining in the roadless area within the Caribou-Targhee National Forest" and a showing that "more projects in roadless areas that would have been forbidden under the Roadless Rule are now imminent."  459 F. Supp. 2d at 914.  This harm justifies injunctive relief.  See id.; Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 545 (1987) ("If [environmental] injury is sufficiently likely, … the balance of harms will usually favor the issuance of an injunction to protect the environment.").[22]

Although defendants seek to undermine California ex rel. Lockyer's remedial analysis, the district court in that case did not "automatically enjoin" the challenged state petitions rule

---

[22] Federal defendants' Brent Larson declaration confirms that the Idaho Roadless Rule permits the logging projects identified by plaintiffs.  See Brent Larson Decl. ¶¶ 14, 16-18 (specified projects "not inconsistent" with Idaho Rule).  While Mr. Larson claims that AR FS 1160, Table 3, indicates only that these projects "may be considered," Brent Larson Decl. ¶¶ 14, 16-18, that document answers "yes" to the question whether the projects specified by plaintiffs will be undertaken, and reserves the term "maybe" for other projects, see AR FS 1160 at 4.

upon finding a NEPA violation.  Kootenai Br. at 15; see Otter Resp. at 20-21.  To the contrary, as the Ninth Circuit held, the California ex rel. Lockyer district court "gave meaningful consideration to the equities in [that] case and carefully applied the traditional balancing of the harms analysis to arrive at its conclusion that the [2001] Roadless Rule should be reinstated." 575 F.3d at 1020; see 459 F. Supp. 2d at 913-19 (remedial discussion).  Nor do the Supreme Court's decisions in Winter v. Natural Resources Defense Council, 129 S. Ct. 365 (2008), or Monsanto, 130 S. Ct. at 2743, effectively overrule California ex rel. Lockyer.  See Kootenai Br. at 13-16; Otter Resp. at 20-21; IAC/IMA Resp. at 13-15.  Winter rejected reliance on a "'possibility' of irreparable harm" to justify an injunction, 129 S. Ct. at 375, but California ex rel. Lockyer relied on a concrete threat of irreparable environmental harm—not a mere possibility, see 459 F. Supp. 2d at 914.  Monsanto rejected the "erroneous assumption that an injunction is generally the appropriate remedy for a NEPA violation," 130 S. Ct. at 2756-57, but California ex rel. Lockyer recognized that, even "in the context of NEPA litigation, courts apply a traditional balance of harms analysis," 459 F. Supp. 2d at 913.[23]

As for intervenors' claim that "[t]here is simply no evidence that the Idaho Roadless Rule will harm the species of grizzly bear or caribou," Kootenai Br. at 16; see Otter Resp. at 23-24; IAC/IMA Resp. at 16, FWS itself recognized that the "take" of even "one individual caribou … could pose the risk of jeopardizing th[e] extremely small [Selkirk] population," AR FWS 18 at 1 (Sept. 3, 2008 call notes); see also BiOp at 107 (same).  Accordingly, FWS concluded that

---

[23] Federal defendants seek to distinguish California ex rel. Lockyer on the basis that the Forest Service in that case "had declined to prepare any NEPA analysis or consult under the ESA." Fed. Resp. at 29 n.21.  However, injunctive relief is equally appropriate to remedy deficient NEPA and ESA analyses.  See, e.g., Native Ecosystems Council v. Dombeck, 304 F.3d 886, 903 (9th Cir. 2002).  Further, while IAC/IMA argues that "the court in Lockyer has recognized that the Idaho Rule supersedes the 2001 Rule in Idaho," IAC/IMA Resp. at 23 & n.6, this fact merely underscores plaintiffs' need for relief.

projects solely within the Idaho Rule's General Forest caribou habitat "could result in significant adverse effects to the caribou."  BiOp at 106 (emphasis added).  Similarly, FWS stated that, given the precarious status of the Selkirk and Cabinet-Yaak grizzly bear populations, "there can be no degradation of the existing habitat conditions," and found that the Idaho Rule "would potentially have serious ramifications on the stability and recovery" of these populations, id. at 144, 145 (emphasis added).  While defendants would render this Court powerless to safeguard the species from these threats absent proof of specific "locations where a particular grizzly bear or woodland caribou … will be harmed," Kootenai Br. at 16, the federal courts have frequently enjoined implementation of programmatic land management decisions that authorize later, site-specific projects threatening injury to listed species.  See Cal. ex rel. Lockyer, 575 F.3d at 1020 (affirming injunction against repeal of 2001 Roadless Rule); Pacific Rivers Council, 30 F.3d at 1056-57 (enjoining implementation of programmatic forest management plan); Citizens for Better Forestry v. U.S. Dep't of Agric., 481 F. Supp. 2d 1059, 1099-1100 (N.D. Cal. 2007) (enjoining Forest Service planning rule despite agency argument that rule "'has no direct environmental impacts'").[24]

