IGNACIA S. MORENO
Assistant Attorney General
U.S. Department of Justice
BARCLAY T. SAMFORD (NM Bar # 12323)
Trial Attorney, Natural Resources Section
MICHAEL R. EITEL (NE Bar # 22889)
Trial Attorney, Wildlife & Marine Resources Section
United States Department of Justice
Environment & Natural Resources Division
1961 Stout Street, 8th Floor
Denver, CO  80294
(303) 844-1475; (303) 844-1479 | Phone
(303) 844-1350 | Fax
Clay.Samford@usdoj.gov; Michael.Eitel@usdoj.gov

WENDY J. OLSON
United States Attorney
ROBERT GRISHAM
Assistant United States Attorney
Washington Group Plaza IV
800 Park Boulevard, Suite 600
Boise, ID  83712-9903
(208) 334-1211 | Phone
(208) 334-1413 | Fax
Robert.Grisham@usdoj.gov

Counsel for Federal Defendants

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| GERALD JAYNE, et al. | ) Civil No. 09-015-E-BLW |
| | ) |
| Plaintiffs, | ) **FEDERAL DEFENDANTS'** |
| v. | ) **REPLY MEMORANDUM IN** |
| | ) **SUPPORT OF DEFENDANTS'** |
| HARRIS SHERMAN, et al. | ) **CROSS-MOTION FOR SUMMARY** |
| | ) **JUDGMENT** |
| Defendants. | ) |
| | ) |
| and | ) |
| | ) |
| IDAHO ASSOCIATION OF COUNTIES, | ) |
| GOVERNOR C.L. BUTCH OTTER, | ) |
| KOOTENAI TRIBE OF IDAHO, and | ) |
| IDAHO MINING ASSOCIATION, | ) |
| | ) |
| Defendant-Intervenors. | ) |

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      PLAINTIFFS CANNOT DEMONSTRATE ARTICLE III STANDING . . . . . . . . . . . . 1

II.     THE FOREST SERVICE COMPLIED WITH NEPA  . . . . . . . . . . . . . . . . . . . . . . . . . 6

      A.      The Forest Service's Timber Harvest and Road-Building Projections
          are Reasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      B.      The Forest Service Properly Analyzed Phosphate Mining  . . . . . . . . . . . . . . . . . 8

            1.      The EIS Properly Discloses the Impacts of Allowing
                 Phosphate Mining  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

III.    FWS AND THE FOREST SERVICE COMPLIED WITH THE ESA  . . . . . . . . . . . . . 11

      A.      Neither the ESA Nor Ninth Circuit Law Restrict FWS's Inquiry to
          Only the Binding and Enforceable Plans of a Federal Agency  . . . . . . . . . . . . . 12

      B.      FWS's ESA Analysis Complies With the ESA, and the Forest Service's
          Reliance on the Biological Opinion was Reasonable  . . . . . . . . . . . . . . . . . . . . . 15

IV.     WINEGAR HOLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

V.      REMEDY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      A.      Plaintiffs are Not Entitled to Injunctive Relief  . . . . . . . . . . . . . . . . . . . . . . . . . 21

      B.      Vacature of the Idaho Rule is Not Appropriate . . . . . . . . . . . . . . . . . . . . . . . . . 23

      C.      Any Equitable Relief Must be Narrowly Tailored . . . . . . . . . . . . . . . . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

## CASES

Ashley Creek Props., LLC v. Timchak, 649 F. Supp. 2d 1171 (D. Idaho 2009) . . . . . . . . . . 2, 3, 4

Arizona Cattle Growers' Ass'n v. Kempthorne, 534 F. Supp. 2d 1013 (D. Ariz. 2008) . . . . . . . 15

Bergh v. Washington, 535 F.2d 505 (9th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281 (1974) . . . . . . . . . . . 21

Califano v. Yamasaki, 442 U.S. 682 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

California v. Block, 690 F.2d 753 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

California ex rel. Lockyer v. U.S. Dep't of Agric., 575 F.3d 999 (9th Cir. 2009) . . . . . . . . passim

City of Tacoma v. FERC, 460 F.3d 53 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Columbia Snake River Irrigators Ass'n v. Nat'l Wildlife Fed'n, 230 Fed. Appx. 659
(9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Connecticut v. Massachusetts, 282 U.S. 660 (1931) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Connor v. Burford, 848 F.2d 1441 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Ctr. for Biological Diversity v. Rumsfeld, 198 F. Supp. 2d 1139 (D. Ariz. 2002) . . . . . . . . . . 14

Didrickson v U.S. Dep't of Interior, 982 F.2d 1332 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . 5

Earth Island Institute v. Ruthenbeck, 490 F.3d 687 (9th Cir. 2007), rev'd in part and aff'd in part
sub. nom, Summers. v. Earth Island Inst., 129 S. Ct. 129 (2009) . . . . . . . . . . . . . . . . . . . . . . . . 6

Friends of Yosemite Valley v. Norton, 348 F.3d 789 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . 9

Idaho Farm Bureau Fed'n v. Babbitt, 58 F.3d 1392 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . 24

Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221 (1986) . . . . . . . . . . . . . . . . . . . . . . 5

Lands Council v. McNair, 537 F.3d 981 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Latino Issues Forum v. EPA, 558 F.3d 936 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Lewis v. Casey, 518 U.S. 343 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

Monsanto Co. v. Geertson Seed Farms, 130 S. Ct. 2743 (2010) . . . . . . . . . . . . . . . . . . . . . 21, 23

Morales v. TWA, 504 U.S. 374 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Munaf v. Geren, 553 U.S. 674 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

N. Alaska Envtl. Ctr. v. Kempthorne, 457 F.3d 969 (9th Cir. 2006) . . . . . . . . . . . . . . . . . 9, 12, 18

N. Alaska Envtl. Ctr. v. Lujan, 961 F.2d 886 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

NRDC v. Kempthorne, 506 F. Supp. 2d 322 (E.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 14

Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 524 F.3d 917 (9th Cir. 2008) . . . . . . . 13, 14

Nat'l Wildlife Fed'n v. Burlington N. R.R., 23 F.3d 1508 (9th Cir. 1994) . . . . . . . . . . . . . . . . 22

Nken v. Holder, 129 S. Ct. 1749 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Northwest Envtl. Advocates v. EPA, 268 F. Supp. 2d 1255 (D. Or. 2003) . . . . . . . . . . . . . . . . 14

Ocean Advocates v. U.S. Army Corps of Eng'rs, 402 F.3d 846 (9th Cir. 2005) . . . . . . . . . . . . . 5

Oregon Natural Desert Ass'n v. Tidwell, --- F. Supp. 2d ---, 2010 WL 2246419
(D. Or. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Perkins v. Bergland, 608 F.2d 803 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Public Citizen v. Carlin, 184 F.3d 900 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Pyramid Lake Paiute Tribe v. Dep't of Navy, 898 F.2d 1410 (9th Cir. 1990) . . . . . . . . . . . . . . 15

Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346 (9th Cir. 1994) . . . . . . . . . . . . . 9

Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208 (1974) . . . . . . . . . . . . . . . . . . 24

Selkirk Conservation Alliance v. Forsgren, 336 F.3d 944 (9th Cir. 2003) . . . . . . . . . . 14, 15, 19

Siskiyou Regional Educ. Proj. v. U.S. Forest Serv., 565 F.3d 554 (9th Cir. 2009) . . . . . . . . . . . 7

Southwest Ctr. v. Bureau of Reclamation, 143 F.3d 515 (9th Cir. 1998) . . . . . . . . . . . . . . . . . 15

Sullivan v. Everhart, 494 U.S. 83 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 19

Summers v. Earth Island Inst., 129 S. Ct. 1142 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

United States v. Am. Friends Serv. Comm., 419 U.S. 7 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . 23

U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship, 513 U.S. 18 (1994) . . . . . . . . . . . . . . . . . 23

W. Oil & Gas Ass'n v. EPA, 633 F.2d 803 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Wash. Toxics Coal. v. E.P.A., 413 F.3d 1024 (9th  Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Western Watersheds Project v. Kraayenbrink, __ F.3d __, 2010 WL 3420012
(9th Cir. Sept. 1, 2010)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

Whitman v. Am. Trucking Ass'ns., 531 U.S. 457 (2001)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Wilderness Soc'y v. Rey, CV-03-00119-DWM, 2010 WL 3665713 (Sept. 22 2010) . . . . .  passim

Winter v. Natural Res. Def. Council, 129 S. Ct. 365 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Wyoming v. USDA, 570 F. Supp. 2d 1309 (D. Wyo. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

STATUTES

16 U.S.C. § 1536 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17, 19

16 U.S.C. § 1538 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

16 U.S.C. § 1539 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

REGULATIONS

36 C.F.R. § 294.28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

50 C.F.R. § 402.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

50 C.F.R § 402.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

50 C.F.R § 402.16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

66 Fed. Reg. 3243 (Jan. 12, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

73 Fed. Reg. 61, 456 (Oct. 16, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

## INTRODUCTION

The Idaho Roadless Rule represents a unique accomplishment in Federal Land management.  Utilizing a robust and inclusive collaborative process, the Forest Service, working with the State of Idaho and numerous stakeholders, crafted a framework for managing Inventoried Roadless Areas in Idaho that "is as, or more, protective than the 2001 Roadless Area Conservation Rule," Decl. of Chris Wood, Dkt. No. 85-2 at 2, but which enjoys broad support among local interests, including the State and county governments, the local environmental community, the Kootenai Tribe of Idaho, and the mining industry.  See Dkt. Nos. 88, 90 and 91.  This robust process gained wide acceptance precisely because the Idaho Rule constitutes a reasonable resolution of complex and controversial issues in a manner that fully complies with applicable law.

