William K. Barquin, ISB No. 7327
Attorney General
Kootenai Tribe of Idaho
Kootenai Tribal Headquarters
P.O. Box 1269
Bonners Ferry, Idaho   83805
Phone:   (208) 267-3519
Facsimile:   (208) 267-9350
e-mail:   wbarquin@kootenai.org

Julie A. Weis, OSB No. 97432, Pro Hac Vice
HAGLUND KELLEY HORNGREN JONES & WILDER LLP
200 S.W. Market Street, Suite 1777
Portland, Oregon 97201
Phone: (503) 225-0777
Facsimile: (503) 225-1257
e-mail: weis@hk-law.com

        Attorneys for Defendant-Intervenor
        Kootenai Tribe of Idaho

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **GERALD JAYNE; GREATER YELLOWSTONE COALITION; THE LANDS COUNCIL; NATURAL RESOURCES DEFENSE COUNCIL; SIERRA CLUB**; and **THE WILDERNESS SOCIETY,**<br><br>        Plaintiffs,<br><br>        v.<br><br>**MARK REY,** Under Secretary for National Resources and Environment, U.S. Department of Agriculture; **GAIL KIMBELL**, Chief U.S. Forest Service; **ROWAN GOULD**, Acting Director, U.S. Fish and wildlife Service; and **DIRK KEMPTHORNE**, Secretary, U.S. Department of the Interior, in their official capacities,<br><br>        Defendants,<br>and<br><br>**KOOTENAI TRIBE OF IDAHO**,<br><br>        Defendant-Intervenor. | Civil No. 09-cv-00015-BLW<br><br>**DEFENDANT-INTERVENOR KOOTENAI TRIBE OF IDAHO'S REPLY BRIEF ON REMEDY AND IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** |

## TABLE OF CONTENTS

I. INTRODUCTION. ........................................................................................................ 1

II. ARGUMENT REGARDING THE MERITS OF PLAINTIFFS' CLAIMS. .......................... 1

    A. The NWF Case Relied on by Plaintiffs is Sui Generis in Many Respects. ..................... 1

    B. There is No Merit to Plaintiffs' Irreversible and Irretrievable Commitment of Resources Argument for General Forest Lands. ............................................................... 3

III. ARGUMENT REGARDING PLAINTIFFS' REMEDY ASSERTIONS. ............................. 6

    A. Plaintiffs' Characterization of Certain Case Law Misses the Mark. ............................... 6

    B. Plaintiffs' Characterization of Caribou Concerns Misses the Mark. .............................. 8

    C. Plaintiffs' Characterization of the Kootenai Tribe's Support for the Idaho Rule is Wholly Unwarranted. .......................................................................................................... 9

IV. CONCLUSION. ........................................................................................................... 12

## **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

Amoco Prod. Co. v. Village of Gambell,
   480 U.S. 531 (1987).................................................................................................7, 8

California ex rel. Lockyer v. U.S. Dept. of Agric.,
   575 F.3d 999 (9th Cir. 2009) ....................................................................................6, 7

Citizens for Better Forestry v. U.S. Dep't of Agric.,
   481 F. Supp. 2d 1059 (N.D. Cal. 2007) .......................................................................7

Conner v. Burford,
   848 F.2d 1441 (9th Cir. 1988), cert. denied sub nom.,
   Sun Exploration and Prod. Co. v. Lujan, 489 U.S. 1012 (1989) ............................4, 5

Friends of the Southeast's Future v. Morrison,
   153 F.3d 1059 (9th Cir. 1998) .....................................................................................5

National Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,
   524 F.3d 917 (9th Cir. 2008) ...............................................................................1, 2, 3

National Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,
   CV 01-640-RE, 2005 WL 1278878 (D. Or. May 26, 2005)........................................2

Northwest Envtl. Advocates v. EPA,
   268 F. Supp. 2d 1255 (D. Or. 2003) ............................................................................3

