William K. Barquin, ISB No. 7327
Attorney General
Kootenai Tribe of Idaho
Kootenai Tribal Headquarters
P.O. Box 1269
Bonners Ferry, Idaho  83805
Phone:   (208) 267-3519
Facsimile:   (208) 267-9350
e-mail:   wbarquin@kootenai.org

Julie A. Weis, OSB No. 97432, Pro Hac Vice
HAGLUND KELLEY HORNGREN JONES & WILDER LLP
200 SW Market, Suite 1777
Portland, Oregon 97201
Phone: (503) 225-0777
Facsimile: (503) 225-1257
e-mail: horngren@hk-law.com
e-mail: weis@hk-law.com

      Attorneys for Defendant-Intervenor

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **GERALD JAYNE; GREATER YELLOWSTONE COALITION; THE LANDS COUNCIL; NATURAL RESOURCES DEFENSE COUNCIL; SIERRA CLUB;** and **THE WILDERNESS SOCIETY,**<br><br>    Plaintiffs,<br><br>    v.<br><br>**MARK REY,** Under Secretary for National Resources and Environment, U.S. Department of Agriculture; **GAIL KIMBELL**, Chief U.S. Forest Service; **ROWAN GOULD**, Acting Director, U.S. Fish and wildlife Service; and **DIRK KEMPTHORNE**, Secretary, U.S. Department of the Interior, in their official capacities,<br><br>    Defendants,<br>and<br><br>**KOOTENAI TRIBE OF IDAHO,**<br><br>    Defendant-Intervenor. | Civil No. 09-cv-00015-BLW<br><br>**SECOND DECLARATION OF GARY AITKEN, SR. (In Support of Federal Defendants' Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment)** |

SECOND AITKEN DECLARATION    1

I, Gary Aitken, Sr., declare and state as follows based on personal knowledge:

1. I am a citizen of the Kootenai Tribe of Idaho (Kootenai Tribe, or Tribe) and a Member of the Kootenai Tribal Council. I previously made a declaration in support of the Kootenai Tribe's intervention in this case. See Docket No. 13.

2. I make this second declaration in further support of the Idaho Roadless Rule. I particularly want to clarify the Tribe's position as most recently set forth in the second declaration of Kootenai Tribal Chairperson Jennifer Porter, see Docket No. 89 (Second Porter Declaration), and in the Tribe's summary judgment brief. See Docket No. 88. I say this in light of a declaration filed by plaintiff The Lands Council that discusses the Tribe's position. See Docket No. 96-10 (Declaration of Mike Peterson, referred to herein as TLC Declaration).

3. The TLC Declaration points to the Kootenai Tribe's belief that implementation of the Idaho Roadless Rule will better allow for land management activities designed to restore fire-prone forests and to protect our potable water supply coming from the Myrtle Creek watershed. TLC Declaration ¶ 3. This is true – the Kootenai Tribe is, and has been, a vigorous advocate for active forest management that will assist the Tribe in keeping its Covenant with the Creator to keep and guard the land forever, and we believe the Idaho Roadless Rule is consistent with the Tribe's approach to protecting natural resources in the Kootenai River watershed and throughout Kootenai Territory.

4. The Tribe also believes (notwithstanding TLC Declaration ¶ 4), that the 2001 Roadless Area Conservation rule (2001 Rule) was an impediment to planning and implementing site-specific land management activities that would protect Tribal interests. For example, consider the 2007 Myrtle Creek Healthy Forests Restoration Project (Myrtle Creek Project) pointed to in the TLC Declaration (at paragraph 4) as an example of a restoration project "allowed"

2

under the 2001 Rule.  I am very familiar with the Myrtle Creek Project because of my role on the Kootenai Valley Resource Initiative's Myrtle Creek Watershed Subcommittee (KVRI Myrtle Creek Subcommittee).  I can attest to the fact that it took many difficult compromises over several years of hard effort for the Myrtle Creek Project to come to fruition and narrowly avoid litigation, and that The Lands Council's opposition to entering roadless areas was an impediment to Project development.

5.  A restoration project designed to protect and restore natural resources – including the drinking water source for the Tribe and the community – should not have taken such a herculean effort.  The next two paragraphs provide some perspective on the difficulties associated with land management under the 2001 Rule.

