IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| GERALD JAYNE; GREATER YELLOWSTONE COALITION; THE LANDS COUNCIL; NATURAL RESOURCES DEFENSE COUNCIL; SIERRA CLUB; and THE WILDERNESS SOCIETY, | Case No. 4:CV 09-015-BLW **MEMORANDUM DECISION** |
| Plaintiffs, | |
| v. | |
| MARK REY, Under Secretary for National Resources and Environment, U.S. Department of Agriculture; GAIL KIMBELL, Chief U.S. Forest Service; ROWAN GOULD, Acting Director, U.S. Fish and Wildlife Service; and DIRK KEMPTHORNE, Secretary, U.S. Department of the Interior, in their official capacities, | |
| Defendants. | |

## INTRODUCTION

The Court has before it cross-motions for summary judgment. The Court heard

oral argument and took the motions under advisement. For the reasons expressed below,

the Court will grant the defendants' motion and deny the plaintiffs' motion.

## FACTUAL BACKGROUND

In the 1970s, the Forest Service began to develop an inventory of roadless areas

within National Forests.  The Forest Service designated roadless areas of more than 5,000 acres as "inventoried roadless areas" (IRAs).  Today, there are over 58.5 million acres contained in IRAs throughout the National Forest system.  The lack of development within the IRAs makes them "bastions for public drinking water, plant and animal diversity, natural appearing landscapes, and other unique characteristics."  *FEIS* at 386.

Concerned about encroaching development, the Forest Service promulgated in 2001 the Roadless Area Conservation Rule ("2001 Roadless Rule") to "prohibit road construction, reconstruction, and timber harvest in inventoried roadless areas because they have the greatest likelihood of altering and fragmenting landscapes, resulting in immediate, long-term loss of roadless area values and characteristics."  *66 Fed. Reg. 3244 (Jan. 12, 2001)*.

The 2001 Roadless Rule was nation-wide in scope and did not contain variations tailored for each State.  As a result, "some states and communities felt disenfranchised by the process."  *73 Fed. Reg. at 61457 (October 16, 2008).*  In 2005, the Forest Service opted for a new approach, inviting States to submit petitions to adjust the management requirements for the IRAs within their borders.  In conjunction with this new approach, the Department of Agriculture (USDA) created the Roadless Area Conservation National Advisory Committee (RACNAC), an advisory committee composed of 14 members to review State petitions and provide advice to the Department.  *See 70 Fed. Reg. 25,654 (May 13, 2005).*  The RACNAC included representatives from state and local governments, industry trade associations like the National Cattleman's Beef Association

and National Mining Association, and conservation-oriented groups, including Trout Unlimited, Montana Wilderness Association, Nature Conservancy, and the Center for Biological Diversity.

In 2005, Idaho's Governor began a collaborative process to draft a state petition governing the 9.3 million acres of IRAs within the State. The State submitted the petition to the RACNAC in 2006, and then-Governor James Risch and his staff met with RACNAC in Washington D.C. to discuss the petition and clarify their intent.

The RACNAC then held four meetings to take comments on Idaho's petition. Many industry and conservation-oriented groups that were not directly represented on the RACNAC itself participated in these meetings. In addition to the RACNAC meetings, the USDA held 16 public meetings in Idaho, and obtained additional input in the written comment period. *See 73 Fed.Reg. at 61458.*

As a result of this process, Idaho's petition was modified and refined. Ultimately, the RACNAC – in a unanimous vote – recommended to the USDA that the petition be approved. The USDA did so on December 22, 2006. *72 Fed. Reg. 17,816, 17,817 (April 10, 2007).*

The resulting Idaho Rule – known as the Idaho Roadless Rule – creates different categories of lands within Idaho's 9.3 million acres of IRAs based on the specific attributes of those lands, and then applies different management "themes" to each category. The first of those themes – the Wild Land Recreation theme (WLR) – covers about 1.5 million acres. *73 Fed. Reg. at 61463.* All road construction in the WLR is

banned except for one exception for roads required by "statute, treaty, reserved or outstanding rights, or other legal duty of the United States." *36 C.F.R. § 294.23(a)*. Similarly, all timber cutting on WLR lands is banned, except where incidental to some other management activity permitted by the rule (such as, for example, constructing a road described above).

The next theme is called "Primitive" and it covers 1.7 millions acres of Idaho IRAs. *73 Fed. Reg. at 61643*. For Primitive areas, road construction is prohibited subject to a single exception. *36 C.F.R. § 294.23(a)*.

The third theme covers 50,000 acres designated under the Special Areas of Historic or Tribal Significance theme ("SAHTS"). SAHTS are treated similarly to Primitive areas. *See 36 C.F.R. §§ 294.23-24*.

For these first three categories – WLR, Primitive, and SAHTS – the Idaho Roadless Rule provides more protection than the 2001 Roadless Rule. *See 73 Fed. Reg. at 61460*. However, the next two categories allow more roads and logging than contemplated by the 2001 Roadless Rule.