Third, defendant-intervenors identify no countervailing hardship or public interest justifying denial of injunctive relief.  Although they argue that federal defendants' ESA violations do not "foreclose the balancing of equities," IAC/IMA Resp. at 20, governing precedent is to the contrary, see Nat'l Wildlife Fed'n v. NMFS, 422 F.3d 782, 793-94 (9th Cir. 2005) (district court did not err "by failing to conduct a traditional preliminary injunction

---

[24] Intervenors rest much of their ESA remedial argument on the Montana district court's denial of a preliminary injunction in Defenders of Wildlife v. Salazar, No. CV 09-77-M-DWM.  See Otter Resp. at 23-24; Kootenai Br. at 16.  However, the Montana court's summary judgment decision in that case vacated the challenged regulation to remedy an ESA violation, as plaintiffs request here.  See Defenders of Wildlife, 2010 WL 3084194, at *18.

analysis" in ESA case because "the balance has been struck [by Congress] in favor of affording endangered species the highest of priorities") (quotations omitted); accord Wash. Toxics Coal. v. EPA, 413 F.3d 1024, 1035 (9th Cir. 2005).

Even outside the ESA context, defendant-intervenors offer nothing that could trump the threat of irreparable environmental harm posed by the Idaho Roadless Rule's General Forest and Backcountry prescriptions, or "the public's interest in preserving precious, unreplenishable resources" in National Forest roadless areas.  Kootenai Tribe, 313 F.3d at 1125.  Although they raise the specter of "[w]ildfire, insect, disease, and other threats from excessive restrictions" under the 2001 Roadless Rule, IAC/IMA Resp. at 20-21, the Ninth Circuit deemed these exact same concerns with the 2001 Rule to be "overstated" in assessing the balance of hardships in Kootenai Tribe, 313 F.3d at 1124.  Consistent with this Ninth Circuit determination, the Kootenai Tribe's assertion here that invalidation of the Idaho Roadless Rule and reinstatement of the 2001 Rule would interfere with "desperately needed restoration of fire-prone forests" in northern Idaho's Myrtle Creek watershed, Kootenai Br. at 18, ignores the Forest Service's recent approval of "a fuels reduction project designed to reduce the severity of potential wildfire effects [in the Myrtle Creek watershed] and protect the drinking water for the Bonners Ferry community" pursuant to the 2001 Roadless Rule.  See Petersen Decl. Ex. A at D (attached) (Myrtle Creek decision).[25]  As for defendants' reliance on a public interest in "collaborative efforts" underlying the Idaho Rule, IAC/IMA Resp. at 22; see Otter Resp. at 25; Kootenai Br. at

---

[25] While the Kootenai Tribe references a 2003 fire in the Myrtle Creek watershed that affected drinking water, see Second Porter Decl. ¶ 6 (Doc. 89), that fire began in the midst of a roaded logging project, Petersen Decl. ¶ 7 (attached), consistent with the Forest Service's finding in the 2001 Roadless Rule FEIS that "human-caused wildland fire is nearly five times more likely to occur on essentially roaded lands than on essentially unroaded lands," 2001 FEIS at 3-116.

17, they ignore the fact that project activities under the 2001 Roadless Rule have equally sparked collaborative efforts, see Petersen Decl. Ex. A at 2-15, 26-29 (Myrtle Creek decision).