As demonstrated by the Rule, the Environmental Impact Statement, the Biological Opinion, and the administrative record, Plaintiffs' legal challenges fall short.  First, because they fail to identify a single project issued pursuant to the Rule which threatens to harm their interests, Plaintiffs lack standing.  On the merits, the Forest Service complied with the National Environmental Policy Act (NEPA) by taking a hard look at Rule's impacts.  Pursuant to the Endangered Species Act (ESA), the U.S. Fish and Wildlife Service (FWS) and the Forest Service properly consulted and rationally relied on reasonable projections about how the Rule may be implemented.  Finally, the Forest Service reasonably utilized the Wyoming Wilderness Act in its decision to allocate the Winegar Hole area.  For all of these reasons, the Court should grant Defendants' motion for summary judgment.

## ARGUMENT

## I.     PLAINTIFFS CANNOT DEMONSTRATE ARTICLE III STANDING

Plaintiffs have failed to establish standing.  The Idaho Rule does not itself authorize timber harvest, road-building, or any other on-the-ground activities in Inventoried Roadless Areas (IRAs), nor does the Rule dictate how such activities will occur if they are authorized in the future. AR FS 1110.  Under these circumstances, Plaintiffs cannot make the requisite

showing that the Idaho Rule has been applied in the approval of a site-specific project that "will impede a specific and concrete plan" of the plaintiff to enjoy a specific area or "parcel" in a National Forest.  Summers v. Earth Island Inst., 129 S. Ct. 1142, 1150 (2009).

Relying on Kootenai Tribe v. Veneman, 313 F.3d 1094 (9th Cir. 2002), Plaintiffs assert they are not required to prove imminent injury from a specific application of the Rule.  Instead, they claim they have standing because they use IRAs that, under the Idaho Rule, are at an "increased risk" of development.  Pl. Reply at 4-5.  The Supreme Court in Summers, however, made clear that any standard less than "imminent" harm is inadequate to establish standing: a plaintiff must identify a "particular timber sale or other project" that "will impede a specific and concrete plan" to enjoy a specific parcel.  129 S. Ct. at 1150.  The Ninth Circuit recently reiterated that the plaintiff must show not only plans to "use a particular tract of land in the future," but also "'that the tract is about to be developed by the Forest Service in a way that harms [plaintiff's] recreational interests.'"  Wilderness Soc'y v. Rey, CV-03-00119-DWM, 2010 WL 3665713 at *5 (Sept. 22, 2010) (quoting Summers, 129 S. Ct. at 1150).

While Plaintiffs make a strained effort to claim that "Kootenai Tribe—not Summers—is controlling," it is clear, as this Court has already recognized, that Summers overrules Ninth Circuit caselaw, such as Kootenai Tribe, which found standing where harm was less than imminent.  As this Court held in Ashley Creek Props., LLC v. Timchak:

> The majority [in Summers] refused to "replace the requirement of imminent harm . . . with the requirement of a realistic threat that reoccurrence of the challenged activities would cause harm in the reasonably near future." The Supreme Court therefore overruled the Ninth Circuit's standard allowing for a finding of procedural injury even when the harm is not "imminent."

649 F. Supp. 2d 1171, 1177 (D. Idaho 2009), appeal docketed, No. 09-35724 (9th Cir. Aug. 5, 2009) (quoting Summers).[1]  The Ninth Circuit reiterated this finding in Wilderness Soc'y v. Rey,

---

[1] The claim that the Court in Summers did not actually reject standing based on increased risk of harm is belied by the plain language of the decision itself.  See Summers, 129 S. Ct. at 1151-52 (noting the "statistical probability" of harm standard would "make a mockery of our prior cases" and that the dissent desired to "*replace* the requirement of "imminent harm," *which it acknowledges our cases establish*, with the requirement of "a realistic treat"") (emphasis added).

at *5 ("There must be an 'imminent future injury that is sought to be enjoined'") (quoting Summers, 129 S. Ct. at 1150).

Nor is Summers distinguishable on the grounds that it involved a substantive challenge to regulations while Plaintiffs here are bringing procedural NEPA and ESA claims. Pl. Reply at 6. Plaintiffs in Summers also alleged procedural injury, and the Supreme Court plainly held that "deprivation of a procedural right without some concrete interest that is affected by the deprivation – a procedural right *in vacuo*—is insufficient to create Article III standing." 129 S. Ct. at 1151. See also Wilderness Soc'y v. Rey, at *8 (holding Summers makes clear that "procedural injury, standing on its own, cannot serve as an injury-in-fact . . . [, instead] [a] concrete and particular project must be connected to the procedural loss."); Ashley Creek Props, 649 F. Supp. 2d at 1177 (holding that in Summers "the Supreme Court implicitly overruled Circuit precedent in procedural rights cases"). Until there is a specific project that authorizes on-the-ground activities in IRAs in reliance on the Idaho Rule, Plaintiffs cannot establish standing for their procedural claims.

Plaintiffs also assert that Summers is distinguishable because the plaintiffs there claimed injuries that were unattached to any particular site, while they have documented their interests in "numerous specific roadless areas." Pl. Reply at 5-6. The Ninth Circuit's recent decision in Wilderness Soc'y v. Rey makes clear this distinction is not meaningful. In Wilderness Soc'y v. Rey, plaintiffs' affiant identified a particular interest in a specific area, the Umpqua National Forest. He failed however, as plaintiffs do here, to link that area to a specific project. Wilderness Soc'y v. Rey, at *4 (plaintiffs' affiant "has not shown that he is likely to encounter an *affected* area of the Umpqua National Forest"); id. at *5 ("The lack of any linkage between the project and the claimed injury undermines the effort to establish standing.").

Plaintiffs claim that even "if proof of threatened injury from a site-specific project were required," they have adequately indentified such a project with the Smoky Canyon North Fork Deer Creek Lease Modification. Pl. Reply at 8. As explained in Defendants' opening brief, however, the lease modification includes a stipulation prohibiting all surface occupancy pending

future determinations by the agency.  Notwithstanding Plaintiffs' unsupported speculation that this future determination is a "foregone conclusion,"  Pl. Reply at 8, it is an uncontroverted fact that at this point the needed determinations have not been made, and the agency retains absolute discretion to determine not to allow surface occupancy.  "[S]peculation does not suffice" to establish standing.  Summers, 129 S. Ct. at 1152; Ashley Creek Prop, 649 F.Supp.2d at 1179 (plaintiffs' "speculation" about future approvals of phosphate mining "fails the imminence requirement set forth in Summers").

Similarly, Plaintiffs' reliance on the Pavia Declaration fails to establish standing for their ESA claims.  Pl. Reply at 9-10.  Mr. Pavia cannot show that the Idaho Rule threatens his alleged interests in the Selkirk woodland caribou and Selkirk and Cabinet-Yaak grizzly bear populations. The Idaho Rule does not authorize on-the-ground activities that could affect caribou or grizzly populations, exempts no "take" of listed species under Section 9, 16 U.S.C. § 1538, and does not dictate how any future projects may occur.  Without a site-specific project within caribou or grizzly bear habitat, Plaintiffs' assumption that such a project may occur in the future and would adversely affect the species is speculation.[2]  See AR FS 863 at C-118-119; C-186 and C-205; AR FS 1107 (BO at 37) (no "foreseeable projects" in grizzly bear or caribou habitat that are likely to adversely affect the species).