Pacific Rivers Council v. Thomas,
   30 F.3d 1050 (9th Cir. 1994) .......................................................................................7

Wildwest Inst. v. Bull,
   547 F.3d 1162 (9th Cir. 2008) .....................................................................................5

**STATUTES**

5 U.S.C. § 553.....................................................................................................................7

16 U.S.C. § 6501...............................................................................................................10

42 U.S.C. § 4332(C)(v).......................................................................................................4

iv

**OTHER AUTHORITIES**

36 C.F.R. § 294.25(e) ......................................................................................................... 5, 6

73 Fed. Reg. 61456 (Oct. 16, 2008)) .................................................................................... 4

**I.       INTRODUCTION.**

Defendant-Intervenor/Amicus the Kootenai Tribe of Idaho (Kootenai Tribe, or Tribe) offers the following reply to plaintiffs' consolidated summary judgment response/reply brief (Docket No. 96) (Pls.' Reply).  The Tribe offers these points in support of federal defendants' cross-motion for summary judgment, in opposition to plaintiffs' motion for summary judgment, and more fundamentally in support of the Idaho Roadless Rule (Idaho Rule).  Accompanying this filing is the Second Declaration of Gary Aitken, Sr. (Second Aitken Decl.) which underscores the Tribe's support for the Idaho Rule and responds to certain statements made by The Lands Council (via the Declaration of Mike Peterson, Docket No. 96-10) regarding the Tribe's position.

**II.      ARGUMENT REGARDING THE MERITS OF PLAINTIFFS' CLAIMS.**

  **A.      The NWF Case Relied on by Plaintiffs is Sui Generis in Many Respects.**

Plaintiffs rely heavily on National Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 524 F.3d 917 (9th Cir. 2008) (NWF), for the proposition that the Fish and Wildlife Service erred by considering certain Forest Service commitments in the context of its Section 7 consultation under the Endangered Species Act (ESA).  See Pls.' Reply at 13-15.  Federal defendants fully refute this assertion, see Federal Defendants' Reply Memorandum (Docket No. 105) (Fed'l Defs.' Reply) at 13-14, but the Kootenai Tribe writes to add additional context for that unusual and long-running litigation in which it is a party.

NWF, which has been an ongoing case since 2001 (see Oregon District Court Case No. 01-640), involves operations of the Federal Columbia River Power System (FCRPS) and the effects of such operations on listed salmon and steelhead species.  NWF, 524 F.3d at 922, 925. Over the course of the last decade, the National Marine Fisheries Service has prepared no less than three FCRPS biological opinions and a more recent 2010 supplemental biological opinion in an

1

effort to properly balance the needs of fish and humans in the FCRPS setting (a balance the Tribe believes has now been achieved). The NWF opinion relied on by plaintiffs involved the adjudication of the 2004 biological opinion which had been deemed legally insufficient by the district court. Id. at 926-27. The court also had invalidated the 2000 biological opinion, and in earlier litigation a 1993 biological opinion had been found arbitrary and capricious. Id. at 925.

By the time of the NWF decision, the district court had grown so weary that it had included in its remand order a "failure report" mandate: if the remand was faltering such that a valid biological opinion looked unlikely, the agency was required to inform the court by way of a failure report that included options – including dam breaching – to avoiding jeopardy to the listed fish species from FCRPS operations. Id. at 937. See also id. (explaining that the district court also had required status reports every three months and ordered the relevant federal agencies to collaborate with state and Tribal governments). That is the bleak legal landscape within which the NWF opinion stands, one of "perpetual litigation" according to the Ninth Circuit. Id. at 937.

Plaintiffs cite to NWF for the seemingly-simple proposition that conservation measures are without consequence absent "specific and binding plans," Pls.' Reply at 13, a statement made by the NWF court in the context of an ESA critical habitat adverse modification claim. NWF, 524 F.3d at 933-36. Put in context, the NWF court was affirming the district court's adverse modification determination which had concluded:

> NOAA's [formerly National Marine Fisheries Service] optimism that long-term improvements in critical habitat will offset the degradation of the habitat necessary for survival or recovery in the first five years of the 2004 BiOp is unrealistic. . . . the action agencies have not committed to install the removable spillway weirs that NOAA relies on to offset the short-term reduction in critical habitat.