6.  The Myrtle Creek Project had its origins in the aftermath of a horrific September 2003 fire that burned about 3,400 acres in the Myrtle Creek watershed and severely dirtied our drinking water and air.  Prior to the fire, nearly 80 years of fire suppression had caused the forest to develop unnatural and unsafe vegetative and fuel conditions that fed the catastrophic wildfire.  Within a year after the fire (by July 2004), the KVRI Myrtle Creek Subcommittee had formed and was working to explore how – in collaboration with the Forest Service – the Myrtle Creek watershed and its drinking water supply could be protected from the hurtful effects of a future fire.  Yet it was not until August 2007 – more than three years after the KVRI Myrtle Creek Subcommittee started its work and more than four years after the catastrophic wildfire – that the Myrtle Creek Project Record of Decision issued.  The delay was particularly frustrating given that the Myrtle Creek Project was a Healthy Forests Restoration Act effort – that 2003 Act was designed to get on-the-ground forest restoration going more quickly.

7.  When the Myrtle Creek Project finally was approved, it was in a substantially

smaller form than originally envisioned. The Record of Decision, which was attached as Exhibit A to the TLC Declaration, explains that the Myrtle Creek Project shrunk from a proposed 2,800 acres down to 2,100 acres due to "the withdrawal of temporary road construction in IRAs." TLC Declaration, Exhibit A at 8. The Lands Council was one of the KVRI Myrtle Creek Subcommittee members opposed to entering roadless areas. The Lands Council also objected to "mechanical fuel reduction treatments in dry forest old growth," id., and tried to get even more acreage dropped from the Project on that ground. Then in the Record of Decision, the Forest Service deferred "decision on portions of the proposal in IRAs" in yet a further effort to avoid conflict over roadless areas. TLC Declaration, Exhibit A at 31.

8. The Lands Council points out that it was a member of the KVRI Myrtle Creek Subcommittee. See TLC Declaration ¶ 6 (referring to the "collaborative effort"). But as I recall, The Lands Council's participation was negative in character – basically attending meetings to raise roadblocks and state what the organization did not or would not approve of. The Lands Council also submitted comments opposing the Myrtle Creek Project on various grounds, stating a preference that no action be taken so that the burned area could "recover" naturally, apparently regardless of the risk to our drinking water supply.

9. The Tribe reiterates its belief that the Idaho Roadless Rule provides the necessary management flexibility to help land managers avoid a repeat of events like the 2003 fire that fouled our environment. See TLC Declaration ¶ 7 (questioning the basis for the Tribe's position). The Tribe's position is not inconsistent with the cause of the 2003 fire, which The Lands Council portrays less than accurately as having been "debris from a logging project." Id. In reality, the "debris" that ignited in the 2003 fire was woody debris (slash) left intentionally on the ground after logging to leach nutrients, particularly potassium, back into the soil.

10. Most of the potassium in trees is found in the needles and branches, so leaving woody debris on the ground enables the potassium to leach back into the soil, after which the slash often is burned. The retention of woody debris is made on a case-by-case basis depending on soil nutrient conditions, but in this case the Forest Service had intended to burn the slash in early 2004. Unfortunately, the September 2003 fire struck shortly before the normal season-ending rains arrived. Ironically, the decision to leave woody debris on the ground had been based on the best and most recently available science, and in concurrence with conservation community concerns about protecting nutrient levels in forest soils.

11. In addition to the retention of woody debris on the forest floor for nutrient recycling purposes, and the "out of whack" condition of the forest in comparison with historical fuel and vegetative conditions, the Myrtle Creek watershed also was in the fifth year of a severe drought when the 2003 fire hit. Given these circumstances, the Tribe and local community actually were lucky that the fire did not move into the Kootenai River Valley, because in September the fields were full of readily-ignitable harvested grain and hay. Now, under the Idaho Roadless Rule, the Tribe expects that the increased management flexibility will enable land managers to address fire risks more proactively so that the Tribe and Kootenai Territory do not have to count on "luck" to be spared in the event of wildfire.

12. I declare under penalty of perjury that the foregoing is true and correct.

DATED this 4th day of October, 2010.

_____
Gary Aitken, Sr.

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2010, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Idaho by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify some of the participants in the case may not be registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party for commercial carrier for delivery within 3 calendar days to the following non-CM-ECF participants:

NONE.

/s/ Julie Weis
Julie Weis, Pro Hac Vice
Attorney for Defendant-Intervenors