The Backcountry/Restoration (BCR) category covers 5.3 million acres. Protections are reduced here because temporary roads and logging are allowed to reduce the threat of wildfire. *See 73 Fed. Reg. at 61458*. The new Rule allows temporary road construction and logging within 442,000 acres of "community protection zones" (CPZs) within BCR lands. *See 73 Fed. Reg. at 61460*. Outside of CPZs, roads and logging are only allowed if there is a significant wildfire risk to a community or water supply, and

protection "cannot be accomplished without a temporary road." *See 36 C.F.R.*
*§ 294.23(b)(2) & (3)*.

To reduce the significance of allowing temporary roads and logging in the BCR, the Rule sets in place three restrictions. First, it requires that "the project generally retains large trees as appropriate for the forest type." *36 C.F.R. § 294.24(c)(1)(I)*. Second, timber cutting outside the CPZ is limited by a similar requirement, as well as the requirement that the action maintains or improves roadless characteristics over the long term. *36 C.F.R. § 294.24(c)(2)*. Third, the building of temporary roads outside of the CPZ to deal with "significant risks" of wildland fire is explicitly anticipated to be "infrequent," *See 36 C.F.R. § 294.23(b)(3)*, and the Rule specifically provides that the "temporary roads" built under its terms must be decommissioned upon completion of the project. *See 36 C.F.R. § 294.23(d)*.

The State of Idaho and the RACNAC were united in their intent that the BCR rules be read to provide at least the same protections as the 2001 Roadless Rule with flexibility to protect communities from the threat of wildfires. *AR FS-590.* The Forest Service agreed to treat the BCR lands in that manner: "Under the final rule, the vast majority of the BCR acres will be managed comparable to the 2001 Roadless Rule with a small amount of additional timber cutting and temporary road construction to allow fuel treatments to better protect vital community interests." *73 Fed.Reg. 61465 (October 16, 2008).*

The final theme is designed as General Forest, Rangeland, Grassland (GFRG) and

covers about 400,000 acres. These areas are mainly managed according to forest plan direction except that roads may not be constructed to access new mineral or energy leases other than to access specific areas of phosphate deposits. *73 Fed. Reg. at 61460.* This will allow construction "in association with phosphate deposits" in the Caribou-Targhee National Forest – including 5,770 acres of currently unleased roadless lands. *36 C.F.R. § 294.25(e)(1).* In contrast, the 2001 Roadless Rule prohibited road construction in connection with new mineral leases issued after January 12, 2001. *36 C.F.R. § 294.12(b)(7).*

Before putting the Idaho Roadless Rule in place, the Forest Service consulted with the Fish and Wildlife Service (FWS) under Section 7 of the Endangered Species Act (ESA) after finding that the new Rule "is likely to adversely affect eight listed species." *See FWS Biological Opinion* at 12. As a result of the consultation, the FWS issued a Biological Opinion finding that the new Rule is not likely to jeopardize the continued existence of any listed species. *Id.*

After reviewing the Biological Opinion, the Forest Service issued a Final Environmental Impact Statement (FEIS) in August of 2008. *AR-FS at 844.* On October 16, 2008, the Forest Service issued a Record of Decision (ROD) adopting the modified Idaho Roadless Rule.

The plaintiffs have brought this action challenging both the Biological Opinion issued by the FWS and the FEIS issued by the Forest Service. Plaintiffs argue that the FWS violated the Endangered Species Act (ESA) in preparing the Biological Opinion.

Plaintiffs also argue that the Forest Service violated NEPA in preparing the FEIS, incorrectly interpreted the Wyoming Wilderness Act in arriving at one conclusion, and improperly relied on the defective Biological Opinion prepared by the FWS. These violations, the plaintiffs assert, require the Court to enjoin the Idaho Roadless Rule and replace it with the 2001 Roadless Rule.

**Standing and Ripeness**

To have Article III standing to seek injunctive relief, a plaintiff must show that he is under threat of suffering "injury in fact" that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury. *Summers v. Earth Island Institute*, 129 S.Ct. 1142, 1149 (2009). The concrete harm requirement can be satisfied by an injury to "the recreational or even the mere esthetic interests of the plaintiff." *Id*. at 1149. Citing *Summers*, the Ninth Circuit held that a member of an environmental group must show that he "had repeatedly visited an area affected by a project, that he had concrete plans to do so again, and that his recreational or aesthetic interests would be harmed if the project went forward without his having the opportunity to appeal." *Wilderness Society, Inc. v. Rey*, 622 F.3d 1251, 1256 (9th Cir. 2010). Where the recreational use of a particular area has been extensive and in close proximity to the plaintiff, an affiant's expressed intention to continue using the land "is sufficiently concrete to underwrite an injury-in-fact." *Id.* "Nonetheless, a vague desire to return to the area 'without any description of concrete

plans, or indeed any specification of when the some day will be' does not support a finding of actual or imminent injury." *Id.* (quoting *Summers*, 129 S.Ct. at 1151).