*Fourth*, and finally, defendants' advocacy against reinstatement of the 2001 Roadless Rule—despite Circuit precedent establishing that "[t]he effect of invalidating an agency rule is to reinstate the rule previously in force," Paulsen, 413 F.3d at 1008—merely recycles arguments already rejected in prior litigation over the 2001 Rule.  Defendant-intervenors invoke the Wyoming district court judgment invalidating the 2001 Rule, which is pending on appeal to the Tenth Circuit.  See IAC/IMA Resp. at 23; Kootenai Br. at 20.  However, like the California ex rel. Lockyer district court, this Court should not follow the Wyoming decision in the face of the Ninth Circuit's Kootenai Tribe ruling "indicating that the [2001 Roadless Rule] was likely valid and absent any appellate decision to the contrary."  459 F. Supp. 2d at 917; see also Cal. ex rel. Lockyer v. U.S. Dep't of Agric., Nos. C05-03508 EDL, C05-04038 EDL, 2008 WL 5102864, at *3 (N.D. Cal. Dec. 2, 2008) (declining to vacate injunction reinstating 2001 Roadless Rule after Wyoming ruling because "this Court must respect the significant guidance provided by the appellate court in Kootenai"); Hogback Basin Pres. Ass'n v. U.S. Forest Serv., 577 F. Supp. 2d 1139, 1146 (W.D. Wash. 2008) (Kootenai Tribe and California ex rel. Lockyer "strongly suggest that the Ninth Circuit would not adopt the Wyoming court's reasoning and would not recognize its injunction of the Roadless Rule").

Defendant-intervenors also argue that reinstatement of the 2001 Roadless Rule "would lead to renewed litigation over that rule," Kootenai Br. at 21, but "renewed litigation is not necessarily undesirable when compared to the alternative proposed by Defendants:  to allow a major environmental rule that the Court has determined was improperly repealed to nonetheless remain permanently repealed without a hard look at the environmental consequences."  Cal. ex

rel. Lockyer, 459 F. Supp. 2d at 917, aff'd, 575 F.3d at 1020.  While Kootenai Tribe argues that,

upon invalidating the Idaho Rule, this Court should "explore the better course of having existing

Forest Plans govern the management of the roadless areas," Kootenai Resp. at 22, "the Forest

Service previously determined in the detailed environmental analysis that accompanied the

[2001] Roadless Rule that those mechanisms were seriously deficient," Cal. ex rel. Lockyer, 459

F. Supp. 2d at 917; see also 73 Fed. Reg. at 61,460 (reporting that, among alternatives studied for

Idaho Roadless Rule, existing forest plans allow most road construction or reconstruction over

next 15 years).[26]

Accordingly, this Court should conclude—as the Ninth Circuit has twice affirmed, see

Cal. ex rel. Lockyer, 575 F.3d at 1019-20; Kootenai Tribe, 313 F.3d at 1124-26—that equity and

the public interest favor reinstating the 2001 Roadless Rule.

**VIII.   CONCLUSION**

For the foregoing reasons, this Court should grant plaintiffs' Motion for Summary

Judgment and deny defendants' cross-motion for summary judgment.

---

[26] Similarly, IAC/IMA errs in discounting any injury to plaintiffs' interest because projects
undertaken pursuant to the Idaho Roadless Rule "must still undergo separate and further
environmental review."  IAC/IMA Resp. at 19.  "Whatever protections of the involved
environmental interests remain in the absence of the [2001] Roadless Rule, there can be no doubt
that the … acres subject to the [2001] Roadless Rule, if implemented, would have greater
protection if the [2001] Roadless Rule stands."  Kootenai Tribe, 313 F.3d at 1110.

Respectfully submitted this 27th day of August, 2010.

                                                  /s/  Timothy J. Preso
                                     Timothy J. Preso
                                     Earthjustice
                                     313 East Main Street
                                     Bozeman, MT 59715
                                     tpreso@earthjustice.org
                                     (406) 586-9699 | Phone
                                     (406) 586-9695 | Fax

                                     *Counsel for Plaintiffs*

                                     Bradford M. Purdy (Idaho Bar # 3472)
                                     2019 N. 17th Street
                                     Boise, ID 83702
                                     bmpurdy@hotmail.com
                                     (208) 384-1299 | Phone
                                     (208) 384-8511 | Fax

                                     *Local Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of August, 2010, I filed the foregoing and accompanying materials electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Kootenai Tribe of Idaho | wbarquin@kootenai.org

Barclay T. Samford | Clay.Samford@usdoj.gov, efile_nrs.enrd@usdoj.gov, linda.shumard@usdoj.gov, susan.middagh@usdoj.gov

Brad Michael Purdy | bmpurdy@hotmail.com

David F. Hensley | david.hensley@gov.idaho.gov

Julie Weis | jweis@hk-law.com, jmalone@hk-law.com

Robert A Maynard | lloyd@perkinscoie.com, Rmaynard@perkinscoie.com

Scott W. Horngren | shorngren@hk-law.com, jmalone@hk-law.com

Thomas C. Perry | tperry@osc.idaho.gov

William K. Barquin | wbarquin@kootenai.org, prentz@kootenai.org


_____ /s/  Timothy J. Preso _____