Mr. Pavia claims he plans to return to the Selkirk IRA "during the next few years," Pavia Decl. ¶ 6, but such an indefinite and "vague desire to return is insufficient" under Article III. Summers, 129 S. Ct. at 1150-51. The fact that Mr. Pavia "lives near the Selkirk Area," Pl. Reply at 10, does not excuse him from the obligation to show specific plans to return to a portion of the area which will be impacted by a future project.  See Wilderness Soc'y v. Rey, 2010 WL 3665713 at *4 (acknowledging the Ninth Circuit's prior findings of standing based on repeated

---

[2]    Nor are FWS's statements in the biological opinion regarding the possibility of adverse impacts to caribou or grizzly bears, AR FS 1107 (BO at 106, 145), sufficient to show that Plaintiffs' purported harms are concrete and particularized, as  FWS's statements regarding a "possibility" do not satisfy the requirements of "concrete and particularized," "actual and imminent" injury-in-fact.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).

recreational use and living in "close proximity," to the area, but holding that "[n]onetheless, a vague desire to return to the area 'without any description of concrete plans, or indeed any specification of *when* the some day will be' does not support a finding of actual or imminent injury") (quoting <u>Summers</u>, 129 S. Ct. at 1151).[3]

While Plaintiffs submitted a Notice of Supplemental Authority (Dkt. No. 99) regarding the Ninth Circuit's decision in <u>Western Watersheds Project v. Kraayenbrink</u>, __ F.3d __, 2010 WL 3420012 (9th Cir. Sept. 1, 2010), that case cannot modify <u>Summers</u>' holdings and is distinguishable.[4]  <u>Kraayenbrink</u> failed to address important aspects of the Supreme Court's decision in <u>Summers</u>, instead relying on pre-<u>Summers</u> cases such as <u>Ocean Advocates v. U.S. Army Corps of Engineers</u>, 402 F.3d 846, 859-60 (9th Cir. 2005), which stand for the proposition that standing may be based on a recreational interest in an area "potentially affected" by the challenged government action.  <u>Summers</u> and the Ninth Circuit's more recent decision in <u>Wilderness Soc'y v. Rey</u> make clear that such probabilistic injury does not suffice: a plaintiff must identify a "concrete application" of the challenged regulatory provision that "threatens imminent harm" to its interests.  129 S. Ct. at 1150-52; <u>Wilderness Soc'y</u>, at 16061.

The instant case is also readily distinguishable from <u>Kraayenbrink</u>.  The plaintiffs there identified specific grazing allotments in which they had an interest.  2010 WL 3420012, at *5. Because the grazing allotment itself is the "project area" (<u>i.e.</u>, grazing is authorized on the entire allotment), the court in <u>Kraayenbrink</u> could assure itself that the allotments in which the plaintiffs alleged an interest would be impacted by the challenged regulations.  <u>Id.</u> at *9.  Here, in contrast, Plaintiffs allege interests in entire IRAs, <u>see</u> Pl. Reply at 5 (noting Mr. Gehrke's interest in almost 34,000 acres), but it is not known where within any particular IRA any future

---

[3] Plaintiffs' reliance on <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555 (1992), is misplaced because the Idaho Rule will not cause "some animals that might have been the subject of [the declarant's] interest [to] no longer exist." <u>Id.</u> at 566-67.  Similarly, <u>Japan Whaling Ass'n v. Am. Cetacean Soc'y</u>, 478 U.S. 221, 231 n.4 (1986), and <u>Didrickson v U.S. Dep't of Interior</u>, 982 F.2d 1332, 1340-41 (9th Cir. 1992), are inapposite, as those cases involved federal actions that would result in take of the species at issue, while the Idaho Rule does not by itself result in any take of species. AR 1107 (BO at 1-2).
[4] The time for filing a petition for rehearing in <u>Kraayenbrink</u> will not expire until October 18, 2010, undermining Plaintiffs' reliance on that non-final opinion at this stage in the proceedings.

project will occur, or whether such a project would occur in a manner affecting Plaintiffs.  Thus, the potential for impact on lands used by the plaintiffs in <u>Kraayenbrink</u> is much higher than with the lands at issue here.[5]

     For these reasons, Plaintiffs have failed to establish Article III standing.

## II.     THE FOREST SERVICE COMPLIED WITH NEPA

### A.     The Forest Service's Timber Harvest and Road-Building Projections are Reasonable

     Plaintiffs continue to allege that the methodology used by the Forest Service to predict levels of timber harvest and road-building within the Backcountry Restoration (BCR) theme and within the General Forest, Rangeland and Grassland (GFRG) theme for three forests, "trivialized" the differences between the Idaho Rule and the Roadless Rule.  This claim fails.

     As explained in Defendants' opening brief, after considering past and projected future activity levels, budgets, input from planners, and the intent of the Idaho Rule, the agency concluded that timber harvest and road-building levels in the BCR theme will be essentially the same as under the Roadless Rule.  Def. Br. at 7-9.  Plaintiffs' principal critique of this methodology is that they deem it unreliable because they read the Idaho Rule to allow more timber harvest and road-building than the 2001 Rule, and because they do not trust the Forest Service to implement the Idaho Rule consistent with its stated intention.  Pl. Reply at 24-25.  Of course, because they have brought a facial challenge to the Rule, Plaintiffs can point to no instance in which the Forest Service has authorized timber harvest or road-building in the BCR theme to inform this Court's review, and this Court cannot simply accept Plaintiffs'

---

[5] With respect to ripeness, the panel in <u>Kraayenbrink</u> did not consider <u>Earth Island Inst. v. Ruthenbeck</u>, 490 F.3d 687 (9th Cir. 2007), <u>rev'd in part and aff'd in part sub. nom</u> <u>Summers v. Earth Island Inst.</u>, 129 S. Ct. 1142 (2009), which held that only the claims against the regulations that had been applied in the context of a site-specific project were ripe for review.  490 F.3d at 695-96.  This holding in <u>Ruthenbeck</u> was not disturbed by the Supreme Court in <u>Summers</u>, 129 S. Ct. at 1153, and clearly provides that challenges to the Idaho Rule are not ripe because Plaintiffs have not challenged the Rule's application to any specific project.  The Ninth Circuit in <u>California ex rel. Lockyer v. U.S. Dep't of Agric.</u>, 575 F.3d 999, 1011 (9th Cir. 2009), similarly failed to address <u>Ruthenbeck</u> in discussing ripeness.

interpretation and discount the agency's stated intentions.[6]  To the contrary, when considering a facial challenge to a regulation, courts are obligated to defer to the agency's understanding of its regulation, Siskiyou Reg'l Educ. Proj. v. U.S. Forest Serv., 565 F.3d 554, 557-58 (9th Cir. 2009), and to presume that the regulation will be exercised "in good faith." Sullivan v. Everhart, 494 U.S. 83, 94 (1990).  Here the agency's methodology and its understanding of its own rule is reasonable and should be upheld.

With regard to timber harvest and road-building projections within the GFRG theme on the Boise, Payette and Sawtooth National Forests, the agency determined that timber harvest and road-building for the foreseeable future would be comparable with levels projected under the Roadless Rule.  AR FS 1161, 1151 and 1148.  In their reply, Plaintiffs fail to point to any error in this approach, suggesting only that because the GFRG theme *allows* more activity than the Roadless Rule, the agency should have projected more timber harvest.  See Pl. Reply at 26.  The agency's projections, however, are not based solely on the permissions of the Rule but also on the three forests' actual plans, anticipated budgets, and management priorities.  See Def. Br. at 9-10.  Plaintiffs fail to point to anything unreasonable in this methodology, and it should therefore be upheld by the Court.  Lands Council v. McNair, 537 F.3d 981, 993 (9th Cir. 2008).[7]

---

[6] Indeed, courts frequently consider the agency's intent as set forth in the preamble to a regulation when interpreting a regulation.  Whitman v. Am. Trucking Ass'ns., 531 U.S. 457, 477 (2001).  See also Public Citizen v. Carlin, 184 F.3d 900, 911 (D.C. Cir. 1999) ("We regularly rely upon the preamble in interpreting an agency rule.  The purpose of the preamble, after all, is to explain what follows.") (citations omitted).

[7] Plaintiffs devote most of their reply to contesting the Forest Service's alternative argument that even if the agency should have used a different methodology to predict timber harvest and road-building in the GFRG theme on the three forests, that error would not have altered the relative comparison between the Idaho Rule and the alternatives to the Rule, because of the relatively small amount of GFRG acreage on the three forests in comparison to the 405,900 acres of GFRG state-wide.