NWF, CV 01-640-RE, 2005 WL 1278878, at *16 (D. Or. May 26, 2005). Put simply, and viewed in the light of the sordid "history of the litigation," NWF, 524 F.3d at 937, the Ninth Circuit was agreeing with the district court that the agency's reliance on removable spillway weirs as a

2

conservation measure was questionable. The history of the litigation led the court to ask (not unreasonably) for "more solid guarantees." Id. at 935.

The instant case, which is grounded in a collaborative and transparent effort to manage Idaho roadless areas in a responsible manner, stands in a very different legal landscape than NWF. This is not a case with a history of failed promises or speculative conservation measures, which frankly distinguishes it also from Northwest Envtl. Advocates v. EPA, 268 F. Supp. 2d 1255 (D. Or. 2003), a case relied on by plaintiffs for a similar "binding commitment" proposition. Pls.' Reply at 15-17. In Northwest Envtl. Advocates, a district court criticized a biological opinion that contained "no assurances that the state-based commitments on which it rested . . . were likely to occur." Northwest Envtl. Advocates 268 F. Supp. 2d at 1273. The commitments were "largely speculative," and the court suspected that the ESA consultation had fallen prey to "political pressures." Id. Those are not our facts. Indeed, as is discussed below in Section III.B with regards to caribou, the record in this case reflects the Forest Service's positive track record for implementing projects in a way that conserves species. Thus, plaintiffs' demand for commitments engraved in concrete should be seen for what it is: a demand for certainty that goes far behind the reasonable degree of certainty found in governing case law. See Fed'l Defs.' Reply at 12-15.

      **B.**    **There is No Merit to Plaintiffs' Irreversible and Irretrievable Commitment of Resources Argument for General Forest Lands.**

As stated in the Kootenai Tribe's opening brief, the Tribe is primarily concerned with the Idaho Rule's effects on lands within Kootenai Territory, particularly lands in northern Idaho on the Idaho Panhandle National Forest and in northwest Montana on the Kootenai National Forest. For that reason, the Tribe has left it to others to oppose plaintiffs' legal claims regarding such issues as phosphate mining in southeast Idaho. Still, the Tribe writes separately now to weigh in on one

3

National Environmental Policy Act (NEPA) allegation raised by plaintiffs in the context of mining but of more general concern to the Tribe.  Specifically, the Kootenai Tribe writes to underscore a point made by federal defendants regarding the fallacy of plaintiffs' suggestion that the Idaho Rule made an irreversible and irretrievable commitment of resources in violation of NEPA by allegedly "constrain[ing] the Forest Service's discretion to consider preserving a roadless area as an alternative to authorizing road construction . . . ."  Pls.' Reply at 29.  In reality, the Idaho Rule "does not authorize the building of a single road or the cutting of a single tree; instead it establishes permissions and prohibitions that will govern what types of activities may occur in IRAs."  Administrative Record (AR) Forest Service Document No. 1110 (73 Fed. Reg. 61456, 61456 (Oct. 16, 2008)) (emphasis added).  This distinction is important to the Tribe and to many of the other stakeholders who collaborated in the Rule's development.

Under NEPA, an agency should not make a premature "irreversible and irretrievable commitment" of natural resources prior to taking a NEPA "hard look" at the potential effects of such action.  See, e.g., Conner v. Burford, 848 F.2d 1441, 1446 (9th Cir. 1988) (explaining that the "irreversible and irretrievable commitment of resources" doctrine derives from 42 U.S.C. § 4332(C)(v)), cert. denied sub nom., Sun Exploration and Prod. Co. v. Lujan, 489 U.S. 1012 (1989).  Here, plaintiffs suggest that the Forest Service ran afoul of NEPA by prematurely committing forest acreage to industrial activity based on the analysis contained in an insufficiently-detailed programmatic environmental impact statement.  See Pls.' Reply at 28 (arguing that the Idaho Rule's "General Forest allocation of at least 5,770 unleased roadless acres for road construction" constitutes an irreversible allocation in violation of NEPA).  That simply is not the case.