The plaintiffs' affidavits establish that their members use and enjoy numerous National Forest roadless areas in Idaho that were protected under the 2001 Roadless Rule but receive less protection under the Idaho Roadless Rule. For example, Craig Gehrke, the Regional Director of plaintiff Wilderness Society, states in his affidavit that "[m]any of the Idaho roadless areas that I have personally hiked and professionally defended are allocated to management themes under the [Idaho Roadless Rule] that do not provide the same level of protection as the 2001 Roadless Rule." *See Gehrke Affidavit (Dkt. 67-3)* at ¶ 5. Gehrke goes on to name specific roadless areas as examples and discusses in detail the ways the new rule will affect his recreational and esthetic enjoyment of those areas. He expresses more than a "vague desire to return to the area," *Wilderness Society*, 622 F.3d at 1256, by alleging that "[i]t is my plan to return to these roadless areas every spring and every fall for as long as I am physically able." *See Gehrke Affidavit, supra,* at 7. These affidavits clearly satisfy the requirement of a "geographic nexus between the individual asserting the claim and the location suffering an environmental impact." *Western Watersheds Project v Kraayenbrink*, 620 F.3d 1187 (9th Cir. 2010).[1]

The Forest Service argues, however, that this alleged injury is not imminent

---

[1] The Court also finds that the other requirements for associational standing are present: The interests at stake are pertinent to the interests of plaintiffs, and there is no indication that resolving this case would require or even be aided by the participation of the plaintiff organizations' individual members. *Western Watersheds*, 620 F.3d at 1199. Moreover, the plaintiffs' claims under NEPA, the ESA, and the Wyoming Wilderness Act fall within the statutes' respective zones of interest. *Id.*

because the Idaho Roadless Rule is a programmatic rule that does not authorize the building of any roads or the logging of any trees. The Ninth Circuit rejected a similar argument in *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1516 (9th Cir. 1992):

> [I]f the agency action only could be challenged at the site-specific development stage, the underlying programmatic authorization would forever escape review. To the extent that the plan pre-determines the future, it represents a concrete injury that plaintiffs must, at some point, have standing to challenge. That point is now, or it is never.

More recently, the Circuit again rejected a similar argument in *Kraayenbrink*. There, the plaintiff challenged the BLM's adoption of nationwide grazing regulations that, among other things, lowered the standards, and lessened the consequences, for grazing violations. The plaintiff's lawsuit challenged those regulations on their face, not as applied to any specific grazing allotment. The Circuit had to determine – as this Court does – whether plaintiffs were allowed to challenge an agency's programmatic rule before it was actually applied in a specific case.

In resolving this issue, *Kraayenbrink* labeled it as one of ripeness, and examined (1) the fitness of the issue for judicial decision, and (2) the hardship to the parties of withholding court consideration. *Id.* at 1199. The Circuit found that the action "would not interfere with further administrative action because [the new nationwide regulations and supporting environmental impact statement] are final." *Id.* Moreover, the Circuit found that the plaintiffs were "taking advantage of what may be their only opportunity to challenge the agency regulations on a nationwide programmatic basis" and that programmatic challenge "can never get riper." *Id.*

The same analysis applies here. The Idaho Roadless Rule is final, and this lawsuit would not interfere with further administrative action. Moreover, this is the only opportunity for plaintiffs to challenge the programmatic rule and that challenge can not become riper.

Thus, whether the requirement of imminence is labeled as one of standing or ripeness, the plaintiffs satisfy the standard.

**Endangered Species Act**

The Idaho Roadless Rule authorizes roads and logging in IRAs that contain habitat for the grizzly bear and the caribou, two species listed under the ESA. In conjunction with its Section 7 consultation with the Forest Service, the FWS discussed the effect of the Rule on both species in a Biological Opinion.

With regard to the caribou, the FWS noted that the entire global population of mountain caribou numbers 46 animals living in British Columbia, and northern Washington and Idaho. *See FWS Biological Opinion* at 75. In Idaho, caribou are found in areas within the Idaho Panhandle National Forest (IPNF). Their survival depends on their ability to spread out over large areas of suitable habitat to avoid predators. *Id.* at 78. The primary threat to their habitat is the "ongoing loss and fragmentation of contiguous old-growth forests due to timber harvesting and wildfires." *Id.*

The FWS concluded that the more permissive rules for some IRAs in the new Rule could adversely affect caribou habitat. The FWS noted that there are 4,545 acres of caribou habitat that are potentially subject to "the most permissive GFRG management

theme," and an additional 58,507 acres of caribou habitat in the BCR IRAs. *Id.* at 107.

While recognizing that this "is a relatively small percentage [6.6%] of the overall Selkirk

recovery area," the FWS concluded that "the existing level of habitat fragmentation

throughout the recovery area makes even small increases in habitat fragmentation a

significant adverse effect on the caribou." *Id.* Explaining that conclusion, the FWS

stated that even

> limited construction of temporary roads in caribou habitat could subject
> caribou to increased levels of human activities, adversely affecting caribou
> where they are displaced from important habitats. Such temporary roads may
> also remove vegetation and fragment forested landscapes in the short-term.
> Although temporary roads could be decommissioned, the effect of constructing
> a road through caribou habitat may have long lasting effects.

*Id.* at 104. Focusing just on the GFRG IRAs, the FWS found that the potential

modification of those lands "given the existing degree of habitat fragmentation within the

Selkirk recovery area and the consideration of habitat fragmentation as a primary threat to

caribou, could result in significant adverse effects to the caribou." *Id.* at 106.