Even adopting Plaintiffs' methodology of using the pre-2001 Forest Plan projections for all GFRG acres on the Sawtooth (55,000) and the Boise (23,400) National Forests, the projections are indistinguishable from the projections actually used by the Forest Service.  See AR FS 1161 (Sawtooth projected annual average is .002 MMBF under pre-2001 plan, .0091 MMBF under the Roadless Rule, and .01 MMBF under the Idaho Rule).  id. (Boise projected annual average is .03 MMBF under the pre-2001 plan, .03 MMBF under the Roadless Rule, and .06 MMBF under the Idaho Rule).  Only on the Payette (where only 2,800 acres of GFRG are at issue), do the pre-2001 plan projections differ significantly from projections used by the Forest Service.  AR FS 1161.  This is the case because the Payette's current forest plan refocuses management from development to restoration.  Based on this change in management, the agency

**B.     The Forest Service Properly Analyzed Phosphate Mining**

Plaintiffs continue to insist that the Forest Service was required to conduct a site-specific analysis of potential future phosphate mining operations on the 5,770 acres of known phosphate lease areas (KPLA) where the Idaho Rule allows road-building in support of phosphate mining. This claim fails because the Idaho Rule does not irretrievably commit any lands to phosphate mining.   As a consequence, the agency prepared a programmatic EIS, and properly deferred site-specific analysis until a site-specific mining proposal is made.   See Def. Br. at 11-16.

In their reply, Plaintiffs do not dispute that at the programmatic level an agency need not evaluate site-specific impacts until it reaches the "critical decision". . . . "to make an irreversible and irretrievable commitment of the availability of resources to a project at a particular site." California v. Block, 690 F.2d 753, 761 (9th Cir. 1982) (internal citations and quotations omitted). Instead, relying solely on California v. Block, Plaintiffs insist that the agency has made an "irreversible and irretrievable commitment" because the Idaho Rule "constrains the Forest Service's discretion to consider preserving a roadless area as an alternative to authorizing road construction to facilitate phosphate mining." Pl. Reply at 29.  This claim is simply not true.  The Idaho Rule gives the agency *permission* to consider road construction on 5,770 acres of KPLAs, but it does not constrain the agency from deciding at the site-specific level not to approve road construction.  This distinction is fatal to Plaintiffs' attempt to analogize this case to Block.

At issue in Block was the Forest Service's designation of certain roadless lands as "Nonwilderness."  690 F.2d at 758.  Although the designation did not itself propose any site-specific activities, it "constrained" future site-specific decisions by "explicitly mandat[ing]" that the areas "'*will be* managed for uses other than wilderness.'" Id. at 762 (emphasis added).  The agency had thus relinquished the "discretion to manage a Nonwilderness area in a manner consistent with wilderness preservation," and although future site-specific proposals would be evaluated under NEPA, the agency would not be able consider wilderness preservation as an

---

reasonably concluded that harvest levels over the next 15 years on the Payette will be similar to levels under the 2001 Rule. See AR FS 1148, 1151.

alternative to development.  <u>Block</u>, 690 F.2d at 763.  Because the agency had irreversibly and irretrievably committed to forego a certain use of its lands, it was obligated to consider the site-specific impacts of that commitment.  <u>Id.</u>

In contrast, the Idaho Rule does not provide that the 5,770 acres of KPLAs at issue "*will be* managed for uses other than" roadless values.  <u>Block</u>, 690 F.2d at 762 (emphasis added).  The rule *permits* the agency to authorize road-building in conjunction with phosphate mining, but the agency retains absolute authority to decide at the site-specific level whether to approve road-building or to deny a proposal based on its detrimental impacts to an area's roadless values.[8]

Plaintiffs attempt to tease a constraint on the Forest Service's discretion out of Section 294.28(e) is unavailing.  Pl. Reply at 29.  Section 294.28(e) simply makes clear that the Idaho Rule cannot be modified by a project-specific decision or by the revision or amendment of a forest plan.  Nothing in Section 294.28 deprives the Forest Service of the discretion to determine not to authorize road-building in conjunction with a proposed phosphate-mining project.  In other words, a project-level decision cannot reallocate acreage from GFRG to another category, but it certainly can determine not to authorize construction of a road.

Because, unlike the rule at issue in <u>Block</u>, the Idaho Rule preserves the agency's discretion to make a site-specific determination about whether to permit road-building in conjunction with proposed phosphate mining, the agency has not made an irreversible and irretrievable commitment of resources, and appropriately prepared a programmatic EIS.  <u>N. Alaska Envtl. Ctr. v. Kempthorne</u>, 457 F.3d 969, 976-77 (9th Cir. 2006); <u>Friends of Yosemite Valley v. Norton</u>, 348 F.3d 789, 801-02 (9th Cir. 2003); <u>Salmon River Concerned Citizens v.</u>

---

[8] Plaintiffs concede the agency "may retain discretion to prohibit road construction . . . for other reasons," but then make the unsupported assertion that the agency cannot do so "for the purpose of preserving their status as inventoried roadless areas."  Pl. Reply at 30.  Plaintiffs' concession is dispositive.  The agency's discretion to bar road-building at the site-specific level means that it has not made an irreversible and irretrievable commitment of resources, and thus may defer site-specific NEPA analysis to that time as well.  <u>Connor v. Burford</u>, 848 F.2d 1441, 1447 (9th Cir. 1988), <u>Block</u>, 690 F.2d at 761.  Second, there is no basis for Plaintiffs' claim that the agency can decide not to authorize road-building for one reason, but not for another.  To the contrary, the Rule makes clear that "[a]llocation to a specific theme does not mandate or direct the Forest Service to propose or implement any action."  73 Fed. Reg. 61,456, 61,463 (Oct. 16, 2008).

Robertson, 32 F.3d 1346, 1357-58 (9th Cir. 1994); N. Alaska Envtl. Ctr. v. Lujan, 961 F.2d 886, 891 (9th Cir. 1992).

### 1.    The EIS Properly Discloses the Impacts of Allowing Phosphate Mining

As explained in Defendants' opening brief, the Idaho Rule EIS provides sufficient detail at the programmatic level to allow the public and the agency to make an informed choice among alternatives.  See Def. Br. at 14-15.  Plaintiffs do not dispute that the EIS allows for a meaningful comparison among alternatives, but rather insist that because the Rule only allows consideration of phosphate leasing on the 5,770 acres that are most likely to be developed, a more detailed analysis could have been developed.  Pl. Reply at 30.  This contention fails.

First, even if it could be developed, the additional detail sought by Plaintiffs is not useful or necessary.  The EIS assumes that over the long-term all acres will be leased and mined, and discloses a range of impacts that enabled the decision-maker to compare levels of phosphate mining impacts under each alternative.  See Def. Br. at 14-15.

Second, while the collaborative rulemaking process reduced the area available for phosphate mining from 14,460 acres to the 5,770 acres most likely to be developed, the evaluation demanded by Plaintiffs remains an unreasonably speculative endeavor, because the agency will not know the site-specific impacts until specific parcels are leased and mining plans developed.  In effect, Plaintiffs demand that the agency invent and then analyze fictitious mining plans over the next 50 years, answering all of the questions that must be resolved in such plans: Where will mining operations be located? In what order will parcels be developed? Where will access roads be constructed? Where will overburden be stored? What remediation and mining technologies will be used?[9]  Such speculation is not called for, as prior to authorizing any mining operations, the impacts of proposed operations will be subject to detailed site-specific evaluation

---

[9]  While the 5,770 acres identified in the EIS are most likely to be developed, the timeframe for doing so spans 50 years.  AR FS 844 (EIS at 175, 179-181).  A mining proposal 40 years from now will likely employ different technologies and have vastly different impacts than would be expected today.

and review under NEPA.[10]  73 Fed. Reg. at 61,469.

Similarly, it is settled law that specific mitigation measures need not be developed until a site-specific proposal is presented.  N. Alaska Envtl. Ctr., 961 F.2d at 891; Def. Br. at 15. Plaintiffs assert that this law is inapplicable here because the agency allegedly relied on mitigation to diminish the Rule's impact on Bonneville and Yellowstone cutthroat trout.  Pl. Br. at 31.  This claim misconstrues the EIS.  The EIS notes, as a background matter, that Bonneville and Yellowstone cutthroat trout are generally at a high risk from potential mining activities because they depend on stream habitat overlapped by KPLAs.  AR FS 844 (EIS at 261).  The EIS then goes on to explain that because standards established by the Forest Plan and regional aquatic conservation strategies require risk to the species be minimized when site-specific proposals are developed, and because those standards would apply to all proposed mining operations *regardless of which rule is adopted*, all of the rules under consideration pose a low risk to species.  See AR FS 844 (EIS at 265) (low risk under 2001 Rule); id. at 267 (no loss of viability under existing plans); id. at 271 (low risk under proposed Idaho Rule); id. at 275 (low risk under Modified Idaho Rule).[11]  Thus, it is not the case that the Forest Service relied on mitigation in a manner that obscured the impacts of the Idaho Rule or compromised the comparison between the Idaho Rule and the alternatives to that rule.[12]

The Forest Service fully complied with NEPA, and should be granted summary judgment on plaintiffs' NEPA claims.

### III.    FWS AND THE FOREST SERVICE COMPLIED WITH THE ESA

---

[10]  The complexity of the site-specific analysis that Plaintiffs demand is illustrated by the more than 1,300 page Smoky Canyon Mine EIS, which evaluated a mining plan for approximately 1,100 acres when the project was proposed.  See AR FS 1445 to 1450.