Like plaintiffs, the Kootenai Tribe supports the early analysis and disclosure requirements of NEPA as good public policy.  However unlike plaintiffs, the Kootenai Tribe recognizes that

4

the Idaho Rule does not irreversibly commit General Forest acreage to road construction for industrial or other purposes – it quite plainly does not. See 36 C.F.R. § 294.25(e) (stating that for the General Forest, Rangeland and Grassland theme, road construction "<u>may be authorized</u> by the responsible official" in connection with certain mining activities) (emphasis added). One need not consult a dictionary to know that "may" is not synonymous with "shall."

In the Ninth Circuit, an "irreversible commitment of natural resources" allegation is properly analyzed under the standard set forth in <u>Friends of the Southeast's Future v. Morrison</u>, 153 F.3d 1059 (9th Cir. 1998), and other guiding case law, which teaches that the irretrievable commitment inquiry focuses on whether the government retains the "absolute right to prevent the use of the resources in question." <u>Id.</u> at 1063. Thus, for example, in <u>Conner v. Burford</u>, <u>supra</u>, 848 F.2d 1441 – where the court framed the issue as "whether the sale of any of the oil and gas leases within . . . two forests constituted an irreversible and irretrievable commitment of federal forest land" to industrial development, <u>id.</u> at 1446 – an irreversible commitment of forest lands had not occurred in connection with industrial leases requiring further agency approval before surface-disturbing activity could commence (the so-called no surface occupancy, or NSO, leases). <u>Id.</u> at 1447. The court explained that because the agency reserved the right to withhold its approval, such leases did not constitute the "go/no go point of commitment." <u>Id.</u> at 1448. In another case, <u>Wildwest Inst. v. Bull</u>, 547 F.3d 1162 (9th Cir. 2008), the court rejected an irreversible commitment of resources argument in the context of a Healthy Forests Restoration Act project where the agency had committed substantial sums and agency efforts to marking trees for timber harvest prior to completing the project's NEPA analysis. The court observed that despite the agency's expenditures of time and money, the agency was not "irretrievably commit[ed] . . . to a particular course of action." <u>Id.</u> at 1169.

5

Likewise, on the record before this Court, there is no credible evidence that the Forest Service has passed the NEPA go/no go point such that it has unlawfully "foreclosed" certain General Forest acreage to industrial development. Rather, under 36 C.F.R. § 294.25(e), the agency enjoys the discretion to withhold its authorization. Thus, because there has been no irreversible commitment of the General Forest acreage to industrial or other activity, the agency cannot be said to have violated NEPA by irreversibly foreclosing the treatment options for certain General Forest acreage.

### III.  ARGUMENT REGARDING PLAINTIFFS' REMEDY ASSERTIONS.

The Kootenai Tribe continues to believe – more strongly than ever given the briefing in this case – that the Court need not reach the issue of injunctive relief because the Idaho Rule complies fully with NEPA and the ESA. Still, the Tribe responds below to three points raised by plaintiffs' remedy argument.