In these areas where road and logging restrictions are eased, the Rule relies on the

protections afforded wildlife in the National Forests' Long Range Management Plans

(LRMPs). With regard to the IPNF – where caribou are found – the FWS found that

"certain caribou relevant LRMP components are outdated . . . ." *Id.* at 79. Nevertheless,

the FWS concluded that the IPNF's management activities, and future commitments,

protected the caribou. For example, although the LRMP does not explicitly restrict

removing old growth stands, the FWS noted that "the IPNF does not conduct timber

harvest that removes allocated old growth stands." *Id*. at 99. The IPNF has identified and allocated old growth stands and their "intent is to maintain and manage old growth stands that are suitable caribou habitat within the caribou recovery area." *Id*. at 100. The FWS also found that since 2001, the IPNF "has not proposed any vegetation management projects that were likely to adversely affect the caribou." *Id.* The FWS also found important that "the IPNF affirmed in a September 18, 2008, letter to the [FWS] that individual project-level planning and analysis considers the best available science, providing a mechanism through which updated and emerging information on caribou habitat needs can be used." *Id.* The IPNF added in that letter that in considering the best science on caribou habitat needs, it was relying on the studies of researchers T.A. Kinley and C.D. Apps. *Id.* The same researchers were found reliable by the FWS as it cited to them numerous times in the Biological Opinion. *See Biological Opinion* at 81, 88, 91, 92 & 95. The FWS's ultimate conclusion with regard to caribou habitat is as follows:

> Based on considering the applicable LRMP components, the prohibitions and permissions associated with the [Idaho Roadless Rule], the IPNF's record since 2001 of designing vegetation management projects that are not likely to adversely affect the caribou, and their stated intent to continue to use the best available science, in consultation with the Service, to maintain and manage caribou habitat, the Service has determined that vegetation management projects proposed within caribou habitat pursuant to the proposed action are likely to be designed in a manner that maintains or improves the habitat to meet caribou needs.

*Id*. at 107-08.

The FWS also studied the Rule's impact on the grizzly bear, a listed species under the ESA. A population of about 40 threatened bears remains in the Cabinet-Yaak region

(referred to as the Cabinet-Yaak Recovery Zone or CYRZ) of northeast Idaho and northwest Montana, with another 46 bears living in the Selkirk region (referred to as the Selkirk Recovery Zone or SRZ). *Id.* at 117. Grizzly bear core habitat comprises about 47% of the SRZ and 55% of the CYRZ. *Id.* at 144. Core habitat is defined as areas greater than or equal to 0.31 miles from any road. *Id.* Given the current habitat conditions, the FWS has concluded that "there can be no degradation of the existing habitat conditions within these recovery zones, which includes losses of core habitat." *Id.*

The FWS found that the Rule "would allow the construction of roads within grizzly bear core habitat . . . in the SRZ and CYRZ, which would potentially have serious ramifications on the stability and recovery of the grizzly bear populations within these ecosystems." *Id.* at 145. The FWS observed that the two Rule themes "under which grizzly bear core habitat could be impacted within the SRZ and CYRZ are the BCR and GFRG themes, as road construction and reconstruction are allowed under these two themes." *Id.* The BCR theme exists in less than 1% of grizzly bear core habitat in the SRZ and approximately 1% of core habitat in the CYRZ. *Id.* The GFRG theme exists in 2% of core habitat in the SRZ and less than 1% of core habitat in the CYRZ. *Id.*

The Forest Service Supervisor of the IPNF recognized these potential threats to grizzly bear habitat in a letter she wrote to the FWS just a month before the FWS's Biological Opinion was filed: "Although there are no foreseeable projects that could result in increased risk of mortality to grizzly bears, the programmatic nature of the Idaho Roadless Rule decision allows for such projects." *See Appendix C to Biological Opinion*.

To counter that risk, the Supervisor explained, the IPNF was in the process of amending its LRMP to add an Access Amendment to "establish standards and guidelines which will apply to all future site-specific decisions regarding wheeled, motorized use and contribute to the conservation and recovery of the species within these National Forests [IPNF & Kootenai National Forests]." *Id.* The Access Amendment was designed "to provide a strategy to minimize the effects to grizzly bears resulting from motorized access into grizzly bear habitat on National Forest lands in the Selkirk and Cabinet-Yaak ecosystems." *Id.* The FWS found that "[t]he Access Amendment will establish standards and guidelines pertaining to wheeled, motorized use within areas occupied by grizzly bears within these ecosystems." *Id.* A Record of Decision (ROD) for the Access Amendment was anticipated by the FWS in 2009. *Id.*

To provide "additional assurance" to the FWS, the IPNF Supervisor agreed "to defer decisions that would have a 'likely to adversely affect' determination, except when the project is designed to provide long-term benefits to grizzly bears, until the Record of Decision for the Access Amendment is signed." *Id.* She noted that "[t]his commitment pertains to road construction, reconstruction, or timber cutting, sale or removal activities in Idaho Roadless Areas that are in core habitat within grizzly bear management units." *Id.*

The FWS interpreted the assurances to mean that "projects allowed pursuant to the [Roadless Rule] will not involve the construction or reconstruction of temporary or permanent roads within grizzly bear core habitat within the SRZ or CYRZ unless the

project is designed to provide long-term benefits to grizzly bears until such time as the ROD for the Access Amendment is signed." *Biological Opinion* at p. 146. The FWS found these assurances were "central to our effects analysis and biological conclusions." *Id.*

Relying on those assurances, the FWS assumed that (1) no road construction will occur in grizzly bear core habitat until the Access Amendment ROD is signed, and (2) the Access Amendment's effects on the grizzly bear would be reviewed during the consultation required by Section 7 of the ESA before the Access Amendment ROD was signed. *Id.* (stating that "[t]he potential road related effects that may occur to grizzly bears under the [Roadless Rule] will be fully evaluated within the analysis conducted with the Forest Service for the consultation on the Access Amendment").