[11]  See, e.g., AR FS 36 (Caribou Forest Plan, RFP 3-14 (requiring mining operations comply with State and Federal surface and ground water standards); Forest Service Manual § 2670.32, http://www.fs.fed.us/im/directives/fsm/2600/2670-2671.doc, (obligating agency to "[a]void or minimize impacts to species whose viability has been identified as a concern")

[12]  Plaintiffs claim that mitigation has "never prevented unlawful water pollution" from phosphate mining.  Pl. Reply at 31.  Aside from the fact that the cite Plaintiffs provide does not support such a claim, any mining activity would be required to comply with a Clean Water Act (CWA) discharge permit and any unlawful pollution in violation of that permit could trigger enforcement actions from EPA, Idaho Department of Water Quality, the BLM, the Forest Service, and/or private parties under the CWA citizens' suit provisions.

**A.     Neither the ESA Nor Ninth Circuit Law Restrict FWS's Inquiry to Only the Binding and Enforceable Plans of a Federal Agency**

The crux of Plaintiffs' ESA challenge to the Idaho Rule is an allegation that the FWS is statutorily precluded from considering commitments made by Forest Service officials (see AR FS 1107 at 307, 309) in the context of a formal Section 7 consultation.  Pl. Reply at 13-14, 15-16.  In this way, Plaintiffs make clear that their dispute is not with the Forest Service's commitments themselves, but rather with the manner in which the commitments were made (i.e., letters from a senior Forest Service official).  See id. at 11 (asserting error because the Forest Service letters were "omitted" from the Idaho Rule); id. at 23 (claiming the Forest Service violated the ESA because it "failed to incorporate" the commitments into the Rule).  Plaintiffs' claims run directly afoul of Ninth Circuit precedent and find no support in the ESA.

First, Ninth Circuit law is explicit that FWS must assess and project how a programmatic regulation may be implemented and may rely on reasonable assumptions and projections in doing so.  In N. Alaska Envtl. Ctr. v. Kempthorne, the agency action at issue (plan to offer oil and gas leases) had no direct impacts on listed species; rather, any effects of the action would arise upon later issuance of permits authorizing oil and gas drilling.   457 F.3d at 973.  Recognizing the agency's obligation to assess potential oil and gas drilling activities, the Ninth Circuit held that the agency is entitled to develop and rely upon reasonable "assumptions" regarding how the future activities under the plan may occur.  Id. at 981.  There, the court specifically upheld reliance on "hypothetical future projections of what might be undertaken in the exploration and development phrases," based in part on past "experiences in drilling elsewhere in Alaska."  Id. at 974.

Second, Ninth Circuit law is clear that FWS may consider any *relevant* information necessary to formulate the assumptions and projections, and is not constrained to consider only the binding or enforceable actions of a Federal agency.  See N. Alaska, 457 F.3d at 974 (upholding projections based on "hypothetical scenarios").  Unlike Plaintiffs' strained reading of the law, this principle is firmly grounded in the ESA.  See 16 U.S.C. § 1536(a)(2) (requiring

FWS to consider the effects of "any action," whether voluntary or discretionary with the agency); 50 C.F.R. § 402.02 ("action" includes "all activities or programs of any kind" including but not limited to "regulations"); 50 C.F.R. § 402.14(c)(6) (requiring FWS to consider "[a]ny other relevant information on the action"); id. § 402.14(g)(1) (requiring FWS to consider "all relevant information provided by the Federal agency or otherwise available"). Accordingly, Ninth Circuit precedent forecloses Plaintiffs' arguments that FWS is limited to considering only binding or enforceable actions of a Federal agency in an ESA consultation.[13]

Plaintiffs' reliance on cases reviewing FWS's or NOAA's consideration of mitigation measures to offset immediate and certain adverse effects to listed species also fails, as those cases do not establish a contrary rule.  For example, Plaintiffs rely heavily on National Wildlife Fed'n v. National Marine Fisheries Serv., 524 F.3d 917 (9th Cir. 2008) ("NWF"), to support their invented standard that the "ESA demand[s]" FWS only consider the effects of those actions stemming from "binding" or "enforceable" plans of an agency.  Pl. Reply at 13-14.  This is not what the Ninth Circuit held.

In NWF, the agency action (operation and maintenance of a series of massive dams throughout the Pacific Northwest) directly and significantly affected 13 species of threatened and endangered fish, and NOAA relied on proposed structural modification to several dams to offset immediate adverse effects to the species.  524 F.3d at 923 & n.2, 936-37.  There, the court concluded that, "without more solid guarantees" that the dams will be structurally modified (such as through "specific and binding plans"), it was arbitrary for NOAA to conclude that this mitigation could be found to offset the "certain immediate negative effects" of the action.  Id. at 935-36.  While the NWF court addressed the reasonableness of NOAA's findings, it did not hold

---

[13]    In this regard, it is notable that Plaintiffs' demand that the Forest Service must establish binding and enforceable plans to implement the Rule is irreconcilable with their request that the 2001 Roadless Rule be reinstated, as the 2001 rule likewise did not specify how the Rule will be implemented as relating to listed species.  See 66 Fed. Reg. 3243, 3257 (Jan. 12, 2001) (providing that "determinations are best made through project specific or land and resource management plan NEPA analyses, as guided by ecological considerations such as those described below").

that the ESA limits the Service's inquiry, in all consultations and regardless of context, to only "specific and binding plans."  Pl. Reply at 13-14, 16.  In fact, the court found that the consulting agencies are *not* precluded from considering actions "in fact under agency control," such as the commitments in the Forest Service's letters at issue here. 524 F.3d at 936 n. 17.[14]

Contrary to Plaintiffs' claims, Selkirk Conservation Alliance v. Forsgren, 336 F.3d 944 (9th Cir. 2003), supports, rather than undermines, FWS's analysis in the 2008 Biological Opinion.  See Pl. Reply at 13-14 (discussing Selkirk). In that case, FWS relied on a "cooperative management plan to minimize effects to the grizzly bear," a plan that FWS "believed" and "assum[ed]" would sufficiently mitigate the adverse effects associated with the project.  Id. 949-50.  Upholding FWS's analysis, the Ninth Circuit did *not* hold that "private mitigation promises" must be enforceable. Pl. Reply at 13-14.  Rather, the Ninth Circuit affirmed the Circuit's prior holdings "that an agency may fulfill its duties under our environmental laws even if the agency relies on private mitigation promises."  Selkirk, 336 F.3d at 955-56 (citing cases).

Recognizing the need to bypass this holding, Plaintiffs seek to find support for their created standard by referring to Selkirk's explanation that a "relevant" consideration in FWS's analysis is the extent to which "the Agreement imposes enforceable obligations on the parties." Selkirk, 336 F.3d at 956; Pl. Reply at 13-14.  However, the Ninth Circuit there was explaining

---

[14]    Like NWF, the other cases Plaintiffs rely upon have little relevance here.  In Northwest Envtl. Advocates v. EPA, 268 F. Supp.2d 1255 (D. Or. 2003), the Court found a biological opinion to be arbitrary and capricious because it contained "*no assurances* that the state-based commitments on which it rested its no jeopardy finding were likely to occur."  Id. at 1273 (emphasis added).  In Ctr. for Biological Diversity v. Rumsfeld, 198 F. Supp. 2d 1139 (D. Ariz. 2002), the Court found the biological opinion required only the development and implementation of a "plan" to address water usage and "participat[ion]" in a regional planning process, instead of requiring the Army to "reduce reliance on groundwater pumping by any particular amount or to achieve any measurable goals with respect to water recharge."  Id. at 1153.  Thus, the court concluded that the biological opinion "enables the Army to sidestep any direct responsibility for addressing deficit groundwater pumping."  Id.  In NRDC v. Kempthorne, 506 F. Supp. 2d 322 (E.D. Cal. 2007), the court determined that the consulting agency's reliance on an adaptive management plan to offset certain and immediate effects of operating large water projects was arbitrary because, while a "process" existed, "nothing requires that any actions ever be taken." Id. at 355-56 ("The existing DSRAM process provides *absolutely no certainty* that any needed smelt protection actions will be taken at any time" (emphasis added)).  All of these cases are akin to a situation where there is no commitment at all to take any action in the Forest Service's letters, which is unquestionably not the situation presented to FWS in this ESA consultation.

that the enforceability of a "mitigation promise" is relevant to assessing whether "the proposed mitigation measures will actually be implemented," a particularly important inquiry in that case involving promises by a non-federal entity. Id. at 956. The consideration of the likelihood in which mitigation measures will be implemented certainly does not mean that FWS is statutorily restricted to considering only enforceable or binding actions of a Federal agency. See, e.g., Southwest Ctr. v. Bureau of Reclamation, 143 F.3d 515, 518 (9th Cir. 1998) (holding consideration of generalized commitment to protect 1,400 acres, without particular location, project specificity, or time frame, reasonable under the ESA); Arizona Cattle Growers' Ass'n v. Kempthorne, 534 F. Supp. 2d 1013, 1036 (D. Ariz. 2008) (rejecting invitation "to fashion an entirely new requirement, unsupported by any ESA-related precedent, simply based upon what Plaintiff believes to be sound environmental policy").[15]

In sum, Ninth Circuit precedent and the ESA belie Plaintiffs' claims that the "ESA demand[s]" that FWS only consider the binding and enforceable actions of the Forest Service. Pl. Reply at 14. In the Biological Opinion, FWS analyzed the potential implementation of the Idaho Rule and, in doing so, developed reasonable assumptions and projections based on the relevant information before the agency. As further demonstrated below, FWS performed this requisite analysis reasonably and rationally, and the agency's analysis is entitled to deference and should be upheld. See Pyramid Lake Paiute Tribe v. Dep't of Navy, 898 F.2d 1410, 1414 (9th Cir. 1990) ("The relevant inquiry is whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choice made.")