#### A.  Plaintiffs' Characterization of Certain Case Law Misses the Mark.

First, plaintiffs' brief at pages 33-40 (discussing remedy) contains several less-than-accurate statements that warrant a response. For example, plaintiffs continue their effort to convince the Court that California ex rel. Lockyer v. U.S. Dept. of Agric., 575 F.3d 999 (9th Cir. 2009), would somehow control the remedy in this case (assuming the Court were to reach the remedy phase, which it should not). Pls.' Reply at 33 (questioning why plaintiffs would not be entitled to "an identical remedy" given that Lockyer is "closely analogous"). This assertion misses the mark, including because this is not a case in which a federal agency failed to consult on a programmatic action under the ESA or concluded that its action was categorically excluded from NEPA. Contra Lockyer, 575 F.3d at 1019 (Forest Service failed to engage in ESA consultation for the State Petitions Rule); id. at 1014-18 (Forest Service wrongly treated the State Petitions Rule

6

as being categorically excluded from NEPA's "hard look" requirement). The <u>Lockyer</u> court itself acknowledged that the Forest Service could rightfully move away from the land management approach contained in the 2001 Roadless Area Conservation Rule (2001 Rule) so long as the agency satisfied "the procedural requirements contained in the National Environmental Policy Act and the Endangered Species Act if and when it does so." <u>Lockyer</u>, 575 F.3d at 1020. The agency now has done so for Idaho – in an unprecedented collaboration with many of the interested stakeholders – such that it is disingenuous for plaintiffs to continually repeat the mantra that <u>Lockyer</u> controls in this very different setting.[1]

Similarly, plaintiffs wrongfully analogize this case to other cases involving programmatic decisions, namely <u>Pacific Rivers Council v. Thomas</u>, 30 F.3d 1050 (9th Cir. 1994), and <u>Citizens for Better Forestry v. U.S. Dep't of Agric.</u>, 481 F. Supp. 2d 1059 (N.D. Cal. 2007). Like <u>Lockyer</u>, those cases are distinguishable due to the complete absence of either consultation under the ESA and/or NEPA analysis. See <u>Pacific Rivers Council</u>, 30 F.3d at 1056-57 (Forest Service failed to consult under ESA Section 7 with National Marine Fisheries Service over potential effects to listed salmon); <u>Citizens for Better Forestry</u>, 481 F. Supp. 2d at 1086-90 (Forest Service wrongfully treated forest planning rule as categorically exempt from NEPA analysis); <u>id.</u> at 1092-97 (Forest Service wrongfully failed to engage in ESA consultation over effects of forest planning rule to listed species).

Also, plaintiffs cite to the Supreme Court's <u>Amoco</u> decision – <u>Amoco Prod. Co. v. Village of Gambell</u>, 480 U.S. 531 (1987) – for the frequently-quoted proposition that a sufficient showing of environmental injury often warrants an injunction. Pls.' Reply at 35. Regardless of how often

---

[1] Given plaintiffs' continuing efforts to analogize this case to <u>Lockyer</u>, the Tribe reiterates that the Idaho Rule was promulgated under the Administrative Procedure Act, 5 U.S.C. § 553, not the State Petitions Rule at issue in <u>Lockyer</u>. AR Forest Service 73 at 3.

7

that sentence is cited without any context, the Court is reminded that in Amoco, the Supreme Court concluded an injunction was not warranted – despite a presumed violation of an environmental law – and instead allowed continued sales of oil and gas leases on Alaska's outer continental shelf. Amoco, 480 U.S. at 544-45.   In any event, as the briefing shows, plaintiffs have not met their burden of showing that injury to the environment "is sufficiently likely" as a result of the Idaho Rule's promulgation.   Amoco, 480 U.S. at 545.   And to be sure, the burden is borne by plaintiffs, despite plaintiffs' effort to shift that burden to defendant-intervenors, as the federal defendants ably point out to the Court.   Fed'l Defs.' Reply at 23.