On September 30, 2008, the FWS issued its Biological Opinion concluding that the new Rule was not likely to jeopardize any threatened or endangered species, including the woodland caribou and grizzly bear. About two weeks later, the Forest Service promulgated the final Idaho Roadless Rule. *73 Fed. Reg. at 61,456.*

The FWS's Biological Opinion showed that the caribou and grizzly bear populations are small and fragile, and the adverse effects of more permissive rules for IRAs in the GFRG and BCR areas could be "serious" for the grizzly bear and "significant" for the caribou. *Id.* at 145, 106. In both cases, the FWS discounted the potential for adverse effects in large part due to the Forest Service's commitment of future protection. Plaintiffs argue that the FWS cannot rely on such commitments.

Section 7(a)(2) of the ESA prohibits agency action that is "likely to jeopardize the continued existence" of any endangered or threatened species or "result in the destruction or adverse modification" of its critical habitat. *See* 16 U.S.C. § 1536(a)(2). To "jeopardize the continued existence of" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." *See* 50 C.F.R. § 402.02 (emphasis added). Indirect effects are defined as "those that are caused by the proposed action and are later in time, *but still are reasonably certain to occur.*" *Id.* (emphasis added).

Given that the Idaho Roadless Rule does not approve the building of any particular road, but makes it easier to build roads in some areas in the future, the Rule does not have a "direct impact" but could have an "indirect impact" if the future road building was "reasonably certain to occur." *Id.* In determining whether the road building is reasonably certain to occur, the FWS has a responsibility to "[r]eview all relevant information provided by the Federal agency . . . ." *See* 50 C.F.R. § 402.14(g)(1). A Forest Supervisor's written commitments to protect a listed species falls within the broad category of "relevant information" that the FWS may consider.

While the FWS properly *considered* the letters, the question remains whether it properly *relied* on the letters to find that harmful road building was not reasonably certain to occur. Here, there is no evidence casting doubt on the IPNF Forest Supervisor's commitments. Indeed, the FWS cited specific actions taken by the IPNF consistent with

its commitment to preserve the habitat for the grizzly and caribou.  *Id.* at 107-08; 146.

Plaintiffs argue, however, that the FWS cannot rely on promises to protect a listed species and cite in support *National Wildlife Federation v. National Marine Fisheries Service*, 524 F.3d 917 (9th Cir. 2008).  There, plaintiffs challenged a Biological Opinion prepared by the National Marine Fisheries Service (NMFS) that concluded that dams on the Columbia River did not jeopardize listed salmon.  In that Biological Opinion, NMFS found that the dams' operations "would have significant negative impacts on each affected species' critical habitat . . . ."  *Id.* at 935.  Nevertheless, NMFS found that conditions would improve, relying on the agency's promise to install certain structural improvements to the dams.  *Id.*

The Circuit found this reliance improper, holding that because the proposed action would cause "immediate negative effects" on a listed species, NMFS could rely only on promises of future action that were "specific and binding."  *Id.*  The promises to install the dam improvements did not meet this standard because, although sincere, they were "general" in nature and not a "solid guarantee."  *Id.* at 935-36.

The "immediate negative effects" on a listed species present in *National Wildlife* do not exist in the present case, however.  Thus, there is no compelling reason here – as there was in that case – to require promises to be "binding" or "guaranteed."

Under the circumstances of this case, the law requires the FWS to determine whether future road building that will harm listed species is "reasonably certain to occur."  *See* 50 C.F.R. § 402.02.  Here, the FWS relied on Forest Service commitments to conclude

that the road building was not reasonably certain to occur.  In reviewing this decision, the

Court's role is merely to ensure the agency has not: (1) "relied on factors which Congress

has not intended it to consider," (2) "entirely failed to consider an important aspect of the

problem," or (3) "offered an explanation for its decision that runs counter to the evidence

before the agency or an explanation that is so implausible that it could not be ascribed to a

difference in view or the product of agency expertise." *Lands Council v. McNair*, 2010

WL 5300804 (9th Cir. December 28, 2010).

With regard to the first point, the FWS properly considered the IPNF Forest

Supervisor's letters under its broad authority to "[r]eview all relevant information provided

by the Federal agency . . . ." *See* 50 C.F.R. § 402.14(g)(1).  With regard to the second

point, the FWS did not ignore evidence casting doubt on the Supervisor's commitments –

there was no such evidence.  With regard to the third point, the Court can find no evidence

suggesting that the FWS's reliance on the letters was based on some implausible rationale.