**B.     FWS's ESA Analysis Complies With the ESA, and the Forest Service's Reliance on the Biological Opinion was Reasonable**

The ESA and Ninth Circuit law make clear that the relevant inquiry is whether FWS's assumptions made in analyzing the potential implementation of the Idaho Rule are reasonable.

---

[15]   Plaintiffs' proffered standard would also frustrate the purposes of the ESA. Under the consultation regulations, the action agency develops the scope of the action under consultation and FWS analyzes the "effects of the action." 50 C.F.R. § 402.14(c), (g). This process does not make any distinction between adverse and beneficial effects. Under Plaintiffs' view, however, any effect – even those that are adverse – not associated with such binding plans could not be considered by FWS and would therefore frustrate the very purposes of an ESA consultation.

Similarly, with respect to the Forest Service, the "critical question is whether the action agency's reliance was arbitrary and capricious."  City of Tacoma v. FERC, 460 F.3d 53, 75 (D.C. Cir. 2006).  The record confirms that the agencies have satisfied these standards.

In consulting on the Idaho Rule, FWS was presented with a programmatic agency regulation that altered the activities the Forest Service may permit within IRAs in Idaho, but does not mandate that the Forest Service take any action or specify how any future action shall occur.  See 73 Fed. Reg. at 61,456 ("The rule does not authorize the building of a single road or the cutting of a single tree"); AR FS 1107 at 42 ("Allocations to a specific theme are not intended to mandate or direct the [Forest Service] to propose or implement any action.").  Because the Idaho Rule altered the Forest Service's discretion in authorizing certain activities in IRAs, FWS fully analyzed the Rule's management themes (AR FS 1107 at 25-37), the relationship between the Rule and existing Forest Plans (id. at 37-41), and the projected amount of temporary road building, timber harvest, or other activities under the Rule (id. at 41-45).  FWS then refined its inquiry, considering the types of activities that could be authorized in grizzly bear and caribou habitat, as well as the extent to which such activities may occur.  Id. at 84-107 (caribou), 140-50 (grizzly bears).  FWS found that the activities permissible under the Rule (such as road-building or timber harvest) have the potential to adversely affect grizzly bears and caribou, and FWS fully analyzed these potential adverse effects.  Id. at 100-09 (caribou), 143-50 (grizzly bears).[16]

As notably unaddressed by Plaintiffs, FWS was also required to consider factors other than the effects of activities like road building or timber harvest on grizzly bear or caribou habitat.  In particular, although the Forest Service possesses limited discretion to authorize, for example, timber harvest or temporary roads in the BCR theme within caribou or grizzly bear habitat, it also is *legally required* to conform any authorization to the prescriptions contained in existing (or future) Forest Plans, biological opinions, and applicable statutory mandates (such as

---

[16]   In this regard, Plaintiffs' terse (and contradictory) assertions that FWS "failed to evaluate development activities" permissible under the Rule, Pl. Reply at 11, 19, or otherwise excluded habitat disturbing activities from consideration, id. at 18, cannot be substantiated.  See also Pl. Reply at 11-12 & n.9 (cherry-picking aspects of the Biological Opinion that show FWS's analysis of the potential consequences of activities generally authorized under the Rule).

Section 7's no jeopardy mandate and Section 9's prohibition on the unauthorized "take" of species, 16 U.S.C. §§ 1536(a)(2), 1539). See 73 Fed. Reg. at 61,473 ("The final rule (section 294.28(d)) makes it clear that applicable [Forest Plan] components (desired conditions, objectives, suitability, guidelines, and standards) must be adhered to during the planning and implementation of a project"); Defs. Br. at 18-19; Defs. SOF ¶¶ 24-31. Yet, neither FWS nor the Forest Service had before it a single activity, planned or proposed, under the Idaho Rule in grizzly bear or caribou habitat. AR FS 1107 at 37, 67, 143.

For this reason, FWS reasonably evaluated how and under what circumstances the Forest Service, *in actuality*, could authorize an action generally permissible under the Idaho Rule in grizzly bear or caribou habitat. See AR FS 1107 (BO at 41-45, 100-08 (caribou), 143-51 (grizzly bears). For example, any activity in grizzly bear habitat, even one permissible under the Idaho Rule, must be consistent with Forest Plan road-density standards applicable in grizzly bear core habitat. See AR FS 1107 (BO at 135-37). FWS considered these standards and their effects on activities that could be undertaken pursuant to the Idaho Rule. See id. at 144-45. FWS also considered the Forest Service's ongoing development of a new Access Amendment, which will include updated road density and other standards to protect grizzly bears and which will be subject to a separate ESA consultation. AR FS 1107 (BO at 37, 145-46).

To address the uncertainty over whether future implementation of the Rule would occur under existing Forest Plan direction or the future Access Amendment, the Forest Service committed to defer authorization of any activity under the Idaho Rule in grizzly bear core habitat that is likely to adversely affect the grizzly bears, except for projects designed to provide long-term benefits to the species, until the Access Amendment and accompanying ESA consultation are completed. Id. at 37, 145-47, 309. FWS considered this information and rationally concluded that future implementation of the Idaho Rule, if any, is likely to be subject to more stringent and protective management direction contained in the Access Amendment and related ESA consultation. Id. at 145-49. By incorporating this assumption as a critical aspect of its ESA analysis, FWS ensured that any deviation from this commitment will necessitate reinitiation of

consultation pursuant to 50 C.F.R. § 402.16; N. Alaska, 457 F.3d at 981 (finding that, should "future actions differ from the [biological opinion's] assumptions, [the action agency] must reinitiate consultation with the FWS.").  FWS's consideration of the other commitments made in the Forest Service's letters (AR FS 1107 (BO at 307, 309)) followed a similar path. AR FS 1107 (BO at 107-110) (caribou); Def. Br. at 20-23.

FWS plainly considered the relevant factors relating to promulgation of the Idaho Rule, and FWS's analysis easily withstands scrutiny.  For instance, Plaintiffs argue that FWS may not rely on past conduct to project how the Rule is likely to be implemented and effect listed species. Pl. Reply at 12.  However, the Forest Service's commitments are clearly substantiated by its past conduct, such as its consistent application of Forest Plan direction to avoid adverse effects to caribou associated with timber harvest activities over the past decade.  AR FS 1107 (BO at 307-08).  Further, Ninth Circuit precedent demonstrates that an agency's past conduct is relevant to FWS's analysis. See N. Alaska, 457 F.3d at 974 (upholding assumption based on evidence of past experiences); Columbia Snake River Irrigators Ass'n v. Nat'l Wildlife Fed'n, 230 Fed. Appx. 659, 661 (9th Cir. 2007) (consulting agency "was within its discretion to find that state-regulated harvests were reasonably certain to occur in the future, based on past practice").

Plaintiffs also dispute FWS's determination that the Forest Service's commitments were applicable to the Kootenai National Forest, Pl. Reply at 21-22, but their arguments ignore the actual evidence before FWS.  First, the Idaho Panhandle Forest Supervisor's letter unambiguously spoke on behalf of the entire Forest Service and in regards to activities in both the Idaho Panhandle and Kootenai National Forests. AR 1107 (BO at 309-10) (expressly discussing "grizzly bear management in the Idaho Roadless Areas that are part of the Kootenai and Idaho Panhandle National Forests").  Second, FWS had before it and considered evidence affirmatively showing the Kootenai National Forest Supervisor made the same commitments. AR FWS 507 at 7218-19; AR FS 1667.[17]   Third, FWS repeatedly addressed the likelihood that

---

[17]   Plaintiffs opine that the FWS cannot rely on the Kootenai Forest Supervisor's letter because, although the letter is in the record, it was not expressly cited in the Biological Opinion. Yet, there is no requirement that a Biological Opinion cite every piece of evidence before the agency and

the Forest Service would adhere to its commitments, in accordance with the Ninth Circuit's instruction in <u>Selkirk</u>, 336 F.3d at 956.  <u>See</u> Def. Br. at 24; AR FS 1657 (noting agreement to explore further some form of agreement to defer activities would be); AR FS 1778 (noting advisability of official guarantee, in writing, from the Forest Service); AR FS 1679 (noting request for official statement from the Forest Service); AR FS 1680 (same); AR FS 1683 (same).