### B.       Plaintiffs' Characterization of Caribou Concerns Misses the Mark.

Second, in response to the Kootenai Tribe's correct observation that demonstrated harm to a species as a whole is necessary to establish irreparable harm (instead of harm to an individual of a given species), see Kootenai Tribe's Opening Brief (Docket No. 88) at 16, plaintiffs point to the record for the assertion that the take of even a single caribou will rise to the level of irreparable harm due to the species' small population.   Pls.' Reply at 36 (citing to the Fish and Wildlife Service's Biological Opinion for support).   Actually, a look at the Biological Opinion shows that although the agency was concerned about the small size of the population, and the associated importance of individual members of that population, the "potential for activities allowed by the MIRR [Modified Idaho Roadless Rule] to adversely affect individual caribou in the near future is considered to be low."   AR Forest Service Document No. 1107 (U.S. Fish and Wildlife Service Biological Opinion and Conference Opinion for the Modified Idaho Roadless Rule at 107). Under a worst case scenario, the agency noted that only about "6.6 percent of the Selkirk recovery area . . . could be affected by" land management activities.   Id.   More fundamentally, given the Forest Service's excellent track record with regard to protection of caribou at the project-specific

level, the agency's expert opinion was that the caribou population would not be harmed, irreparably or otherwise, by the Idaho Roadless Rule:

> [P]rojects allowed under the MIRR will be subject to LRMP [Land and Resource Management Plan] standards that address caribou needs . . . . [T]he IPNF's [Idaho Panhandle National Forest's] compliance with these standards has, since 2001, resulted in all vegetation management projects being designed in a manner that is not likely to adversely affect the caribou.

Id.

Although plaintiffs would have the Court believe otherwise in an effort to buttress their irreparable harm argument, the agency actually concluded that under the Idaho Rule, any site-specific project would likely maintain or improve habitat conditions for caribou:

> Based on considering the applicable LRMP components, the prohibitions and permissions associated with the MIRR, the IPNF's record since 2001 of designing vegetation management projects that are not likely to adversely affect the caribou, and their stated intent to continue to use the best available science, in consultation with the Service, to maintain and manage caribou habitat, the Service has determined that vegetation management projects proposed within caribou habitat pursuant to the proposed action are likely to be designed in a manner that maintains or improves the habitat to meet caribou needs.

Id. at 107-08.  Put simply, plaintiffs' allegations regarding caribou do not revitalize their inadequate assertions of irreparable harm that allegedly would flow from the Idaho Rule.

### C. Plaintiffs' Characterization of the Kootenai Tribe's Support for the Idaho Rule is Wholly Unwarranted.

Last but by no means least, wholly unwarranted are plaintiffs' specific allegations aimed at the Kootenai Tribe's support for the Idaho Rule and frustration with the 2001 Rule. Pls.' Reply at 38 (criticizing the Kootenai Tribe for its assertion that "invalidation of the Idaho Roadless Rule and reinstatement of the 2001 Rule would interfere with 'desperately needed restoration of fire-prone forests' in northern Idaho's Myrtle Creek Watershed"). According to plaintiffs, the Tribe is turning a blind eye to the Forest Service's Myrtle Creek Project, which was approved

while the 2001 Rule was in effect.  See also Pls.' Reply at 38-39 (criticizing the Tribe's belief that the Idaho Rule embodies true collaboration, and making the rather remarkable assertion that "project activities under the 2001 Roadless Rule have equally sparked collaborative efforts"). Plaintiffs' criticism of the Tribe is misplaced.

The Tribe stands by its statements that the Idaho Rule will better allow land managers to protect and restore fire-prone forests and, as a result, better protect the Tribe's drinking water supply, which comes from the Myrtle Creek watershed.  Second Aitken Decl. ¶ 3.  From the Tribe's perspective, the 2001 Rule impeded and hindered land management activities meant to protect Tribal interests and further the Tribe's Covenant to guard and keep the land forever.  Id. ¶¶ 3-4.  The Myrtle Creek Project pointed to by plaintiffs is a good example of the ways in which the 2001 Rule posed a barrier to important on-the-ground restoration work.  Id. ¶ 4.