For example, in the IPNF letter regarding the caribou, the IPNF not only expressed its

intent to follow the best science but also identified the best science as represented by two

researchers whose studies were also relied upon by the FWS in its Biological Opinion, as

discussed above.  Moreover, the FWS relied on the IPNF's commitment to maintain old

growth habitat for the caribou because the IPNF had a record over the past decade of

protecting that same habitat.  Under these circumstances, the Court cannot find that the

FWS acted arbitrarily in relying on the IPNF commitments with regard to the caribou.[2]

A similar analysis applies to the FWS's decision regarding the grizzly bear. The FWS relied on the IPNF's commitment that (1) no road construction will occur in grizzly bear core habitat until the Access Amendment ROD is signed, and (2) the Access Amendment's effects on the grizzly bear would be reviewed during the consultation required by Section 7 of the ESA before the Access Amendment ROD was signed. Once again, there is nothing in the record to cast doubt on these commitments. The Access Amendment was not some vague aspiration but a detailed proposal, amending the LRMP's of both the IPNF and the Kootenai National Forest (KNF). At the time the FWS was preparing its Biological Opinion, the proposed Amendment was proceeding through the administrative process. After reviewing the proposed Amendment, the FWS concluded that it "will contribute to the conservation and recovery of grizzly bears within the Selkirk and Cabinet-Yaak ecosystems." *BO* at p. 145.

While plaintiffs argue that the KNF never provided a commitment letter similar to that received by the IPNF, the Court finds that the FWS reasonably concluded that the commitments applied to both National Forests. First, the IPNF letter stated that it was designed to clarify the "baseline for grizzly bear management" not only in the IPNF but also in the KNF. *AR-FWS at 310.* While the KNF Supervisor did not sign that letter, he

---

[2] The plaintiffs argue that the FWS never had a commitment from the KNF similar to that of the IPNF. It appears from the briefing and argument that the plaintiffs confine this argument to the grizzly bear, and are not applying it to the caribou, apparently because the caribou has not been found in the KNF.

had provided an earlier letter to the FWS that made the same commitments. In a letter dated February 26, 2007, the KNF Supervisor committed to conduct "no ground disturbing activities from Forest Service initiated projects . . . in grizzly bear habitat that would be likely to adversely affect grizzly bears, including habitat modification." *AR-FS at 7219*. In addition, the KNF committed to "conduct consultation with the FWS prior to signing the new access amendment ROD." *Id*. Moreover, the Access Amendment applied to both the IPNF and the KNF. Thus, the FWS was reasonable in assuming that the commitments made in the IPNF letter applied with equal force to the KNF.

Plaintiffs argue, however, that these commitments did not include the grizzly bears in the Pack River Area (PRA) of the IPNF. The PRA is overlapped by the BCR theme, which allows road building. The FWS, recognizing that the IPNF letter did not specifically cover the PRA grizzly bears, nevertheless assumed that the IPNF's commitments to avoid adverse effects to grizzly bears "would extend" to actions proposed in the PRA. *BO at 147*. There is nothing in the record demonstrating that assumption to be arbitrary. The IPNF has made a firm commitment to protect the grizzly bear in other areas, and it is reasonable to assume they would follow the same course in the PRA. Moreover, the FWS identified protective measures that could be taken if road building occurred in the PRA, including closing or restricting "other existing roads within the PRA." *Id*. This measure, the FWS concluded would, given the low numbers of grizzly bears in the area, "provide secure areas for grizzly bears to be displaced to and utilize." *Id*. Plaintiffs point to nothing in the record challenging this conclusion.

**Memorandum Decision - 20**

Accordingly, the Court finds that the Forest Service did not act in an arbitrary or capricious manner with regard to the Pack River Area grizzly bears.

**Estimates of Timber Harvest and Road Construction**

Plaintiffs argue that the Forest Service relied on an inaccurate assumption in estimating the impact of the Idaho Roadless Rule on logging and road building. Specifically, they argue that the Forest Service assumed that the amount of logging and road building under the more lenient rules of the BCR and GFRG themes of the Idaho Roadless Rule would not increase much over the levels experienced under the more restrictive 2001 Roadless Rule. This assumption, plaintiffs assert, is irrational because the new rules were designed to allow more logging and road building.

NEPA required the Forest Service to take a "hard look"at the environmental impacts of the Idaho Roadless Rule. *Native Ecosystems Council v. U.S. Forest Service, 418 F.3d 953 (9th Cir. 2005)*. That "hard look" standard is not satisfied when an agency relies "on incorrect assumptions or data in an EIS." *Id.* at 964. At the same time, the Court must defer to an agency's determination in an area involving a "high level of technical expertise." *Selkirk Conservation Alliance v. Forsgren, 336 F.3d 944, 954 (9th Cir.2003)*.

In this case, the Forest Service estimated the Rule's impact by relying on data and projections it obtained from each National Forest. This information included (1) logging and road projects since the 2001 Roadless Rule, and (2) "any foreseeable future projects [over the next 15 years] and the likelihood of their implementation based on budget." *See*

*FEIS* at 95.  An interdisciplinary team of experts examined that data and developed

projections for future logging and road building "based on trends from the Existing Plans

[provided by the National Forests] and from the 2001 Roadless Rule, and considering the

Agency's flat budget trend and high interest in responding to fire risk."  *Id.*  After

reviewing the report of the interdisciplinary team, the Forest Service concluded that road

building

> would likely not see an increase in the foreseeable future (next 15 years)
> because the appropriated budget is flat or declining and there is no indication
> the trend will change.  In addition, there is a backlog of road maintenance;
> therefore, there is no emphasis on constructing new roads that need to be
> maintained.  If roads are constructed they are likely to be temporary.