Thus, FWS rationally concluded that it may properly rely on representations made by a senior Forest Service official for grizzly bear habitat in both the Kootenai and Idaho Panhandle National Forests and that it need not second-guess these official representations without any basis to do so.  These conclusions are certainly reasonable and supported by the law.  <u>See</u> <u>Sullivan v. Everhart</u>, 494 U.S. 83, 94 (1990) ("Respondents' fear of intentional manipulation" by an agency "can be entirely dismissed if this provision is observed in good faith – as we must presume, in this facial challenge, it will be."); <u>Oregon Natural Desert Ass'n v. Tidwell</u>, --- F. Supp. 2d ---, 2010 WL 2246419, *18 (D. Or. June 4, 2010) (holding that NOAA "was entitled to rely on the official representations of the Forest Service" and that NOAA "was not required to second guess those representations").[18]

Plaintiffs' challenge to FWS's analysis of the Pack River Area (PRA) likewise fails. Pl. Reply at 20-21.  In the Biological Opinion, FWS determined that activities under the Idaho Rule could occur in grizzly bear habitat in the PRA without adversely affecting the bears, based on an assessment of the habitat characteristics, grizzly bear presence, and management options and discretion available to the Forest Service.  AR FS 1107 (BO at 147).  Because activities under

---

relied upon in its analysis.  <u>See</u> 16 U.S.C. § 1536(b)(3)(A) (requiring FWS to provide "a <u>summary</u> of the information on which the opinion is based" (emphasis added)); <u>see also</u> <u>Latino Issues Forum v. EPA</u>, 558 F.3d 936, 941 (9th Cir. 2009) ("'Even when an agency explains its decision with less than ideal clarity,' we 'will not upset the decision on that account 'if the agency's path may reasonably be discerned.'") (quoting <u>Alaska Dep't of Envtl. Conservation v. EPA</u>, 540 U.S. 461, 497 (2004)).

[18]  Plaintiffs' efforts to distinguish <u>Tidwell</u> fail.  Pl. Reply at 15 n.11.  There, the court noted that "implementation [of the measures] relies upon Forest Service and permittee action," and the question before the court was whether the Forest Service "could implement the proposed conservation measures," not whether the Forest Service's commitment was "enforceable." <u>Id.</u> at *17.  These precise considerations are at issue here.

the Rule and grizzly bear protection in the PRA are not incompatible, FWS assumed the Forest Service would exercise its discretion, consistent with the mandates of the ESA itself, to design and authorize activities in the PRA to avoid adverse effects to grizzly bears, should it ever decide to authorize an activity there.  Id.  Contrary to Plaintiffs' claims, FWS did not assume that the commitment to defer activities in grizzly bear core habitat also applied to the PRA, as FWS was explicit that the Forest Service's "commitment to avoid adverse effects," not defer activities in core habitat, "would extend to actions proposed under the [Rule] within the PRA."  Id.

In sum, FWS considered all of the relevant factors, including the potential adverse effects of authorizing generally permissible activities in grizzly bear or caribou habitat and the likely circumstances in which the Forest Service may implement the Rule.  Far from constituting an "empty exercise," Pl. Reply 17, the ESA consultation afforded the agencies an opportunity to develop and gather needed information, consider the potential environmental effects under different regulatory regimes, and identify additional measures for the protection and conservation of the species, including amending the Idaho Rule to require adherence to applicable species' conservation and protection measures and securing additional commitments that "provide additional assurance to the consultation."   AR FS 1107 (BO at 37) (discussing the Forest Service's letters); Def. Br. at 24.  The agencies fully complied with the ESA, and Plaintiffs' ESA claims should be dismissed.

## IV.   WINEGAR HOLE

Plaintiffs assert that in allocating the 2,600 acres Winegar Hole area to the Primitive theme, the Forest Service "impermissibly" construed the Wyoming Wilderness Act (WWA) as a formal "release" of the Winegar Hole area to multiple-use management.  Pl. Reply at 32.  This claim fails.

To the extent Plaintiffs intend to suggest the Forest Service's discretion to manage Winegar Hole for multiple uses was constrained absent a congressional release of the area, which the WWA obviously does not provide, that claim fails.  The Forest Service has the organic authority to allocate the Winegar Hole area to any management regime it deems appropriate, so

long as its decision was not arbitrary.  Perkins v. Bergland, 608 F.2d 803, 806 (9th Cir. 1979) (noting the Forest Service's multiple use mandate "breathes discretion at every pore") (citation omitted).  Rather than relying on the WWA for *authority* to manage the Winegar Hole as nonwilderness, as Plaintiffs suggest it did, the agency noted as one factor in it decision of how to allocate the area that in enacting the WWA Congress considered the adjacent lands for designation as wilderness and did not include the Winegar Hole.   See Def. Br. at 27. Consideration of the WWA in this limited manner was not arbitrary.

While Plaintiffs focus on a single statement in the EIS, the record as a whole shows the agency also considered a range of factors in its allocation decision, including input from the public, counties and the states of Idaho and Wyoming.  Def. Br at 26; Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974) (agency's analysis sufficient where the basis for its decisions can "reasonably be discerned" from the record).  In light of the whole record, the agency's allocation of  the Winegar Hole area was not arbitrary or capricious.

## V.      REMEDY

Plaintiffs seek equitable relief in the form of "an injunction vacating and setting aside FWS's biological opinion and the Idaho Roadless Rule . . . [and] reinstating the 2001 Roadless Rule."  Pl. Br. at 29.  Plaintiffs are not entitled this relief, and to the extent the Court finds that the issuance of relief is warranted, further proceedings are necessary to tailor any relief to the precise violation found.

### A.      Plaintiffs are Not Entitled to Injunctive Relief

To obtain injunctive relief, a "'plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law  . . . are inadequate . . . ; (3) that, considering the balance of hardships between the plaintiffs and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'"   Monsanto Co. v. Geertson Seed Farms, 130 S. Ct. 2743, 2756 (2010) (quoting eBay Inc. v. MercExchange,

547 U.S. 388, 391 (2006)).[19]

Plaintiffs claim that they have suffered irreparable injury because the Idaho Rule "authorizes harmful development activities in previously protected roadless areas." Pl. Reply at 35. But Plaintiffs have not identified <u>any</u> such activities. As set forth in Defendants' opening brief and unrebutted in Plaintiffs' reply: there are not yet final agency actions on any of the timber projects named by Plaintiffs; no final agency action has occurred on the Dairy Syncline phosphate project; no projects have been proposed in IRAs in caribou or grizzly bear habitat; and the agency had not made the further determinations that must take place before there can be surface occupancy on the Smoky Canyon North Fork Deer Creek Lease Modification. Def. Br. at 3-4. In short, Plaintiffs' claim of injury rests on no more than the speculative possibility that the Forest Service will at some point in the future approve a project in an IRA that will harm their interests.[20] Injunctive relief cannot be awarded on the basis of speculative future actions. <u>Morales v. TWA</u>, 504 U.S. 374, 382 (1992) ("[C]onjectural injury cannot warrant equitable relief"); <u>Connecticut v. Massachusetts</u>, 282 U.S. 660, 674 (1931) ("[An] injunction will not be granted against something merely feared as liable to occur at some indefinite time in the future.").

Moreover, Plaintiffs also fail to explain why declaratory relief is not adequate to remedy their alleged harms. Should the Court find the Idaho Rule invalid in any respect, declaratory relief affords Plaintiffs an adequate remedy: when the Forest Service authorizes a project under the Idaho Rule that Plaintiffs believe will cause them injury, they can challenge that project based on the weight of that declaratory relief and ordinary principles of <u>stare decisis</u>. <u>See, e.g.,</u>

---

[19]  Under the ESA, the same four-part inquiry is required and injunctive relief is not automatic. Nat'l Wildlife Fed'n v. Burlington N. R.R., 23 F.3d 1508, 1510 (9th Cir. 1994), although the Ninth Circuit has made clear that in weighing the equities, the balance tips to the needs of endangered species, <u>Wash. Toxics Coal. v. E.P.A.</u>, 413 F.3d 1024, 1032 (9th Cir. 2005).