From the Tribe's point of view, a restoration project meant to protect the forest and the Tribe's drinking water source in the aftermath of a horrific fire should not have been so difficult. Id. ¶ 5.  Yet the Myrtle Creek Project – which was authorized under the 2003 Healthy Forests Restoration Act, 16 U.S.C. § 6501 et seq., an Act designed to expedite forest health work – was not approved by the Forest Service until four years after the 2003 catastrophic wildfire that invigorated the Kootenai Valley Resource Initiative (KVRI) to involve itself in the process.  Id. ¶ 6.  Further, by the time the Myrtle Creek Project was finally approved, its size had decreased substantially, although not as substantially as The Lands Council would have liked.  Id. ¶ 7.  As a result, additional areas of the forest remain in need of treatment.

As for plaintiffs' effort to portray the 2001 Rule as having engendered collaboration, the Tribe respectfully disagrees with that characterization.  See Pls.' Reply at 39.  As explained in the first Declaration of Gary Aitken, Sr. (Docket No. 13) (First Aitken Decl.), Kootenai Tribal

members share a fundamental belief in the importance of exercising the Tribe's sovereign powers in a responsible manner, which calls for collaboration among interested stakeholders.  First Aitken Decl. ¶ 5.  Because of the Kootenai Tribe's strong belief in the importance of collaboration, the Tribe reached out to the City of Bonners Ferry and to Boundary County to form KVRI as a mechanism to foster citizen and governmental participation in the land management process.  Id. ¶ 7.  See also id. ¶ 8 (explaining that KVRI's "mission is to improve coordination, integration and implementation of existing local, state, federal and Tribal programs to maintain, enhance and restore the social, cultural, economic and natural resources of the Kootenai Valley").  Among other things, KVRI provided a vital venue for the public to discuss and comment on the Idaho Rule.  Id. ¶ 16.  KVRI also provided a forum for the Tribe and others to urge and support the Forest Service to engage in forest health and restoration work after the hurtful Myrtle Creek fire of 2003, which dirtied Tribal members' drinking water and the surrounding environment.  Id. ¶ 18.  See also Second Aitken Decl. ¶ 6.

 It was through the KVRI's Myrtle Creek Subcommittee that the Tribe and other community members collaborated on the Myrtle Creek project, not because of the 2001 Rule.  Second Aitken Decl. ¶ 6.  And frankly, it was because of the Tribe's insistence on following the best science – joined by other KVRI members – that the Myrtle Creek planning process looked at roadless areas of the forest, as was necessary to ensure the project truly was science-based, not driven by roadless philosophies.  First Aitken Decl. ¶ 18.  It is true that The Lands Council was a member of the KVRI's Myrtle Creek Subcommittee, as that plaintiff has pointed out.  Second Aitken Decl. ¶ 8.  But from the Tribe's vantage point, The Lands Council's effort was not truly collaborative.  Id. (explaining that The Lands Council's participation was more "negative in character").  Regardless, it is less than accurate to characterize the one-size-fits-all 2001 Rule as

11

having "sparked collaboration" to any real degree, certainly not to the degree of the Idaho Rule.

## IV. CONCLUSION.

For the foregoing reasons, and based on the argument offered by federal defendants along with the other intervenors and amici who support the Idaho Rule – a diverse coalition that includes the Idaho Association of Counties, the State of Idaho, the Idaho Mining Association, Trout Unlimited, Idaho Conservation League and Dale Harris – the Kootenai Tribe of Idaho urges the Court to uphold the Idaho Roadless Rule in its entirety.

DATED this 5th day of October, 2010.

    KOOTENAI TRIBE OF IDAHO

    By:/s/ William K. Barquin
    William K. Barquin, ISB No. 7327

    HAGLUND KELLEY HORNGREN
    JONES & WILDER LLP


    By:/s/ Julie A. Weis
    Julie A. Weis, Pro Hac Vice
    Attorneys for Defendant-Intervenor
    Kootenai Tribe of Idaho

CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of October, 2010, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Idaho by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case may not be registered CM/ECF users.   I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party for commercial carrier for delivery within 3 calendar days to the following non-CM-ECF participants:

NONE.

/s/ Julie Weis
Julie Weis, Pro Hac Vice
Attorney for Defendant-Intervenors