*Id*. at p. 96.  Consistent with that conclusion, the Forest Service projected over the next 15

years there would be no increase in permanent roads over the 2001 Roadless Rule but an

increase in temporary roads from 3 miles to 21 miles.  *Id*. at p. 97.

This record shows that the Forest Service's projection of road building was based

not only on levels existing under the 2001 Roadless Rule but also on the realities of

budgets and the balancing of priorities.  While plaintiffs accurately point out that the Idaho

Roadless Rule allows more roads, they offer nothing to challenge the Forest Service's

assumption that its lean budget will be stretched thin just to cover maintenance of existing

roads, and will not allow the construction of any more permanent roads.  Moreover,

plaintiffs offer no evidence that the projection of an increase in temporary roads from 3

miles under the 2001 Roadless Rule to 21 miles under the Idaho Roadless Rule was

arbitrary or capricious.  The Forest Service's analysis is entitled to deference given the

expertise the agency has in matters of its own budget and how it affects project priorities. *Selkirk,* 336 F.3d at 954.

With regard to logging, there is no dispute that more logging is allowed under the Idaho Roadless Rule in the BCR and GFRG themes than under the 2001 Roadless Rule. Nevertheless, the Forest Service assumed that logging would only rise a modest amount, from 3 million board feet under the 2001 Roadless Rule to 5.04 million board feet under the Idaho Roadless Rule. *Id*. at p. 96, Table 3-2.

There is language in the BCR and GFRG themes that could, if read expansively, support more than a modest increase in logging. The Forest Service, however, elected to read that language restrictively rather than expansively: "Under the final rule, the vast majority of the BCR acres will be managed comparable to the 2001 Roadless Rule with a small amount of additional timber cutting and temporary road construction to allow fuel treatments to better protect vital community interests." *See 73 Fed.Reg. 61465 (October 16, 2008)*. That is precisely how the RACNAC and former Idaho Governor Risch intended that the language be read. *AR FS-590*.

The Forest Service's interpretation that the "vast majority" of BCR acres will be managed comparable to the 2001 Roadless Rule is supported by the language of the Rule. Within the BCR theme, 92% of the acres fall outside the category of Community Protection Zones (CPZs), and on these acres the Rule specifically states that temporary road construction "is expected to be infrequent." *See 36 C.F.R. § 294.23(b)(3)*. The Forest Service did not interpret this language in a vacuum but did so in light of its own

operational realities, including its limited budget: "Infrequent use of this provision, with its conditions, is anticipated due to resource conditions, agency budgets, and regional forester approval and oversight." *See 73 Fed. Reg. 61460 (October 16, 2008).*

An agency's construction of its own regulations is entitled to substantial deference. *Martin v. Occupational Safety & Health Review Com'n, 499 U.S. 144, 150 (1991).* In situations in which "the meaning of [regulatory] language is not free from doubt," the reviewing court should give effect to the agency's interpretation so long as it "sensibly conforms to the purpose and wording of the regulations." *Id.* The Forest Service's restrictive interpretation of the Rule "conforms to the purpose" of the Rule, as that purpose was expressed by both the RACNAC and then-Governor Risch, as explained above. *AR-FS 590.* Moreover, the application of the Rule to future situations is never precise and never "free from doubt," and the Forest Service's restrictive reading is reasonable. Finally, "applying an agency's regulation to complex or changing circumstances calls upon the agency's unique expertise and policymaking prerogatives," *Martin, 499 U.S. at 151,* and the Forest Service's decision here falls within its expertise and is entitled to deference. *Selkirk, 336 F.3d at 954.*

With regard to the GFRG theme, the plaintiffs assail the Forest Service's assumption that for the Boise, Payette, and Sawtooth National Forests, the logging in the more permissive GFRG theme would be similar to that under the more restrictive 2001 Roadless Rule. The Forest Service's assumptions are based on the data these Forests provided considering the "likelihood of their implementation based on budget," and the

assumption that "budgets would continue to be flat." *AR at 1151.* Once again, the Forest Service's predictions here are within their area of expertise and entitled to deference.

**Phosphate Mining Provision**

As discussed above, the Idaho Roadless Rule opened over 5,000 acres of roadless areas to road construction for phosphate mining that was prohibited under the 2001 Roadless Rule. The areas opened to roads – under the GFRG theme – are located in 5,770 acres of "known phosphate lease areas" (KPLAs) in the Caribou-Targhee National Forest. The previous ban on roads in this area by the 2001 Roadless Rule effectively precluded phosphate mining there. *See FEIS* at 171. The plaintiffs argue that the Forest Service violated NEPA by failing to conduct a site-specific analysis of potential future phosphate mining operations in this area.