[20]  Plaintiffs err in asserting that they have shown injury "equivalent" to the showing that justified the injunction in <u>California ex rel. Lockyer</u>. Pl. Reply at 35. The court there based injunctive relief on projects that had reached final decisions and it found injury was thus imminent. 459 F. Supp. 2d 874, 914 (N.D. Cal. 2006). The phosphate mining activity the California district court found caused injury "ha[d] already gone forward" when the court entered its decision, and the other projects had all reached final decisions. <u>Id.</u> at 891-892 ("The parties stipulated that there have been fourteen incursions into IRAs for timber harvesting and road reconstruction.").

United States v. Am. Friends Serv. Comm., 419 U.S. 7, 11 (1974) (a full and fair opportunity to litigate claims in a separate suit constitutes an adequate remedy at law, thereby undercutting "the existence of irreparable injury").

Finally, Plaintiffs fault the Defendant-Intervenors for failing to identify a "countervailing hardship . . . justifying denial of injunctive relief." Pl. Reply at 37. This demand reverses the burden of proof: it is Plaintiffs' burden to demonstrate the need for injunctive relief, not for other parties to "justify denial" of such relief. See Monsanto, 130 S. Ct. at 2757 ("It is not enough for a court considering a request for injunctive relief to ask whether there is a good reason why an injunction should *not* issue; rather, a court must determine that an injunction *should* issue under the traditional four-factor test."). Moreover, because Plaintiffs have failed to demonstrate irreparable injury, there is no need for the Court to address the remainder of the equitable factors, as a plaintiff must carry its burden as to all four factors. See Winter v. Natural Res. Def. Council, 129 S. Ct. 365, 376 (2008); Munaf v. Geren, 553 U.S. 674, 690-91 (2008).

### B.    Vacatur of the Idaho Rule is Not Appropriate

Although Plaintiffs initially framed their request for relief as "an injunction" vacating the Idaho Rule and reinstating the Roadless Rule, they suggest in their reply that vacatur "normally" accompanies findings of legal error in regulations, and that the Court "may not need" to address the injunctive factors to vacate the Idaho Rule.[21] Pl. Reply at 33-34.

While there is some uncertainty as to the precise equitable inquiry that accompanies the vacatur decision,[22] it is clear, as Plaintiffs concede, that Courts have the discretion to leave a

---

[21] Even if the Idaho Rule can be set aside via "vacatur," an order reinstating the 2001 Rule is an injunction, requiring a showing of irreparable harm. See Nken v. Holder, 129 S. Ct. 1749, 1757 (2009) (an injunction "directs the conduct of a party, and does so with the backing of its full coercive powers"); California ex rel. Lockyer v. U.S. Dep't of Agric., 575 F.3d 999, 1020 (9th Cir. 2009) (holding the "district court gave meaningful consideration to the equities in this case and carefully applied the traditional balancing of the harms analysis to arrive at its conclusion that the Roadless Rule should be reinstated").

[22] Vacatur is unquestionably an equitable remedy, U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship, 513 U.S. 18, 26 (1994), and the Supreme Court has made clear that "irreparable injury" is an "essential prerequisite for traditional equity jurisdiction." United States v. Am. Friends Serv. Comm., 419 U.S. 7, 11 (1974). Some courts however, have focused on equitable concerns apart from injury. See, e.g., W. Oil & Gas Ass'n v. EPA, 633 F.2d 803, 813 (9th Cir. 1980) (expressing "desire to avoid thwarting" the Clean Air Act and to avoid "undesirable

regulation in place while errors are corrected, and have frequently done so when the defective rule is more environmentally protective than the regime that would result from vacatur.  See Pl. Reply at 34.  Here, the record is clear that leaving the Idaho Rule in place during a remand is environmentally preferable to its vacatur, which would return management of IRAs to the Forest Plans for each National Forest in Idaho.[23]  The EIS for the Idaho Rule makes clear that the Idaho Rule is more restrictive of potentially harmful activities in IRAs than existing Forest Plans.  AR FS 844 (EIS at 74-85).

### C.    Any Equitable Relief Must be Narrowly Tailored

Whether in the form of vacatur or an injunction, courts must craft equitable relief to be "no broader than required by the precise facts to which the court's ruling would be applied." Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 222 (1974).  See also Lewis v. Casey, 518 U.S. 343, 357 (1996) ("The [injunctive] remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."); Califano v. Yamasaki, 442 U.S. 682, 702 (1979) (injunctive relief must "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs"); Idaho Farm Bureau Fed'n v. Babbitt, 58 F.3d 1392, 1405 (9th Cir. 1995) (leaving rule in place during remand).

Assuming relief is warranted, the nature of the Idaho Rule (which the agency intended to be severable[24]), and the nature of Plaintiffs' legal claims (which focus on discrete and limited errors), strongly favor crafting a narrowly tailored remedy that leaves in place all portions of the

---

consequences").  Resolution of this issue is not necessary here, because even under the standard proffered by Plaintiffs—that a regulation may be left in place when the results of vacatur could be environmentally harmful—vacatur of the Idaho Rule is inappropriate.

[23] In now advocating for vacatur, Plaintiffs apparently presume that the vacatur of the Idaho Rule will lead to the automatic reinstatement of the Roadless Rule.  Reimposition of the Roadless Rule, however, is an *injunctive remedy* to which plaintiffs are not entitled.  While the Roadless Rule has been reimposed by injunction within much of the Ninth Circuit, that injunction excludes Idaho, California ex rel. Lockyer v. U.S. Dep't of Agric., 2008 WL 5102864, *7 n.3 (N.D. Cal. Dec. 2, 2008) and thus vacatur of the Idaho Rule will return management of IRAs in Idaho to the Forest Plans for each National Forest in the State.

[24] 36 C.F.R. § 294.28(i)( "If any protection of the rules in this subpart . . . are held invalid, the remainder of the regulations in this subpart and their application remain in force.").

Rule not implicated by any legal error.[25]  For example, a finding of an ESA violation would not require relief beyond those aspects of the Rule that pertain to IRAs overlapping grizzly bear or caribou habitat.  Nor would a finding that the agency improperly designated the 2,600 acres of the Winegar Hole, or erred in its evaluation of the 5,770 acres available for phosphate mining require relief beyond those areas of the Rule.   In other words, "the scope of injunctive relief is dictated by the extent of the violation established," Califano, 442 U.S. at 702, and vacating a Rule that covers 9.3 million acres to due to an error that, for example, related only to the 2,600 acres in the Winegar Hole, would plainly be overbroad.

 In sum, none of the errors alleged by Plaintiffs require both vacatur of the Idaho Rule and an injunction reinstating the Roadless Rule, and Defendants respectfully request that if the Court finds any legal error, it hold separate proceedings to craft a remedy that fits the legal error found.

## **CONCLUSION**

For the reasons set forth herein, Plaintiffs' motion for summary judgment should be denied and Defendants' cross-motion for summary judgment should be granted.

DATED:  September 29, 2010   IGNACIA S. MORENO
            Assistant Attorney General
            U.S. Department of Justice

            /s/
            BARCLAY T. SAMFORD (N.M. Bar # 12323)
            Trial Attorney, Natural Resources Section

            /s/
            MICHAEL R. EITEL (NE Bar # 22889)
            Trial Attorney, Wildlife & Marine Resources Section
            United States Department of Justice
            Environment & Natural Resources Division
            1961 Stout Street, 8th Floor

---

[25] This Court should also consider potential conflict between of any injunctive relief it should issue and the current nation-wide injunction issued by the Wyoming district court, which bars the USDA from implementing the Roadless Rule.  Wyoming v. USDA, 570 F. Supp. 2d 1309 (D. Wyo. 2008).  See Bergh v. Washington, 535 F.2d 505, 507 (9th Cir. 1976) ("when an injunction sought in one federal proceeding would interfere with another federal proceeding, considerations of comity require more than the usual measure of restraint.").

Denver, CO  80294
(303) 844-1475; (303) 844-1479 | Phone
(303) 844-1350 | Fax
Clay.Samford@usdoj.gov; Michael.Eitel@usdoj.gov

Counsel for Federal Defendants

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 29th day of September, 2010, I filed the **FEDERAL DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Beverly F Li    beverly.li@usdoj.gov

Brad Michael Purdy    bmpurdy@hotmail.com

David Fermin Hensley    dhensley@gov.idaho.gov

Julie Weis    jweis@hk-law.com

Robert A Maynard    Rmaynard@perkinscoie.com

Scott W Horngren    shorngren@hk-law.com

Thomas C. Perry    tperry@osc.idaho.gov

Timothy J Preso    tpreso@earthjustice.org

William K. Barquin    wbarquin@kootenai.org


      /s/Susan Middagh
      Susan Middagh