NEPA requires that the evaluation of a project's environmental consequences take place at an early stage in the project's planning process. *Friends of Yosemite Valley v. Norton, 348 F.3d 789 (9th Cir. 2003).* That requirement, however, is tempered by (1) "the statutory command that [a reviewing court] focus upon a proposal's parameters as the agency defines them," and (2) "the preference to defer detailed analysis until a concrete development proposal crystallizes the dimensions of a project's probable environmental consequences." *Id.* at 800 (quoting *California v. Block, 690 F.2d 753, 761 (9th Cir. 1982)*). To accommodate these concerns, NEPA requires a full evaluation of site-specific impacts only when a "critical decision" has been made to act on site development, *i.e.*, when "the agency proposes to make an irreversible and irretrievable commitment of the

availability of resources to a project at a particular site." *Id.*

Here, the Forest Service has not made an irreversible and irretrievable commitment to build roads in this area. Once a site-specific project is presented to the Forest Service for approval, the agency retains full discretion to turn down the project. The plaintiffs cite certain regulations under the Rule that, they assert, constrain the Forest Service's ability to ban site-specific projects in the future. *See 36 C.F.R. §§ 294.25(e)(1); 294.28(d) & (e).* However, these regulations only provide that the Idaho Roadless Rule cannot be modified by either (1) decisions made on site-specific projects or (2) revisions to National Forest LRMPs. In other words, an LRMP could not reallocate acreage from the GFRG theme to another theme, as one example. These regulations do not constrain or prevent the Forest Service from denying a site-specific road project in this area. Indeed, the ROD states that "[a]llocation to a specific theme does not mandate or direct the Forest Service to propose or implement any action." *73 Fed. Reg. at 61463.*

These circumstances distinguish this case from *California v. Block*, 690 F.2d 733 (9th Cir. 1982), the case plaintiffs rely upon. There, the Forest Service was found to have made an irreversible commitment of resources because its discretion was constrained by a regulation that "explicitly mandated" certain action. *Id.* at 762. There is no similar mandatory requirement in the Idaho Roadless Rule that would prevent the Forest Service from rejecting a site-specific road proposal in this area.

The plaintiffs argue, however, that the Forest Service FEIS should have contained a much more detailed analysis of mitigation measures, particularly methods to prevent toxic

selenium from getting into the ground water. On this issue, the FEIS concluded that over the next 15 years, the only proposal for mining phosphate in a roadless area would be the expansion of the Smoky Canyon Mine. *See FEIS* at p. 168. That expansion was studied in a site-specific EIS, concluding that mitigation measures would contain selenium contamination and ensure that the mine expansion would not degrade water quality standards. *Id.* at p. 169. The Smoky Canyon Mine EIS – and the decision to proceed with the mine expansion – was recently upheld by the Ninth Circuit in *Greater Yellowstone Coalition v. Lewis*, 2010 WL 5191370 (9th Cir. December 23, 2010). The Circuit held that the agencies had taken the requisite hard look at selenium pollution and other issues as required by NEPA.

Further studies would be speculative and unnecessary. The site-specific NEPA analysis for the single known project has been done, and for any future projects will be done at the time the proposal is made. *Northern Alaska Environmental Center v. Lujan, 961 F.2d 886 (9th Cir. 1992)* (holding that programmatic EIS did not violate NEPA and that mitigation measures could be better studied in the light of a site-specific proposal). For these reasons, the Court finds the discussion of phosphate mining passes muster under NEPA.

**Winegar Hole Roadless Area**

Plaintiffs claim that the Forest Service arbitrarily relied on the Wyoming Wilderness Act to open Idaho's Winegar Hole Roadless Area to logging. The Winegar Hole Roadless Area (WHRA) consists of 3,800 acres located in the Targhee National

Forest abutting Yellowstone National Park. The Idaho Roadless Rule assigns 2,600 acres of the WHRA to the Primitive theme, which authorizes logging. *See* *36 C.F.R. § 294.24(b)*. The FEIS states that the Idaho Roadless Rule "would place these acres into a Primitive theme because the Congress has already enacted wilderness legislation for the surrounding area and declined to incorporate these 2,600 acres into wilderness." *See FEIS* at 71.

However, there is nothing in the Wyoming Wilderness Act showing that Congress "declined" to incorporate the Idaho acres into wilderness. The Court is not sure what the agency meant by this statement, but there are other reasons in the record explaining the agency's action. Even when an agency explains its decision "with less than ideal clarity," courts will not upset the decision on that account "if the agency's path may reasonably be discerned." *Alaska*, 540 U.S. at 497 (2004). Here, the record reveals that the State of Idaho wanted to assign Winegar Hole to the Primitive theme, *AR 73 at 33,* and that the Forest Service "coordinated with the State of Wyoming on the Winegar Hole Roadless Area" *AR* *FS 860* *at R-65.* In addition, as the Forest Service points out in its briefing, the agency received no objections during the public comment period to assigning Winegar Hole to the Primitive theme.

The agency's statement about the Wyoming Wilderness Act may fall short of "ideal clarity" but the agency's path may "reasonably be discerned" from the record. *Alaska*, 540 U.S. at 497 (2004). The record reveals that the Forest Service did not arbitrarily or capriciously assign the Winegar Hole area to the Primitive theme.

## Conclusion

The Court finds the FWS did not violate the ESA in preparing the Biological Opinion. The Court also finds that the Forest Service did not violate NEPA in relying on the Biological Opinion or in preparing the FEIS and ROD approving the Idaho Roadless Rule. For these reasons, the Court will grant the defendants' motions for summary judgment and deny plaintiffs' motion for summary judgment. The Court will issue a separate Judgment as required by Rule 58(a).

DATED:  **January 29, 2011**



Honorable B. Lynn Winmill
Chief U. S. District Judge